1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

10
11

BARBARA STROUGO, individually and on behalf of all others similarly situated,

Plaintiff,

12

13

-against-

14
15
16
17

REALNETWORKS, INC., ROBERT GLASER, BRUCE A. JAFFE, CHRIS JONES, DAWN G. LEPORE, ERIC PRUSCH, MICHAEL B. SLADE, and TIM WAN,

Defendants.

18
19

No.  **2:24-cv-00297**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1. **VIOLATIONS OF SECTION 14(A) OF THE SECURIIES EXCHANGE ACT OF 1934**

2. **VIOLATIONS OF SECTION 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

20
21
22
23
24
25

Plaintiff Barbara Strougo ("Plaintiff"), by her attorneys, alleges upon information and belief (based, in part, upon the investigation conducted by and through her undersigned counsel), except with respect to her ownership of RealNetworks, Inc. ("RealNetworks" or the "Company") common stock, and her suitability to serve as class representative, which is alleged upon personal knowledge, as follows:

26

CLASS ACTION COMPLAINT - 1

**NATURE OF THE ACTION**

1.      This is a shareholder class action brought by Plaintiff on behalf of the former minority shareholders of RealNetworks against RealNetworks and the former members of its Board of Directors (the "Board"),[1] including Robert Glaser ("Glaser"), the Company's Founder, Chairman, Chief Executive Officer and largest shareholder, for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(e) and § 78t(a).   Plaintiff's claims arise in connection with the acquisition of the Company (the "Transaction") by Glaser and Glaser's investment entities Greater Heights LLC ("Parent") and Greater Heights Acquisition LLC ("Merger Sub" and, together with Glaser and Parent, the "Glaser Parties").

2.      On July 28, 2022, the Company announced it had signed a definitive agreement ("Merger Agreement") agreeing to sell the Company to Glaser for $0.73 per share for each share of Company stock that Glaser did not already own (the "Merger Consideration").   At the time, the Company had over 47 million shares of common stock issued and outstanding and Glaser owned approximately 39% of the outstanding shares of RealNetworks's stock.   The Transaction closed on December 21, 2022.

3.      The Merger Agreement was the culmination of a campaign by Glaser to drive down the Company's stock price and internal forecasts, thereby allowing him to acquire the entire Company on the cheap.   Indeed, the Transaction is the product of an unfair, manipulated process that was timed and designed to depress the Company's stock price to artificial, all-time low levels

---

[1] The Board at all relevant times consisted of the following defendants: Robert Glaser, Bruce A. Jaffe ("Jaffe"), Chris Jones ("Jones"), Dawn G. Lepore ("Lepore"), Erik Prusch ("Prusch"), Michael B. Slade ("Slade"), and Tim Wan ("Wan").

CLASS ACTION COMPLAINT - 2

at which the Company's stock had never traded in its over 25 years as a public company (other than briefly at the outset of the COVID-19 pandemic in March 2020). The closing of the Transaction was conditioned on approval by a shareholder vote, and defendants secured shareholder approval via a materially false and misleading proxy statement.

4.      RealNetworks is a technology Company that was instrumental in creating the streaming media category in the mid-1990s and is involved in numerous lines of technology-related business today. In recent years, the Company has increasingly focused on developing artificial intelligence ("AI")-based products and services such as its Secure Accurate Facial Recognition ("SAFR") computer vision platform and its "Kontxt" natural language processing-based message classification and analysis product.

5.      The sales process that culminated in the Merger Agreement began on November 9, 2021, when Glaser informed the Board that he was considering making a proposal to acquire all of the Company shares not owned by him or his affiliates. Glaser made this offer based on inside information that the Company, which had struggled in recent years, was on the brink of enjoying monumental success. By seeking to take the Company private, Glaser could unfairly keep the Company's future profits for himself and deprive the Company's longtime public shareholders of their share of the Company's future gains.

6.      Although the Company has struggled in recent years, the Company's own internal forecasts show that it is on the brink of success. Indeed, from 2012 to 2021 the Company's reported revenue had a compound annual growth rate ("CAGR") of -15.3%; from 2017 to 2021 the Company's CAGR improved slightly to a CAGR of -7.3%; and, based on a March 2022 presentation to the Board, ███████████████████████████████████████

CLASS ACTION COMPLAINT - 3

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

7. Similarly, between 2012 and 2021 adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") (including approximately $25 million per year in R&D) ranged between -$7 million to -$56.6 million. ████████████████████████ ██████████████████████████████████████████████████████████████████████████ ███████████████████   ████████████████████████████████████████████████ ██████████████████████

8. Due to his unique position and his control of the Company, its management and Board, Glaser had particular knowledge regarding the status and value of the Company's latest growth initiatives, including SAFR and Kontxt, which began development over four years ago and *cost over $50 million to bring to fruition*. With the Company on the cusp of achieving success following these transformative investments, Glaser used the Transaction to acquire the entire Company for himself at a bargain price.

9. In advance of seeking shareholder approval of the Transaction, ████████ ████████████████████████████████████████████████████ In recent years, the Company has been reliant on Glaser to ensure its short-term needs for cash are met. Indeed, despite the Company's representation to its shareholders in November 2021 that "2021 is a year of investment that will position the Company for double-digit revenue growth beginning in 2022," ████████████ ████████████████████████████████████████████████████████████████████████████ and continue on its transformation to a successful AI company, which had been the operations focal point since the Company commenced development of its growth initiatives in 2018.

10. Glaser's scheme was assisted by his crony, defendant Jaffe, the Board's purportedly "Lead Independent Director" who was also appointed to a two-person Special

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Committee (together with defendant Prusch) in charge of negotiating and vetting the Transaction on behalf of the Company's shareholders. Jaffe and Prusch designated Jaffe as the chair of this Special Committee.

11.     Jaffe was unable to fulfil his obligation to negotiate the Transaction with Glaser independently and at arms'-length.  As detailed below, Jaffe was controlled by Glaser and was not *independent*. Among other examples, Glaser (i) facilitated Jaffe's appointment as a director of the Company; (ii) provided Jaffe with lucrative chair roles on Board committees and as Lead Independent Director; (iii) appointed Jaffe as chair of the Corporate Development Committee (controlled by Glaser, and composed of Jaffe, Glaser and the Company's Chief Financial Officer ("CFO"), of which Jaffe is the only compensated member and is paid over 2.5 times the cash paid to non-executive directors of RealNetworks); (iv) appointed Jaffe as the RealNetworks-designated director of Rhapsody (in which Glaser invested directly); and (v) a few weeks after the Special Committee and Board approved the Merger Agreement, Glaser rewarded Jaffe for his loyalty by designating Jaffe as the RealNetworks-designated director of Scener, Inc. ("Scener"), a company in which Glaser is both an investor and director.

12.     Tellingly, although Jaffe was appointed as a director of Scener and granted RealNetworks options and restricted stock units ("RSUs") on August 19, 2022 (the "2022 Jaffe Award"), the appointment was not disclosed until the filing of a Definitive Proxy with the U.S. Securities and Exchange Commission ("SEC") on November 7, 2022, and, due to a purported "inadvertent administrative error," the Form 4 disclosing the award was not filed with the SEC until October 28, 2022, over two months late.  The 2022 Jaffe Award was also not reflected in the Company's 2022 preliminary proxy statements.  Moreover, while options and RSUs granted

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

under the Company's Outside Director Compensation program vest in equal installments over a 12-month period, the 2022 Jaffe Award vests in four, equal, monthly installments beginning August 2022 until fully vested in December 2022, thus ensuring full vestment of the Jaffe awards within a week of the vote on the Transaction.

13.     To add insult to injury, the Special Committee of the Board (entrusted to negotiate and vet the Transaction) retained a conflicted financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), to assist with the sales process.  As described below, Houlihan Lokey possessed significant conflicts of interest and failed to safeguard the interests of the Company's public shareholders.

14.     As a result of the tainted sale process, the Merger Consideration significantly undervalues the Company.  Among other things, the Merger Consideration ignores key assets such as the Company's over $336 million net operating loss ("NOL") carryforwards.  The Merger Consideration also undervalued the Company's interest in Scener (a majority owned subsidiary launched in late 2017) and the Company's latest growth initiatives, which cost approximately $25 million per year in research and development since 2017, and which consumed approximately 50% of the Company's gross profits over the same period.  Indeed, but for these investments, the Company's earnings could have been positive most, if not all, of the past 10 years.

15.     The Transaction also provided the added benefit of liquidity to the Board, as their otherwise illiquid holdings shed their restrictions as a result of the Transaction.  Additionally, certain Individual Defendants (defined below) became entitled to considerable severance and golden parachute payments in connection with the Transaction.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

16.     On November 7, 2022, in order to convince RealNetwork's stockholders to vote in favor of the unfair Transaction, Defendants authorized the filing of a materially false and/or misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

17.     Specifically, the Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process for the Company; (b) management's financial projections; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinion provided by Houlihan Lokey.

18.     Plaintiff seeks monetary damages on behalf of the unaffiliated stockholders who were cashed out of their RealNetworks shares as a result of the Transaction (the "Class") or, alternatively, rescission of the Transaction.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

20.     This Court has personal jurisdiction over each of the Defendants because each conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because (i) the conduct at issue took place and had an effect in this District; (ii) RealNetworks maintains its principle place of business in this

CLASS ACTION COMPLAINT - 7

District and the Individual Defendants either reside in this District or have extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically or otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **PARTIES**

22.     Plaintiff owned RealNetworks common stock at all relevant times up to the consummation of the Transaction. At the time of the close of the Transaction, Plaintiff held 10,000 shares of Company stock.

23.     Defendant RealNetworks, up until the consummation of the Transaction, was a Delaware corporation with its principal executive office located at 777 108th Avenue NE, Suite 200, Bellevue, Washington.  The Company's stock was listed on the New York Stock Exchange ("NYSE") under the symbol "RNWK" at all relevant times.

24.     Defendant Glaser, founder of RealNetworks, currently serves as RealNetworks's Chief Executive Officer.  He has served as Chairman of the Board since its inception in 1994 and served as Chief Executive Officer of RealNetworks from 1994 through January 2010, returning as interim chief executive officer ("CEO") in July of 2012 and becoming permanent CEO in July 2014. Glaser is also a member of the Board's Corporate Development Committee, together with Jaffe, as chair, and the Company's CFO.  Pursuant to the terms of an agreement entered into in September 1997 between RealNetworks and Glaser, RealNetworks has agreed to use its best efforts to nominate, elect and not remove Glaser from the Board so long as Glaser owns a specified number of shares of Company common stock.  In maintaining Mr. Glaser's position as Chairman,

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

the Board has recognized the value of leveraging Mr. Glaser's longtime leadership and knowledge of RealNetworks.  In appointing Mr. Glaser as Chief Executive Officer, among other things, the Board determined that Mr. Glaser is best positioned to effectively identify and execute on our strategic priorities.  Glaser's professional experience also includes ten years of employment with Microsoft Corporation where he focused on the development of new businesses related to the convergence of the computer, consumer electronics and media industries.  Glaser holds a B.A. and an M.A. in Economics and a B.S. in Computer Science from Yale University.

25.     Defendant Jaffe served as a Director of the Company since 2015 and as the Board's Lead Independent Director since October 31, 2019 through at least the consummation of the Transaction. Jaffe is a member and the chair of the Board's Compensation Committee and a member of the Nominating & Corporate Governance Committee. In addition, Jaffe serves as chair of the Board's Corporate Development Committee, serving with Glaser and RealNetworks's CFO. From June 1995 through February 2008, Jaffe held various positions at Microsoft Corporation, most recently serving as its Corporate Vice President, Corporate Development, where he managed M&A, investments, and strategic transactions.  As lead independent director, Mr. Jaffe is responsible for presiding over executive sessions of the independent directors, advising as to the quality, quantity and timeliness of the flow of information from management necessary for independent directors to effectively and responsibly perform their duties, coordinating the activities of the other independent directors, and acting as principal liaison between independent directors and management.

26.     Defendant Jones served as a director of RealNetworks from 2016 through at least the consummation of the Transaction.  Jones spent over 25 years at Microsoft Corporation in

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

leadership roles in product management and product development.  As Engineering Director for Microsoft, a position he has held from October 2015 to May 2018, he co-created Microsoft Healthcare NExT, an incubator that aims to accelerate healthcare innovation through artificial intelligence and cloud computing.  Previously, from February 2000 to October 2015, Jones served as a Corporate Vice President in various business divisions at Microsoft, including OneDrive & SharePoint, Windows Services, and Windows, where he led the engineering teams for several Microsoft products, such as OneDrive and OneDrive for Business, SharePoint Online and SharePoint Server, Outlook.com and other consumer services, and Windows XP. Jones joined Microsoft in August 1991.

27.     Defendant Lepore served as a director of RealNetworks from October 2013 through at least the consummation of the Transaction.

28.     Defendant Prusch served as a director of RealNetworks from December 2019 through at least the consummation of the Transaction.

29.     Defendant Slade served as a director of RealNetworks from November 2011 through at least the consummation of the Transaction.  From 2002 to May 2007, Slade served as a director of aQuantive, Inc., a publicly traded digital marketing service and technology company that was acquired by Microsoft Corporation in May 2007.  From 1983 to 1992, Slade held various executive and leadership positions with various technology companies including Microsoft Corporation.

30.     Defendant Wan served as a director of RealNetworks from December 2019 through at least the consummation of the Transaction.

31.     Defendants Glaser, Jaffe, Jones, Lepore, Prusch, Slade, and Wan are collectively

CLASS ACTION COMPLAINT - 10

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

referred to hereinafter as the "Individual Defendants" or the "Board."

32.      As directors of RealNetworks, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company.

33.      Defendant Parent is a Washington limited liability corporation and owned by Glaser.

34.      The Individual Defendants together with Defendant RealNetworks are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *COMPANY BACKGROUND*

35.      RealNetworks was founded in February 1994 by its chairman and CEO, Robert Glaser. The Company invented the streaming media category in 1995 and continues to build on its foundation of digital media expertise and innovation, creating a new generation of products and services to enhance and secure its customers' daily lives.

36.      In recent years, the Company has increasingly focused on developing AI-based products and services such as its SAFR computer vision platform and its KONTXT natural language processing-based message classification and analysis product.  RealNetworks provides its software and services to consumers, mobile carriers, device manufacturers, system integrators, and other businesses.

37.      Consumers use the Company's digital media products and services to store, organize, play, manage and enjoy their digital media content.  For over 25 years, RealNetworks has advanced the renowned RealPlayer, which has provided millions of people worldwide a powerful way to download, store, organize, and experience the rapidly expanding universe of

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

digital media content, regardless of format.

38.     The SAFR computer vision platform, one of the Company's two key investment initiatives, enables new applications for security, convenience, and analytics, and is optimized for live video. RealNetworks's consumer products feature GameHouse Original Stories, a unique IP portfolio of free-to-play mobile games.  Its consumer products also include ringback tones, licensed to mobile operators, and video compression and enhancement technology, which are primarily licensed to original equipment manufacturers, including manufacturers of mobile devices, smart TVs, and set-top boxes.  The Company's product line also includes KONTXT, an AI-based platform for categorizing Application to Person ("A2P") messages to help messaging aggregators and mobile carriers provide a better customer experience, strengthen customer loyalty, and drive new revenue through text message management, classification and anti-spam.

39.     The Company reports revenue and operating income (loss) in three segments: (1) Consumer Media, (2) Mobile Services, and (3) Games.

***Consumer Media***

40.     In the Consumer Media segment, revenue is primarily derived from the licensing a portfolio of video compression and enhancement technology, also known as codec technology. Codecs are an encoding and decoding technology designed to reduce the amount of bits required to stream or store media content, and modern codecs achieve significant savings in streaming bandwidth and storage costs.  The codec technologies business is primarily focused on the Chinese market, where the Company's RealMedia Variable Bitrate codec remains a prevalent, though declining, format.

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

41.     RealNetworks continues to develop and innovate its video compression and enhancement technology to meet user demands for increasing compression efficiency and visual quality.  Its codec technology is licensed to a variety of electronic equipment, microchip, and integrated circuit manufacturers who embed the codec in their products, including mobile devices, laptops, smart TVs and other devices.

42.     The Company also generates revenue through online sales to consumers of RealPlayer subscription products, including its SuperPass service, which provides consumers with access to digital entertainment content for a monthly fee.  The RealPlayer media player includes features and services that enable consumers to discover, play, download, manage and edit digital video, stream audio and video, download and save photos and videos from the web, transfer and share content on social networks, and edit their own photo and video content.  As part of the RealPlayer download process, the Company also offers distribution of third-party software products to consumers, which generates additional revenue.

### Mobile Services

43.     Mobile Services consists of the various products and services provided to mobile and other service providers.

44.     In recent years, the Company has increasingly focused on AI-based and machine learning products and services such as SAFR and KONTXT- the two main products and key investment initiatives in the Company's AI portfolio, which are both included in the Mobile Services segment.

45.     The Company's software as a service ("SaaS") offerings are its messaging products, which include the Metcalf intercarrier messaging service; KONTXT, a AI-based text

CLASS ACTION COMPLAINT - 13

message management, anti-spam, and classification product; and ringback tone service.  These services are provided to a large number of mobile carriers around the world, although a significant portion of revenue for this segment results from contracts with a few mobile carriers and one service partner. RealNetworks also offers business intelligence, subscriber management and billing for the carriers who make its offerings available to their customers.  Also included in this segment is the RealTimes platform.

46.     The Company's Metcalf intercarrier messaging platform enables operators to send and receive SMS messages worldwide between networks and service providers, regardless of network technology, typically processing *billions* of SMS messages per day between users on hundreds of different networks.  A portion of the revenue earned from the intercarrier messaging service is based on a revenue-sharing arrangement with one service partner.

47.     RealNetworks's next-generation AI-based mobile messaging platform, KONTXT, utilizes natural language processing-based ("NLP") message classification and evaluates message streams sent from an application to a person and classifies those messages into various categories allowing network operators and other service providers to create policies for prioritization and delivery of messages and blocking spam and fraudulent messages, resulting in more efficient text message delivery.

48.     RealNetworks's AI-based computer vision platform, SAFR, detects faces and other types of objects by leveraging the power of AI-based machine learning to enhance security and convenience for customers around the globe with fast, accurate, low-biased face recognition and additional person- and object-based AI capabilities.  The Company continues to invest in and build industry partnerships for SAFR, typically licensing it to technology partners, system

CLASS ACTION COMPLAINT - 14

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

integrators, third-party resellers, and directly to end customers. The Company's SAFR platform is a key investment initiative.

49.     Kontxt is based on AI NLP analysis, allowing RealNetworks's customers to analyze and classify multiple billions of messages monthly in real time in order to protect end consumers from spam and fraud.  The Company's focus on AI-based products and data science resources allows it to be agile, continuously evolving, and rapidly creating new solutions to solve customers' problems.

***Games***

50.     The Games segment is focused on the development, publishing, and distribution of casual games, which are offered via mobile devices, digital downloads, and subscription play. Casual games typically have simple graphics, rules and controls, are quick to learn, and often include time-management, board, card, puzzle, word and hidden-object games.

51.     Since 2019, RealNetworks's primary focus in its Games segment is free-to-play mobile games, most notably its Delicious Bed and Breakfast and Delicious World games.  These free-to-play games generate revenue from consumer purchases of in-game goods and from advertising displayed to consumers during play.  The mobile games are digitally distributed through third-party application storefronts, such as the Apple App Store and Google Play, and are principally offered in North America, Europe and Latin America.

52.     PC consumers can also access and play both Original Stories and hundreds of third-party games through individual purchases or a subscription service offered through the Company's GameHouse and Zylom websites, and through websites owned or managed by third parties.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

53.    The Company maintains patents in the U.S. and other jurisdictions relating to various aspects of its technology.  The Company's practice is to "regularly analyze [its] patent portfolio and prepare additional patent applications on current and anticipated features of [its] technology, or sell or abandon patents or applications that are no longer relevant or valuable to [its] operations." *See* RealNetworks's Form 10-K filed with the SEC on March 15, 2021 (the "2021 10K") at 7.

54.    In addition, over time, RealNetworks has assembled an international portfolio of trademarks and service marks that cover certain of its products and services. The Company also has applications pending for additional trademarks and service marks in jurisdictions around the world, and several unregistered trademarks.  Many of the marks begin with the word "Real" (such as RealPlayer).

55.    RealNetworks's ability to compete across its businesses depends on the superiority, uniqueness and value of the technology that it develops and licenses.  To protect its proprietary rights, RealNetworks relies on a combination of patent, trademark, copyright and trade secret laws, confidentiality agreements with employees and third parties, and protective contractual provisions.

### THE TRANSACTION WAS TAINTED BY UNDISCLOSED CONFLICTS

56.    According to the Proxy, on November 9, 2021, at a meeting of the Board (in advance of its annual shareholder meeting), Glaser "informed the Board that he was considering making a proposal to acquire all of the Company" shares not owned by him or his affiliates.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

57.     Contrary to the representations in the Proxy, however, ██████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████ *See* RN_Strougo_0000092-093.[2]

58.     In truth, the minutes indicate that ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████   *Id.*

59.     Moreover, the Proxy misrepresents ████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████   According to the Proxy, "*[i]n __response to__*

*Mr. Glaser's potential plans*, *the Board formed a special committee* of independent and

disinterested directors (the "Special Committee") to establish the process by which Mr. Glaser

could engage with management of the Company, and to allow the Board to evaluate any proposal

Mr. Glaser might make and negotiate the terms thereof.  The Board appointed Bruce Jaffe and

Erik Prusch to serve as the members of the Special Committee."

60.     Yet, the minutes and resolutions of the November 9 Board meeting ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[2] Citations herein to materials produced by RealNetworks to Plaintiff in response to Plaintiff's demand for books and records pursuant to Rev. Code Wash. § 23B.16.020) are in the format: "RN_Strougo_____."  Unless otherwise indicated all emphasis is added.

CLASS ACTION COMPLAINT - 17

██████████████████████████████████████████████████████████

█████████████, each of Bruce Jaffe and Erik Prus[c]h (each, a 'Committee Member'), is

hereby identified, as of the date of these resolutions, as an independent and disinterested director

who is hereby appointed by the Board as a member of the [Special] Committee.")

61.     At that same meeting, the Board approved the formation of the Special Committee

and the resolutions pertaining to its formation. *Id.*  The Special Committee was "appointed and

authorized to (1) conduct a full and independent **review of the process** by which the Company

intends **to consider and evaluate the Transaction** and to make a recommendation to the Board

regarding any Transaction and (2) negotiate the terms and conditions of any Transaction." *Id.* at

RN_Strougo_0000094.

62.     The resolutions approved November 9, 2021, also ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██ ██ ██ ██ ██ ██ █ ██ ████ ██ ████ ██ ██ ██

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ *Id.* at RN_Strougo_0000096.

63.     The next week, on November 17, 2021, the Special Committee met to (1) discuss

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

the process for evaluating a potential transaction with Glaser, (2) receive an overview of the Special Committee's fiduciary duties related to evaluating the Transaction, and (3) **discuss the hiring of a financial advisor** by the Special Committee in connection with the evaluation of a Transaction. RN_Strougo_0000001-02.

64.     The Special Committee also discussed ███████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.*

65.     In an apparently meaningless gesture, the Special Committee ████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████ *Id.*

66.     On November 23, 2021, the Special Committee met to discuss, *inter alia*, ██

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████ RN_Strougo_0000004-05. Despite the various personal and business relationships between Jaffe and Glaser, Jaffe was appointed as

CLASS ACTION COMPLAINT - 19

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

chairman of the Special Committee.[3]

67.     In addition, Glaser and Jaffe have an ongoing social relationship that extends beyond business hours and interests. ███████████████████████████████████

████████████████████████████ ██ ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████ RN_Strougo_0000019. █████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ██████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

68.     During a meeting of the Special Committee on December 2, 2021, the Special Committee ███████████████████████████████████████████████████████████

██████l. *See* RN_Strougo_0000007-08. ████████████████████████████████████

---

[3] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████. *Id*. at RN_STROUGO_0000094. ████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1 ████████████████████████████████████████████████████████

2 █████████████████████████████████ *Id.*

3    69.    For reasons detailed herein, through artifice and gamesmanship, Glaser repeatedly

4 sought to drag out the sales process as long as possible because it interfered with the Company

5 developing its annual budget and 2022 strategic plan, which required an imminent capital infusion

6 to successfully shepherd the Company and its various initiatives to their anticipated positive

7 earnings.  This effectively allowed Glaser to drive down the Company's projections and make the

8 Transaction appear more fair to the Company's unaffiliated shareholders.

9

10   70.    To wit, at the December 2, 2021 meeting, the Special Committee also discussed

11 ████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████  *Id.*  The Special Committee ██████████████████████

15 ████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████  *Id.*  Yet, with Jaffe at the helm, despite the importance of an advisor, the

18 Special Committee did not rush to retain any such advisor and Glaser was permitted to delay the

19 process to the detriment of the Company and its public shareholders.

20   71.    On December 16, 2021, the Committee met to discuss the status of the potential

21 transaction with Glaser and "the hiring of a financial advisor by the [Special] Committee in

22 connection with the evaluation of a Transaction," which it still had not retained.  *See*

23 RN_Strougo_0000009-010. █████████████████████████████████ort

24

25

26

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

1   ████████████████████████████████████████████████

2   ██████████████████████████      ██████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   █████████   *Id.*

7        72.      The Special Committee again discussed ███████████████████████

8   ████████████████████████████████████████████████

9

10   █████████   The Special Committee also discussed the recent Board meeting and the Board's

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   █████████   The Special Committee again acknowledged ██████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████   *Id.*

19        73.      On December 23, 2021, the Special Committee met to discuss the status of the

20   potential transaction with Glaser and information sharing and confidentiality protections in

21   connection with the Transaction. The Special Committee had still not retained an advisor and the

22   Company, as expected, could not plan its 2022 budget and forecasts.  Glaser, however, apparently

23   knew sufficient, relevant prospective financial information for his planning purposes. ██████

24   ████████████████████████████████████████████████

25

26

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

█████████████████████████████████████████████████

███████ *See* RN_Strougo_0000011.

74.     Less than a week later, at a Special Committee meeting on December 28, 2021,

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████" *See* RN_Strougo_0000013.  Although Glaser

previously indicated that "he would not be in a position to make a formal proposal, if at all, until

late in the first quarter,"████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████ *Id.*

75.     On January 11, 2022, over two months after the formation of the Special

Committee and approval of the resolution authorizing the Special Committee to retain a financial

adviser, and over five weeks after the Special Committee acknowledged the need for an

independent financial advisor to help it ascertain the financial impact of various strategies and

assess the impact of Glaser's desire to delay the process, the Special Committee met to discuss

potential financial advisors, which it was still yet to retain. *See* RN_Strougo_0000017-018.  As

reflected in the meeting minutes, although it was tarrying retention of its advisor, the Special

Committee was intent on retaining Houlihan Lokey based on its experiences, history and comfort

working with their team of advisors. *Id.* ("[T]he Committee would retain Houlihan, noting its

experience serving as an independent financial advisor in similar situations, the team's experience

in the technology industry more broadly and the [Special] Committee's overall comfort level with

the proposed team from Houlihan.").

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

76.     Given Jaffe's various Board and committee leadership roles, including his service as chair of the Corporate Development Committee (the "CDC"), (where he serves with Glaser and the CFO assisting in the design and analysis of potential corporate development opportunities), it appears that Jaffe's familiarity and "comfort" with Houlihan Lokey stems from a 2020 related party transaction between Glaser and the Company.  Specifically, on or about February 10, 2020, Glaser acquired approximately 8 million shares of RealNetworks Series B Preferred Stock for aggregate gross proceeds to the Company of approximately $10 million.  According to the Proxy, at 55, Houlihan Lokey has in the past provided "services to a committee of the Board of Directors, including a financial opinion rendered in 2020 in connection with a related party transaction, for which Houlihan Lokey received compensation of $175,000." Unsurprisingly, the Proxy omits and/or misrepresents the fact that the "related party transaction" involved Glaser and that the special committee responsible for approving the transaction and to which Houlihan Lokey rendered its fairness opinion was also led by Jaffe (possibly by himself).

77.     On January 20, 2022, at a meeting of the Special Committee, the committee discussed ███████████████████████████████████████████████ ███████████████████████████████████. *See* RN_Strougo_0000020. ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ *Id.*

78.     ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ██████████████████████     ██████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ███████████████████████████████████████████ *Id.* at

10 20.

11      79.    Indeed, as described in the Company's risk disclosures in its most recent annual

12 report:

> in order to grow our new businesses, we must make long-term investments, develop
> or obtain appropriate intellectual property and commit significant resources before
> knowing whether the products and services that we are developing or have
> introduced will meet the demands of the relevant market. As we have experienced,
> we may not realize a sufficient return, or may experience losses, on these
> investments. If this happens, it could cause further strain on our limited cash
> resources and negatively affect our ability to pursue other needed growth or
> strategic opportunities. ***Sustaining and growing our businesses, and managing
> our cash resources, are subject to these risks inherent in developing, distributing
> and monetizing our new products and services. Our failure to manage these risks
> could further impair our operations and financial results to a material degree,
> and could cause an unsustainable depletion of our cash resources.***

21 Form10-K, Annual report for year ending December 31, 2021, filed with the SEC on February 25,

22 2022, at 10.

23      80.   ███████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26

CLASS ACTION COMPLAINT - 25

████████████████████████████████████████████████████

████████████████████████████ *Id.* at 20.

81.     On January 27, 2022, at a meeting of the Special Committee, ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.*

82.     At that meeting, and as noted above, the Special Committee knew that the adoption of the baseline budget could have the impact of driving down growth, and ultimately projected value, but in order to assist Glaser's takeover effort and make any offer appear more fair, the Special Committee represented that ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

CLASS ACTION COMPLAINT - 26

1    ████████████ *Id.*   Likewise, there is no possible justification for the Special Committee's

2    continued delay retaining a financial advisor.

3        83.    At the end of that meeting, ███████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████████

6    ██████████████████████████████████████████  *Id.* at 22.  ████████████████████████

7    ████████████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████████████

9    ████████████████████████

10       84.    On February 25, 2022, Jaffe and Glaser attended *another* social event together,

11   where they discussed the status of Glaser's outreach to potential sources of financing. In

12   furtherance of his effort to delay making a proposal as long as possible, Glaser claimed that a

13   number of potential financing sources were reluctant to invest in a potential take-private

14   transaction by Glaser for a variety of reasons, including the current economic climate, the state of

15   the investors' business portfolio, and concerns about the Company's prospects – which were being

16   actively harmed by Glaser's scheme and the Company's dwindling cash.

17       85.    On March 1, 2022, the Special Committee held a meeting where Houlihan Lokey

18   shared its preliminary observations regarding the Company and the industries in which it operates.

19   Houlihan Lokey discussed recent trading performance and the make-up of the Company's

20   shareholder base, as well as the "baseline" financial forecast prepared by Company management,

21   which management indicated represented management's best estimates for future financial

22   performance as orchestrated by Glaser and Jaffe.  Houlihan noted the Company's historic track

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

record of failing to achieve forecasted performance, both across the Company and in various business segments.

86.    The presentation included:



87.    As noted by Houlihan Lokey, the Company was covered by a single analyst at Lake Street Capital Markets.   On February 10, 2022, Lake Street affirmed its Buy recommendation and a $4 share price target (nearly 5.5 times the Merger Consideration of $0.73 per share) which it had previously issued in November 2021.  Houlihan Lokey noted the following observations:

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



## Selected Wall Street Analyst Commentary

*(dollars in millions, except per share values)*

| Analyst / Report Date | Price Target | Recommendation | Selected Commentary |
|---|---|---|---|
| Lake Street Capital Markets (2/10/22) | $4.00 (Unchanged) | Buy | *"AI products SAFR grew 44% year-over-year and KONTXT 14% year-over-year. SAFR revenues were slightly lower than we would like to see after a couple of key contracts wins in Q2 and Q3 [CY 2021A]. We believe the company has identified new markets with better prospects, and we could see additional contract wins in CY 2022A. The AI business is still developing but holds significant potential as it racks up more reference wins, including using its SAFR facial authentication technology in a Japanese government program."*<br><br>*"While its AI revenues are still episodic, RealNetworks is in a prime position to exploit strong end-market demand for AI-related security solutions with its healthy balance sheet of $27 million in cash...We expect RNWK has the capital needed to get its AI business past its proof of concept to meaningful revenues."*<br><br>*"We have lowered our estimates to reflect Q1 guidance calling for $12.0 million - $14.0 million in revenues and adjusted EBITDA of ($5.5)–($4.0M), slightly below our estimates. We lowered our revenue, adjusted EBITDA, and adjusted EPS estimates to reflect marginally lower Games and Ringtones revenues, with operating expenses ticking up as its AI investment continues. Our CY 2022E model ratchets lower due to lower Games contribution expectations and a longer burn on AI revenue ramp."*<br><br>*"Our $4.00 price target is based on a blended 3.0x EV/revenue multiple consisting of 2.0x CY 2022E revenue on its non-AI business and 7.0x on its AI/machine learning business. It is hard to find exact comparable public companies for Real. However, we believe a blend of digital media/tech for its legacy non-AI components and biometric/authentication software companies for its AI components is fair to approach the valuation discussion."* |
| Lake Street Capital Markets (11/4/21) | $4.00 (▼$2.00) | Buy | *"As softness in the Games and Ringtones segments continues, management expects Q4 to be down sequentially on revenues and adjusted EBITDA. AI revenues were approximately $1.8 million in Q3, down from $2.4 million in Q2, with SAFR growing 124% year-over-year and KONTXT up 12% year-over-year. SAFR revenues were slightly lower than we would like to see after a strong Q2 as results remain episodic...[The Company] did note a growing opportunity with DOD SI Bowler Pons to roll out its authentication technology. Like the NTT DoCoMo relationship, we view these reference wins as a precursor to revenue, hopefully, sooner vs. later."*<br><br>*"We have lowered our estimates to reflect Q4 guidance calling for $12.5 - $15.0m in revenues and adjusted EBITDA of ($5.5)–($3.5M)."*<br><br>*"Our $4.00 price target, down from $6.00, is based on a blended 3.0x EV/revenue multiple consisting of 2.0x CY 2022E revenue on its non-AI business and 7.0x (down from 9.0x) on its AI/machine learning business."* |

*A refers to Actual; Adjusted EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization, adjusted for certain non-recurring items.*
*Adjusted EPS refers to Net Income per Share of Common Stock, adjusted for certain non-recurring items.*
*AI refers to Artificial Intelligence; CY refers to Calendar Year; E refers to Estimated; EV refers to Enterprise Value; Q refers to Quarter.*
*Source: Wall Street analyst research.*
CONFIDENTIAL – PRELIMINARY DRAFT – SUBJECT TO FURTHER REVIEW

HOULIHAN LOKEY | 11

88.    In addition, Houlihan Lokey provided the following preliminary observations regarding the two forecast cases approved by management:

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

89.     According to the Proxy, on January 26, 2022, the Board held a regularly scheduled meeting (remarkably, aside for portion of the cover page describing the date and time/place of the meeting, and the lists of the Board members that were present or absent, the Company elected to redact the entirety of the minutes claiming that the contents are "NONRESPONSIVE" to Plaintiff's demand to inspect books and records). During the meeting, the Board discussed three-year financial forecasts prepared by the Company's management team, with a view to approving a budget for fiscal year 2022.

90.     In consideration of the budget, the Board reviewed a "baseline forecast" that did not reflect any additional near-term capital investment and a financial forecast (an "investment

CLASS ACTION COMPLAINT - 30

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

case") that, according to the Proxy "assumed the Company would receive approximately $15 million of additional near-term capital to fund its growth projects."   In light of business uncertainty and related open questions around additional capital required, the Board approved a budget for only the first six months of 2022 and requested more detail from management regarding financial outlays and projections for the second half of 2022.

91.     In a further effort to delegitimize the more appropriate investment case (which the Special Committee also disparaged)█████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████     █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

92.     According to the Proxy, in early March 2022, Glaser contacted Jaffe and indicated that he had not identified any potential financing sources that he was willing to agree to terms with to support his potential acquisition of the Company. Glaser stated that he would continue to explore possible alternative transaction structures, including partnering with a potential acquirer of one or more of the Company's businesses, with Glaser responsible for the remainder of the necessary capital.

93.     Nevertheless, despite the implicit relevance of a sum of the parts analysis to Glaser's potential alternative where he would sell one or more of the Company's businesses, and Jaffe's awareness of this possibility since at least early March, the Board, Special Committee and Houlihan Lokey failed to duly consider a valuation analysis of the Company's parts.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

94.     On March 23, 2022, the Company issued a press release announcing the launch of

SAFR SCAN, a highly innovative Access Control product for commercial and office uses. SAFR

SCAN is the ***Company's first integrated hardware-software product*** and was publicly unveiled

at the ISC West 2022 trade show in Las Vegas.  In the release, Glaser was quoted as follows:

> SAFR SCAN is a game changer. It's the fastest and most secure way to control building and office access ever created[.]
>
> SAFR SCAN is **the first integrated hardware-software product we've built in Real's 27-year history**. We chose to make hardware because it enabled us to leverage our SAFR software platform to deliver a world-class product for less than half of what competing products cost.

A touchless biometrics solution that is much more secure, reliable, and accurate than keycard-

based systems, SAFR SCAN is engineered for use in both indoor and outdoor environments.

SAFR SCAN will be sold in North America through a network of system integrators and has an

MSRP of $1,199.  Designed as a standalone or networked solution, SAFR SCAN delivers fast,

frictionless throughput capable of authenticating up to 30 individuals per minute.  Designed and

made in the USA, SAFR SCAN units were scheduled for delivery beginning in May 2022.

95.     On March 24, 2022, the Special Committee held a brief meeting to discuss the

status of a potential transaction ███████████████████████████████████████

███████████████████████     ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

96.     In Houlihan Lokey's preliminary discussion materials for the Special Committee,

dated March 24, 2022, ██████████████████████████████████

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

97.

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16      98.     According to the Proxy, on April 11, 2022, in preparation for the regularly

17  scheduled meeting Board meeting on April 21, 2022, **_Glaser informed the Board that he had_**

18  **_ended his efforts to pursue a potential transaction with a third-party investor, including_**

19  **_[Imperial Capital's] support of those efforts._** Having been unable to identify potential partner

20  financing sources, Glaser told the Board that **_the concept of a transaction supported by a partner_**

21  **_financing source was not viable at this time_**.

22

23      99.     As with the Proxy's other representations, its assertion that, on April 11, 2022,

24  Glaser notified the Board that he ended his efforts to pursue the potential transaction ▓▓▓▓▓▓

25  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

26

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

█████████████████ ███████████████████████████████████████

████████ ██████ █ ████ █ ██ █ ██ ██████ ████ █ the Proxy's

misrepresentation of the termination date is intended to lend credibility to Glaser's purported

termination.

100.    As evident a few weeks later, on May 6, 2022, when Glaser *spontaneously*

transmitted his first written acquisition proposal to acquire the whole Company (despite

purportedly having "terminated" his efforts to pursue a transaction less than two months earlier),

Glaser's message to the Board was a deception designed to afford him access to material non-

public information he could not access while he was actively exploring a buy-out of the Company

and the CDC (previously chaired by Jaffe, with Glaser and the CFO as members) was not active.

101.    █████████████████████████████████

█████ ██ ███ ████████ ██ ██ ████ ███████ █████ ███ ███ *See*

RN_Strougo_0000083-086.  After recessing in the evening of April 20, the meeting resumed on

April 22, 2022, ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1  ██████████████████████████████████████████████████

2  ████████████████████████

3    102.    Thus, on April 22, 2022, using the pretense that Glaser was no longer pursuing his

potential buy-out of the Company, Glaser and Jaffe successfully effected ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

    103.    On April 26, 2022, the Special Committee held a meeting where "Jaffe provided

the [Special] Committee with an **_overview of his recent discussions with Mr. Glaser_**." *See*

RN_Strougo_0000023.   Jaffe explained that Glaser had informed him that he was unable to

generate sufficient interest from third party financing sources in backing his proposed Transaction

and that therefore "**_Glaser was terminating his process to raise capital and to potentially_**

**_purchase the Company_**." *Id.* ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

    104.    The Committee discussed "**_the apparent conclusion of the process that began_**

**_when Mr. Glaser suggested he might be interested in purchasing the outstanding equity of the_**

**_Company_**." *Id.*   The Special Committee concluded that rather than immediately disband, the

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

committee should go on hiatus to understand whether Glaser would seek potential buyers and seek to participate in such process, or whether he would consider acquiring the Company without the support of third party financing sources. The Special Committee also discussed ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ *Id.* The Board had previously empowered any member of the Strategic Transactions Committee to unilaterally veto certain potential transactions involving the Company, thereby allowing Glaser to singlehandedly block a sale of the Company to anyone but himself.

105. On May 6, 2022, Glaser contacted Jaffe to inform Jaffe that he decided to proceed with a proposed transaction ***that did not require third-party financing*** and that Glaser would be submitting a proposal to acquire all of the outstanding shares of the Company that were not currently owned by Glaser and his affiliates. In his offer letter, (the "May Proposal") Glaser proposed to acquire RealNetworks in a going private transaction for $0.67 per Share. This proposal claimed to reflect "an attractive value for the Company's shareholders under the difficult circumstances, and a unique opportunity for them to monetize their investment at a premium to the Company's current and recent stock price." Proxy at 18. No explanation was apparently given for Glaser's abrupt about-face, given that Glaser had recently represented that he did not possess the financial wherewithal to take the Company private on his own without engaging with partners to share the financial costs.

106. Glaser indicated that he "expect[s] [the Board] *will establish a special committee of independent directors to consider this proposal on behalf of the Company's shareholders and*

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

to make a recommendation to the full board of directors" and "that the special committee _will retain_ its own independent _legal and financial advisors to assist in its review of the Transaction_." _Id_.  Glaser advised that he "retained legal and financial advisors to assist in the pursuit of the Transaction."  And, given his "extensive history and knowledge of the Company," he is [now] "prepared to negotiate definitive agreements with the special committee and its advisors," and "to complete the Transaction in an expedited manner." _Id_.

107.    Further, the May Proposal communicated to the Board that:

In considering this proposal, please note that, in my capacity as a shareholder of the Company, I believe _it would be in the best interests of the Company for the special committee to negotiate exclusively with me toward definitive agreements and not attempt to commence an auction process in parallel with our negotiation_. _Such a process would introduce uncertainty and delay at a time when the Company can afford neither._ If the special committee or board of directors feels a need to market check my proposed offer, there can be an opportunity to do so after we have reached a definitive agreement.

Through a combination of the rollover of existing capital stock in the Company and my available liquid financial resources, this Transaction would be fully funded, as would the ongoing operations of the Company following the Transaction. Accordingly, _this proposal would not be subject to an uncertainty or delay with respect to any financing, and the Transaction will not be subject to a financing condition._

Following the Transaction, _I would expect that the Company's management team would remain in place. In addition, I anticipate maintaining the Company's talented and valuable employee base at closing, which I view as one of its most important assets_.

I have engaged DLA Piper LLP (US) as legal advisor for the Transaction. I have also engaged Imperial Capital as financial advisor for the Transaction.

This letter constitutes only a preliminary indication of interest and does not constitute any binding commitment with respect to the Transaction proposed in this letter or any other transaction. A binding commitment will result only after additional confirmatory due diligence and the execution of definitive agreements, and then will be on terms and conditions provided in such documentation. _While this letter is a non-binding commitment that I may withdraw at any time, please_

CLASS ACTION COMPLAINT - 38

___note that I regard time as of the essence in light of the Company's financial___
___position___, and I do not intend to move forward with an of er on the terms set forth
herein if we do not reach a definitive agreement by June 8, 2022 or if the
Company's cash balance falls below $15 million.

108.    Notably, the May Proposal reads as if Glaser was unaware of the Board and
Committee meetings of April 2022 and their respective resolutions, including the April 26, 2022
decision of the Committee "that it should not disband, but rather should sit in hiatus in case any
such transaction emerged." *See* Proxy at 17.  Similarly, Glaser's proposal implies that he does not
know about the retention of Houlihan Lokey as the financial advisor in connection with his take-
over proposal.

109.    More importantly, the May Proposal serves as clear evidence of Glaser's prior
deceptions.  Whereas the May Proposal feigns urgency and sensitivity to the precariousness of
the Company's situation, between November and April, Glaser manifested little concern for the
near-term health and growth of the Company as if he were not its largest shareholder, let alone its
chairman and CEO.  Whereas the May Proposal emphasizes Glaser's ability to negotiate and
finalize his proposal on an expedited basis due to Glaser's "extensive history and knowledge of
the Company," and his ability to proceed without any financing, the protracted (and *abandoned*)
diligence between November and April was predicated on Glaser's need to identify a financing
partner and his dependance on prospective financial information, including management's 2022
budget, in order to proceed with his diligence efforts.

110.    Separately, the May Proposal and the Proxy both overlook a major difficulty that
resulted from the Board actions at the meeting on April 22, 2022. ████████████████
████████████████████████████████████████████
████████████████████████████████████████████

CLASS ACTION COMPLAINT - 39

1    ████████████████████████████████  Based on Glaser's responsibilities and role as a

2    member of the CDC, opportunities to monetize the Company that Glaser identified after the CDC

3    was established on April 22 emerged while he was an agent of the Company and cannot be

4    usurped by Glaser for his personal benefit.  The only other possibility is that the circumstances

5    giving rise to the May Proposal were known to Glaser prior to April 22, in which case he lied

6    about his intentions and fraudulently effected the suspension of the Special Committee.

7        111.    On May 10, 2022, the Special Committee held a meeting to discuss the proposal

8

9    received from Glaser.  █████████████████████████████████████

10   ██████████████████████████████████████████████████

11   ██████████████████████████████████████████████████

12   ██████████████████████████████████████████████████

13   ████████████████████████████████████████████  ████

14   ██████████████████████████████████████████████████

15   ████████████████████████████████  ██████████████████

16   ██████████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   ██████████████████████████████████████████████████

19   ██████████████████████████████████████████████████

20   ██████████████████████████████████████████████████

21   ██████████████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   ██████████████████████████████████  *Id.*

24

25

26

CLASS ACTION COMPLAINT - 40

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

112.   At the meeting, Houlihan Lokey discussed the status of the preliminary draft financial projections prepared by Company management in January 2022 (the "January Projections"). ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████ █████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████ RN_Strougo_0000026.

113.   ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████ *See* RN_Strougo_0000026.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

114.    On May 18, 2022, at a meeting of the Special Committee, Houlihan Lokey summarized recent discussions it had with "parties submitting indications of interest in buying some or all of the Company" ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████

115.    On May 25, 2022, at a meeting of the Special Committee, Houlihan Lokey summarized recent interest received regarding acquiring the Company, in whole or in part. Specifically, Houlihan Lokey described interest from "potential third-party bidders in connection with the proposed Transaction, following a number of inbound requests for information after the Company's receipt of the May 6, 2022 proposal from Mr. Glaser." *See* RN_Strougo_0000029. ██

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

CLASS ACTION COMPLAINT - 42

1 ██████████████████████████████████████████████████████

2 ████████████    ████████████████████████████████████████

3 ████████████████████████████████ *See* RN_Strougo_0000030.

4    116.    ████████████████████████████████████████████

5 ██████████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 ████████████████████    ██████████████████████████████████

9 ████████████████████████████████████████████████████

10    117.    On May 29, 2022, at a meeting of the Special Committee, the committee decided

11 that "the management-prepared forecasts represented management's best available estimates of

12 future performance of the Company and should be utilized for Houlihan Lokey's financial

13 analysis." (the "May Projections"). RN_Strougo_0000033.  Following a presentation by Houlihan

14 Lokey, the Committee determined to respond with a price per share of $0.90.

15 RN_Strougo_0000033.

16

17    118.    On June 3, 2022, the Special Committee met to discuss the May Proposal.  The

18 committee determined to respond with a price per share of $0.90.

19    119.    Notably, as described in Houlihan Lokey's preliminary discussion materials

20 provided to the Board, ████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ████████████████████████████████████████    ██  ██

23 ██████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████

25 ██████████████████████████████████████████████████████

26

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

████████████████████████████████████████████████████

████████████████████████████ *Id.* at 4.

120.     On June 7, 2022, the Special Committee met to discuss a counteroffer of $0.70 per share that Glaser communicated orally to Jaffe and Prusch on June 6, 2022, which was an increase of only $0.03 per share over his prior offer.  In response, the committee the committee concluded to respond to Glaser that it would support a proposed price of $0.80 per share.  The meeting minutes note that the Special Committee "viewed such price as a ***substantial concession***." RN_Strougo_0000033.

121.     On June 7, 2022, the Special Committee met to discuss Glaser's response to the committee's counteroffer of $0.80 per share.  Despite the Special Committee's "substantial concession" on price, ████████████████████████████████████████

████████████████████████████████████████████████████

███████   ███████  ██████  █████  ██████  █████████  ████████  ████  █████  ██████  █████

RN_Strougo_0000040.   In response, the Special Committee decided to share information regarding transaction expenses with Glaser.  In addition, the Special Committee also "expressed their unwillingness to renegotiate the pricing terms of the proposed Transaction ***without first*** understanding whether Mr. Glaser would be willing to compromise on the material issues outlined in the Committee's June 7, 2022 letter to Mr. Glaser." RN_Strougo_0000041.   The Special Committee determined to "convey to Mr. Glaser that the [Special] Committee was not in a position to engage with Mr. Glaser on price absent a more fulsome response from Mr. Glaser that also addresses the concerns, and proposed resolutions, the [Special] Committee raised in its June 7, 2022 letter."

CLASS ACTION COMPLAINT - 44

122.    The Special Committee met again on June 9, 2022.  The committee "noted that Mr. Glaser was unwilling to increase his offer above $0.70 per share at this time, and Mr. Glaser did not intend to provide a fulsome response to the [Special] Committee's June 7, 2022 letter outlining the key terms of a Transaction which the [Special] Committee could support until the [Special] Committee and Mr. Glaser had reached agreement on price." RN_Strougo_0000042. The Special Committee spoke with Glaser that night, and Glaser reiterated that he was not willing to raise his price above $0.70 per share.

123.    ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████  *Id*.

124.    On June 13, 2022, the Special Committee met and discussed, among other things, ████████████████████████████████████████████████████
████████████████████████████████████████████████████
RN_Strougo_0000049.

125.    ███████████████████████████████████████████
████████████████████████████████████████████████████

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1

2

3

4

5

6

7 ███████████████ RN_Strougo_0000050-51 (emphasis added).

8 126.   At a June 15, 2022, Special Committee meeting, the Special Committee discussed

9

10

11

12

13

14

15

16

17

18

19

20 ██████████████████████████████.

21 127.   At a June 16, 2022, Special Committee meeting, the committee discussed

22

23

24

25

26

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1  █████████████████████████████████████████████████████

2  █████████████████████████████████████████████████████

3  █████████████████████████████████████████████████████

4  █████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████

6

7  ██  ██  ████  ███  ███  ██  ███  ████  ███  █  ███  █████

8  RN_Strougo_0000055.

9      128.   At a June 23, 2022, Special Committee meeting, the committee ████████████

10 █████████████████████████████████████████████████████

11 RN_Strougo_0000058-59.

12     129.   On July 15, 2022, the Special Committee met and discussed ████████████

13 █████████████████████████████████████████████████████

14 █████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████

16 █████████████████████████████████████████████████████

17 ████████████   RN_Strougo_0000055 (emphasis added).   ████████████████

18 ████████████████████████████████████████

19     130.   On July 18, 2022, the Special Committee met ████████████████

20 █████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████

22

23 █████████████████████████████████████████████████████

24 █████████████████████████████████████████████████████

25 █████████████████████████████████████████████████████

26

CLASS ACTION COMPLAINT - 47

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

1

2

3

4                                                                        *Id.*

5

6        131.    Later that same day, the Special Committee reconvened with its advisors "to

discuss the status of Houlihan Lokey's discussions with Imperial. Representatives of Houlihan

Lokey conveyed that Imperial signaled Mr. Glaser would not exceed $0.73 per share (and that

Imperial may not be able to get him to that price) and agreed that he would also like negotiations

concluded before the upcoming Board meeting [the following day]." RN_Strougo_0000063. █

11

12

13

14

15               *Id.* (emphasis added).

16       132.    On July 19, 2022, the Special Committee met

17

18

19

20

21

22

23

24

25

26

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

████████████████████████████████████████████

████████████████████████████ *See Id.*[4]   The Special Committee then instructed Houlihan Lokey to contact Imperial and explain that the [Special] Committee would support a transaction at $0.73 per share, provided it was on the terms already agreed to and that Mr. Glaser would confirm the same before the Board meetings began that evening." RN_Strougo_0000065.

133.   On July 26, 2022, a representative of Houlihan Lokey met with the Special Committee and "explained that based on its financial analysis, Houlihan Lokey found that the price of $0.73 per share to be received by the unaffiliated shareholders of the Company in Transaction pursuant to the merger agreement was fair to them from a financial point of view and that upon the request of the [Special] Committee, Houlihan Lokey was prepared to deliver an executed fairness opinion confirming the same." RN_Strougo_0000071.

134.   Also on July 26, 2022, the Special Committee again met ██████████ ██ ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

135.   In the evening of July 26, 2022, all members of the Board except for Glaser met and approved the execution of the Merger Agreement.

---

[4] Mere weeks earlier, on May 29, 2022, the Special Committee and its advisors concluded that the forecasts "represented the best estimates of future financial performance available to the Special Committee." Proxy at 26. Remarkably, on July 19, 2022, when the Special Committee decided to accept Glaser's offer of $0.73 per share, it also concluded that the forecasts required negative revision.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

136.    On the morning of July 28, 2022, the Company announced the execution of the Merger Agreement.

137.    On July 28, 2022, RealNetworks announced the Merger Agreement with Glaser Parties through a press release, which states in pertinent part:

> SEATTLE, July 28, 2022 /PRNewswire/ -- RealNetworks, Inc. (Nasdaq: RNWK) announced today it has signed a definitive agreement with the Company's founder, Chairman and CEO, Robert D. Glaser, pursuant to which the Company will merge with and into Greater Heights LLC, an affiliate of Mr. Glaser, and each outstanding share of common stock of the Company will be converted into the right to receive cash consideration of $0.73 per share. Mr. Glaser, together with his affiliates, currently owns approximately 39% of the outstanding shares of RealNetworks's stock.  The merger consideration represents a 55% premium to the Company's closing stock price on the last trading day prior to announcement of Mr. Glaser's proposal to acquire the Company.
>
> The Merger Agreement and the merger has been approved by the Company's Board of Directors, based on the recommendation of a Special Committee of the Board consisting exclusively of independent directors. The Company's shareholders will be asked to vote upon the adoption of the Merger Agreement and approval of the merger at a shareholders meeting called for such purpose on a date to be announced.  The closing of the transaction is conditioned upon the approval of a majority of the shares not owned by Mr. Glaser and his affiliates.  The parties anticipate the transaction will close in the fourth quarter.
>
> "I founded RealNetworks 28 years ago because I believed that the Internet represented a once-in-a-generation transformational opportunity for digital media," said Glaser.  "I believe that Machine Learning-based Artificial Intelligence represents a similar transformational opportunity today, albeit one that will also take time and resources to fully realize.  I'm happy that the RealNetworks Board and I could reach agreement on a path to pursue that transformation with focus, efficiency, and speed by turning Real back into a private company, and in a way that is fair to all shareholders."
>
> Bruce Jaffe, the Chairman of the Special Committee, said, "The Special Committee is very pleased to have completed a thorough process that has resulted in a transaction with Rob that we believe provides immediate liquidity and compelling value to the public shareholders of RealNetworks without the risk of future performance and securing working capital in this economic climate."

CLASS ACTION COMPLAINT - 50

Houlihan Lokey is acting as independent financial advisor and King & Spalding LLP is acting as independent legal counsel to the Special Committee in connection with the transaction.  Wilson Sonsini Goodrich & Rosati P. C. is acting as legal counsel to the Company.

Imperial Capital is acting as financial advisor and DLA Piper LLP (US) is acting as legal counsel to Mr. Glaser.

## *THE MERGER CONSIDERATION IS WOEFULLY INADEQUATE*

### The Merger Consideration Inappropriately Failed to Account for NOLs and Tax Credits

138.    As of September 30, 2022, the Company had an accumulated deficit of $587.9 million. Form 10-Q, filed by RealNetworks with the SEC on November 9, 2022, at 8.

139.    As of December 31, 2021, the Company maintained a valuation allowance of $131.5 million for deferred tax assets that it believes "are not more likely than not to be realized." 2021 10K at 51.

140.    RealNetworks's U.S. federal net operating loss carryforwards totaled $336 million by December 31, 2021. *Id.*  The net operating loss carryforwards as of December 31, 2021 are from prior U.S. taxable losses *and* from acquired subsidiaries.  These net operating loss carryforwards expire between 2024 and 2037.

141.    In addition, RealNetworks possess a U.S. federal research and development tax credit carryforward of $13.4 million as of December 31, 2021.  The research and development credit carryforwards expire between 2022 and 2041.

142.    Shockingly, the Board failed to earnestly assess the value and utility of the massive, accumulated carryforwards.

143.    Moreover, as indicated in its presentations to the Board, Houlihan Lokey ██████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

CLASS ACTION COMPLAINT - 51

1 ████████████████████████████████████████████

2 ███████████   ██████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████   *See* RN-

5 RN_Strougo_0000026.

6   144.   Although 26 U.S.C. § 269(a) provides that any tax benefit, such as a deduction,

7 credit, or other allowance, *may* be disallowed if it is obtained by a person or corporation acquiring

8 control of another corporation, it is specifically when the principal purpose of the acquisition is

9 avoiding or evading federal income tax.  Moreover, although Glaser acquired the majority of the

10 Company's shares in the Transaction, the determination of control is not the dependent on a

11 percentage of ownership, but actual control.  As the Federal Court of Claims has stated that "the

12 ultimate expression of voting power is the ability to approve or disapprove of fundamental

13 changes in the corporate structure, and the ability to elect the corporation's board of directors"

14 (Hermes Consol. Inc., 14 Cl. Ct. 398 (1988)).

15   145.   Glaser already possesses the ability to approve or disapprove of fundamental

16 changes in the corporate structure, and the ability to elect the board of directors.  Thus, at a

17 minimum, the potential value of the carryovers is complex and requires research, investigation

18 and consultation with an expert.

19   146.   This is the opposite of what happened as between the Board and its advisor.

20 Instead of the Board relying on a qualified expert, the financial advisor deferred to the uninformed

21 opinion of the Board.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

147.     Despite RealNetworks's optimism about its revenue turnaround expected in 2022 from the AI initiatives, Glaser (and the Board) knew that they needed at least one more capital infusion to see the initiatives through.  Moreover, together with Jaffe and the CFO, which has since resigned, Glaser serves on the Board's Corporate Development Committee, which assists "the Board in its design and analysis of potential corporate development opportunities." Considering his control of the Company stock, Glaser also knew that if he dangled the prospect of investing capital or buying the Company, he could cause the Company to stall just as it was about to turn the corner.  The Board could not turn to the public for money if they thought the controller was about to buy the Company, lest the Board risks Section 11 liability to the purchasers. But, the Board also could not move forward without a capital infusion.

***The Company's Interest in Scener was Not Properly Valued in the Transaction***

148.     The Merger also fails to properly account for the Company's lucrative interest in Scener.  The Company listed Scener as one of its 20 subsidiaries in Exhibit 21.1 to its Form 10-K filed on March 8, 2019.  In a Form 8-K filed on November 7, 2018, the Company stated that it "launched Scener in the third quarter. Scener is a new product and business that was ***incubated inside of RealNetworks*** to redefine the over-the-top video experience by integrating synchronized commentary directly with OTT video." (emphasis added).

149.     In an earnings call dated November 7, 2018, Glaser stated the following regarding Scener:

> Lastly, I'd like to touch on a different kind of new initiatives, Scener. Scener is a new social platform that spans of great streaming shows and movies go deeper with synchronized social video commentary. We sometimes refer to it as twitch for Netflix and YouTube. It revolutionized the experience of watching premium over the top content by enriching it with video content for experts, comedians and fellow fans. [inaudible] the growth initiative process we started about two and a half years

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

ago, and we're very excited about its prospects. However, unlike our other growth initiatives, we believe the Scener is best positioned for success by collaborating with Investment Partners. In this scenario, we would retain equity and we provide support and advice to Scener which will be an independent company.

150.    In 2019, Glaser directly invested $800,000 in Scener in exchange for shares of preferred stock of Scener.

151.    In the third quarter of 2020, Scener received $2.1 million in cash in return for issuing rights to investors for certain shares of Scener's capital stock contingent upon the occurrence of specific future capital raising events by Scener.  The funding consisted of $700,000 from Glaser in July 2020 and $1.4 million in funding from outside investors in August 2020. The rights were each issued as a Simple Agreement for Future Equity ("SAFE Notes"). The future contingent events also contemplate the possibility of Scener having to pay back the original cash investment to each investor. The SAFE Notes are recorded as a liability on RealNetworks's consolidated financial statements within other long-term liabilities and are required to be recorded at fair value each quarter.

152.    As of December 31, 2020, RealNetworks owned approximately 82% of Scener's outstanding equity, and RealNetworks consolidate its financial results into its financial statements.  The financial results of Scener are reported in RealNetworks's Consumer Media segment.

153.    In a press release dated August 24, 2020, Glaser stated that "[g]oing forward, [RealNetworks] will continue to focus the operations of [RealNetworks] on our primary growth initiatives, such as our SAFR computer vision platform and our GameHouse free-to-play casual games business.  *We will also continue to nurture innovation, for example our Scener watch party service and platform*." (emphasis added).

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

154.    In an earnings call dated November 3, 2020, Glaser stated:

Scener is a nascent business we incubated for two years and are now in the process of spinning out. Scener raised a total of $2.1 million in funding from external investors, led by Seattle Real Estate Investment Clinical and also a significant presentation from launch and its affiliated investment. I also participated as an individual investor. Eventually, we expect that Scener will become an independent operation. Within the short term, Scener will remain consolidated with Reals financial results.

155.    During an earnings call on May 12, 2021, Glaser stated:

As we would like to recall, Scener is a virtual movie theater service, which allows consumers to watch shows virtually with their friends, and about a dozen video service including Netflix, Disney Plus and HBO Max. Recently I stepped down as Chairman of Scener and we brought in an esteemed tech and entertainment industry executive and entrepreneur, Richard Walberg to be Scener's Executive Chairman. Daniel Strickland remains senior CEO. Richard, Daniel and the rest of the senior team are doing incredible job scaling up Scener. ***Scener has grown its audience by over 100 times, not 100%, 10,000% over the past year. Consumers are now using Scener to watch over 100 million minutes of video each month.***

Given this rapid growth, Scener is in the process of raising additional expansion capital. ***I will continue to serve on Scener's Board as well Mike Ensing. I believe [RealNetworks] has a great opportunity as a shareholder to participate in Scener's success***.

Emphasis added.

156.    In a Form 8-K filed with the SEC on August 4, 2021, Glaser was quoted as saying "[w]e're also very pleased with the progress that Scener is making on its path as an independent company.  Scener continues to grow rapidly with consumers using it to watch over 100 million minutes of video each month. ***Scener is now self-sufficient financially and has a very bright future***." (Emphasis added).

157.    The Company added that, as a result of Scener's progress as an independent company, as of June 30, 2021, the Company deconsolidated Scener, previously a consolidated subsidiary of RealNetworks, and recognized a non-cash gain of $2.0 million in other income, net

CLASS ACTION COMPLAINT - 55

on the condensed consolidated statement of operations.  Also as of June 30, 2021 RealNetworks no longer had a controlling interest and will account for its remaining interest in Scener using the equity method of accounting.

158.    Also on August 4, 2021, the Company held an earnings call at which Glaser stated in part, in response to an analyst question, "Scener has independent leadership team, it – Mike [Ensing, RealNetworks President and Chief Operating Officer] and I are on a board but we are not a majority of the board."  Glaser added that Scener "has [] independent capital needs, basically this sort of model, if you think of any of these free consumer services, the big ones like the Facebook's of the world or the Twitter's the world, Instagrams, et cetera. You are in an investment mode for several years as you're scaling the audience. And then once the audience gets to a certain size, there's a bunch of ways to monetize it."

159.    Also on the August 4, 2021 call, Glaser added that "[a] second step we've taken is to support Scener's progression as an independent company…As a result, as of June 30, [2021] Scener has moved to a next phase of independence and it's no longer part of our consolidated results or operations…I look forward to serve on Scener's Board along with Mike Ensing. We believe [RealNetworks] shareholders have a great opportunity over time to benefit from Scener's successes as an independent company."

160.    In December 2021, Scener had a qualifying equity financing which also triggered the conversion of the SAFE notes to equity.  As a result, RealNetworks's ownership in Scener's outstanding equity decreased to approximately 46% and RealNetworks recognized a dilution gain of $6.0 million.  At December 31, 2021 the carrying value of RealNetworks's investment in Scener was $2.2 million and is included in Other assets on its consolidated balance sheets.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

161.    As of March 31, 2022, RealNetworks owned approximately 45% of the issued and outstanding stock of Scener.

162.    On April 05, 2022, RealNetworks made an investment of $595,410.20 in working capital to Scener in exchange for 4,848,617 shares classified as series seed-2A preferred stock. As of June 30, 2022, RealNetworks owned approximately 48% of the issued and outstanding stock of Scener.  RealNetworks's investment in Scener as of June 30, 2022 was $2.1 million.

163.    On an earnings call dated February 9, 2022, Glaser stated "[n]et loss for the Fourth Quarter was $1.8 million and was impacted by a ***2.1 million net gain related to Scener***." (emphasis added).  Glaser added that "[n]et loss for the full year from continuing operations attributed to RealNetworks was $21.2 million…***offset by net gains related to Scener of $4.1 million***." (emphasis added).

164.    Jaffe serves as a Company designee on the Scener Board of Directors.  Glaser rewarded Jaffe for his loyalty by appointing him the Scener board on August 19, 2022.  And, the Company granted Jaffe an option to purchase 5,000 shares, with a per share exercise price of $0.6946, and an award of RSUs covering 21,595 shares for his appointment by the Board to serve, on behalf of the Board, on the board of directors of Scener.

165.    A presentation to the Special Committee by Houlihan Lokey dated June 3, 2022, notes that ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

**The Company Recently Modified its Business Strategy and is Due to Realize the Benefit of its $50 million R&D Investments to bring SAFR and Kontxt to Market**

166.    RealNetworks has devoted a substantial portion of its resources to developing new products, enhancing existing products, expanding and improving its fundamental technology, and strengthening its technological expertise in all its businesses.

167.    Since 2018, RealNetworks's growth strategy has centered on its machine learning AI-based products and solutions, SAFR and Kontxt.

168.    As noted frequently over the last few years, the Company expected these initiatives to comprise an increasing percentage of its go-forward business. *See, e.g.*, RealNetworks Form 10-Q for quarter ended September 30, 2022, at 32.

169.    In addition to the two AI initiatives, in 2019, the Company also identified significant opportunities for growth with its free-to-play mobile games.   During 2019, RealNetworks began to shift its strategy to free-to-play games and away from premium mobile games.  RealNetworks now has three in-market free-to-play games, which generate revenue from player purchases of in-game goods and from advertising displayed to consumers during play.  The Company's mobile games are digitally distributed through third-party application storefronts, such as the Apple App Store and Google Play, and are principally offered in North America, Europe and Latin America.   In 2019, based on the mobile gaming market, the GameHouse Original Stories' total addressable market was $68.5 billion based on Company management estimates on industry data, with a projected CAGR of 11.3% from 2020 to 2022.  In an SEC filing dated April 27, 2021, the Company stated that "[i]n the last five years, our mobile games sales, including both our traditional mobile game subscriptions and free-to-play games, has had a 24% CAGR."

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

170.     However, in order to successfully monetize these initiatives, RealNetworks required significant capital investments, culminating in an April 2021 share issuance which successfully raised $21 million.

171.     On or about February 10, 2020, Glaser acquired approximately 8 million shares of RealNetworks Series B Preferred Stock for aggregate gross proceeds to the Company of approximately $10 million.

172.     As noted in the April 2021 Prospectus, for the fiscal year ended December 31, 2020, revenue from SAFR grew by 169% over the prior year.  Revenue from Kontxt grew by 131% over the prior year. SAFR's total addressable market was estimated at a combined $27.2 billion for the access control and video surveillance markets in 2019, with projected CAGR of 8.5% and 13.3%, respectively, for the period from 2019 to 2024.  Kontxt's TAM was $10.7 billion in 2020 for the natural language processing market, with a projected CAGR of 26.8% for the period from 2021 to 2026.

173.     For fiscal year 2020, revenue from these two growth businesses comprised approximately 23% of total revenue for the Mobile Services segment, up from approximately 9% in the prior fiscal year.

174.     GameHouse Original Stories was a third growth driver for RealNetworks, driven by its focus on free-to-play casual mobile games.

175.     In the April 2021 Prospectus, the Company stated that it expected double-digit revenue growth in fiscal year 2022 and fiscal year 2023 driven by its artificial intelligence-focused products, SAFR and Kontxt, as well as its Games business.  However, it also noted that it expected adjusted EBITDA losses for the full fiscal year 2021 to be greater than the full fiscal year 2020

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

adjusted EBITDA, due to the expected investments in the growth initiatives.

176.    In April 2021, in order to cover its corporate overhead and address the capital requirements required by its initiatives, the Company completed an underwritten public offering of 8,250,000 shares of common stock at a price to the public of $2.70 per share. The aggregate gross proceeds from the offering were $22.3 million and approximately $20.1 million, after deducting underwriting discounts, commissions, and legal and other fees.

177.    Remarkably, in the Company's press release announcing its financial results for the third quarter of 2021, filed November 3, 2021- less than a week before Glaser told the Board that he was potentially interested in acquiring the Company - the Company represented that "**2021 is a year of investment that will position the Company for double-digit revenue growth beginning in 2022.**"

178.    Nevertheless, the Company had already gotten a taste of the potential of SAFR and KONTXT.  As of 3Q21, YoY revenue growth for SAFR was 124% and for KONTXT was 12%; and, together, they comprised 31% of total revenue for Mobile Services, compared to 19% in 3Q20.

179.    As described by the Company in its November 2021 shareholder presentation, SAFR and KONTXT reflected RealNetwork's future and were the culmination of a "4 Year Effort in Machine Learning Based on artificial Intelligence."

180.    On April 6, 2022, the Company issued a press release, wherein Glaser was quoted:

In just a few short years, KONTXT has become one of the most widely used NLP platforms in the U.S. Telecom industry, blocking millions of pernicious spam and phishing text messages every day[.]

To take KONTXT's business to the next level, we're delighted that Mike Cooley is joining us and will be leading the charge. Our goal is to deploy KONTXT and our

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

other messaging products even more widely to enable our partners to deliver the best mobile experience for consumers worldwide.

181.    On May 5, 2022, the Company announced that SAFR SCAN was the recipient of the 2022 Platinum Govies Award for Access Control – Biometrics.  The prestigious award was announced by Security Today April 26, 2022, honoring SAFR SCAN as being an outstanding product for government security applications.

182.    On June 27, 2022, the Company announced a pilot program with Vodafone Germany to launch a new service called Vodafone CallProtect. Vodafone CallProtect will warn Vodafone Germany customers of potential fraudulent, scam, or spam-type calls.  The technology behind CallProtect is RealNetworks's KONTXT, an AI-based anti-spam solution for messaging and voice calls, which includes the KONTXT Reputation Service database.

183.    On November 8, 2022, the Company's press release announcing its financial results for the third quarter ended September 30, 2022, the Company disclosed that SAFR Scan has been receiving encouraging feedback from initial clients, and during the quarter RealNetworks closed its first large SAFR Scan customer as well as a pipeline of sales opportunities for the exciting new product.

### Glaser Controls the Company and the Board and used Rhapsody (d/b/a Napster) to Reward Insiders and Prop Up His Own Investments

184.    On April 21, 2003, RealNetworks announced it has entered into a definitive agreement to acquire Listen.com, Inc. in a cash and stock transaction valued at approximately $36 million.  With this acquisition, RealNetworks acquired RealOne SuperPass, which offers news, sports and entertainment programming, and the Rhapsody music service.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

185.     On August 20, 2007, RealNetworks and MTV Networks ("MTVN"), a division of Viacom International Inc. ("Viacom"), created Rhapsody America LLC ("Rhapsody America"), to provide consumers with music services, including access to music through subscriptions, downloads and ad supported services.  At the time, Rhapsody America was owned 51% by RealNetworks and 49% by MTVN.  RealNetworks consolidated the financial results of Rhapsody America for the period from August 20, 2007 through September 30, 2007, with a 49% minority interest represented by MTVN's equity in Rhapsody America.

186.     On February 9, 2010, RealNetworks and MTVN announced plans to restructure their digital music service joint venture, Rhapsody America, into a newly formed corporation that will operate independently from its parent companies.  RealNetworks, at the time the majority owner and operator of Rhapsody, and Viacom agreed to restructure their ownership and rights in the joint venture to provide the necessary intellectual property rights to launch the new company as an independent entity.  RealNetworks also agreed to contribute operating capital as part of the transaction.  Under the terms of the restructuring, RealNetworks would no longer have operating control over the venture, and Rhapsody would have no single majority owner.

187.     At the closing, Rhapsody was converted from a limited liability company to a corporation, and RealNetworks and MTVN held the majority of outstanding shares of Rhapsody, with RealNetworks and MTVN owning slightly less than 50% each, but an equal amount.  RealNetworks agreed to contribute $18 million in cash in exchange for shares of convertible preferred stock of Rhapsody, carrying a $10 million preference upon certain liquidation events.  A portion of RealNetwork's cash contribution was to repurchase the international radio business that was previously contributed to Rhapsody.   MTVN agreed to contribute a $33 million

advertising commitment in exchange for shares of common stock of Rhapsody, and MTVN's previous obligation to provide advertising of approximately $111 million as of December 31, 2009 was cancelled.

188.    Also at the closing, the RealNetworks and MTVN entered into a Stockholder Agreement that contains provisions regarding the governance of Rhapsody, stock transfer restrictions and approval of certain corporate transactions.  Rhapsody would be initially governed by a Board of Directors with two directors appointed by each of RealNetworks and MTVN and one independent director appointed by mutual agreement of RealNetworks and MTVN.

189.    On March 31, 2010, the Rhapsody restructuring transactions described above were completed.  At the closing, Rhapsody was converted from a limited liability company to a corporation, and RealNetworks, MTVN and two minority stockholders hold the outstanding shares of Rhapsody such that MTVN owns 47.5%, RealNetworks owns slightly less than 47.5% of such outstanding shares and the minority stockholders own the remainder.

190.    RealNetworks director Michael Mulica served as a director of Rhapsody beginning July 2013.

191.    On October 21, 2017, RealNetworks director Slade was appointed to the Rhapsody Board of Directors and granted an option to purchase 15,000 shares of RealNetworks common stock with a per share exercise price of $4.86 and scheduled to vest monthly in equal increments over a 12-month period following the award's grant date assuming continued service as a RealNetworks-designated director of Rhapsody, and RSUs covering 9,259 shares of RealNetworks common stock scheduled to vest monthly in equal increments over a 12-month period following the award's grant date assuming continued service as a RealNetworks-

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

designated director of Rhapsody, with the RSU share distribution date occurring on the first anniversary of the grant date

192.    In 2015, the Company received $5.2 million from Rhapsody for the full repayment of a loan, plus interest.

193.    On January 18, 2019, RealNetworks acquired an additional 42% interest in Rhapsody International, Inc. (now doing business as "Napster") bringing its aggregate ownership to 84% of Napster's outstanding equity, thus giving RealNetworks a majority voting interest. Napster's music streaming service provides users with access to digital music, offering on-demand streaming and conditional downloads through unlimited access to a catalog of millions of music tracks.  Napster offers music services worldwide and generates revenue primarily through subscriptions to its music services either directly to consumers or through distribution partners.  RealNetworks committed to pay $1.0 million cash in connection with the closing of its acquisition of the 42% interest in Napster and, subject to certain conditions, up to an additional $14.0 million over the following five years, with additional consideration depending on subsequent events, for a potential total of up to $40.0 million.

194.    In 2019, Glaser directly invested $800,000 in Napster in exchange for shares of preferred stock of that entity.  As of December 31, 2019, RealNetworks owned approximately 82% of Napster's outstanding equity, and RealNetowrks consolidate its financial results into the Company's financial statements.  The financial results of the subsidiary are reported in the Company's Consumer Media segment.

195.    Following the January 2019 Napster Acquisition, RealNetworks has the right to nominate directors constituting a majority of the Napster board of directors, however, Napster

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

would continue to operate as an independent business with its own board of directors, strategy and leadership team.  The Company is consolidating Napster's financial results into its financial statements for fiscal periods following the closing of the acquisition, and Napster is reported as a separate segment in RealNetworks's consolidated financial statements. Napster, however, remains a distinct legal entity and RealNetworks assumed no ownership or control over the assets or liabilities of Napster.

196.    On July 19, 2019, the Board approved equity awards to compensate Jaffe for his service as a RealNetworks-designated director on the board of Rhapsody International, Inc., d/b/a Napster.  The equity awards served as compensation to Jaffe for Rhapsody board service for the one-year period following July 19, 2019.  In connection with his appointment to the Rhapsody International board of directors, on July 19, 2019, Jaffe was granted an option to purchase 15,000 shares of RealNetworks common stock with a per share exercise price of $1.65 and scheduled to vest monthly in equal increments over a 12-month period following the award's grant date assuming continued service as a RealNetworks-designated director of Rhapsody, and RSUs covering 27,272 shares of RealNetworks common stock scheduled to vest monthly in equal increments over a 12-month period following the award's grant date assuming continued service as a RealNetworks-designated director of Rhapsody, with the RSU share distribution date occurring on the first anniversary of the grant date.

197.    In connection with his appointment to the Rhapsody International board of directors, on July 20, 2020, Jaffe was granted an option to purchase 15,000 shares of RealNetworks common stock with a per share exercise price of $1.63 and scheduled to vest monthly in equal increments over a 12-month period following the award's grant date assuming

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

continued service as a RealNetworks-designated director of Rhapsody, and RSUs covering 27,607 shares of RealNetworks common stock scheduled to vest monthly in equal increments over a 12-month period following the award's grant date assuming continued service as a RealNetworks-designated director of Rhapsody, with the RSU share distribution date occurring on the first anniversary of the grant date.  The vesting of the option and RSUs awarded as compensation for his Rhapsody board service was fully accelerated on December 30, 2020 in connection with the closing of the sale of Rhapsody to a third party.

198.    The sale of Napster to MelodyVR Group PLC closed on December 30, 2020. Valued at the closing date, the price of the transaction is approximately $70.6 million, comprising $15.0 million in cash, $11.6 million in MelodyVR stock, and assumption by MelodyVR of approximately $44.0 million in payment obligations, primarily to various music industry entities. In connection with the sale, RealNetworks received $1.5 million on repayment of a note and $10.0 million worth of MelodyVR stock in repayment of an outstanding loan.  RealNetworks also received $5.7 million in cash and stock proceeds in liquidation preference based on its preferred stock holdings in Napster.  In addition, $3.0 million was held in an 18-month indemnity escrow; the residual portion to be paid to RealNetworks after 18 months.

*JAFFE IS CONTROLLED BY GLASER AND LACKS INDEPENDENCE IN MATTERS INVOLVING GLASER*

199.    At the Company's 2016 Annual Meeting of Shareholders, Jaffe was elected as a Class 3 director to serve together with Glaser until the 2018 annual meeting. In 2018, Glaser and Jaffe were re-elected as the Class 3 directors to serve until the annual meeting of shareholders in 2021.  And, in 2021, Glaser and Jaffe were re-elected as the Class 3 directors to serve until the annual meeting of shareholders in 2024.

CLASS ACTION COMPLAINT - 66

200.    Jaffe was appointed as lead independent director in 2019. As such, Jaffe is responsible for presiding over executive sessions of the independent directors, advising as to the quality, quantity and timeliness of the flow of information from management necessary for independent directors to effectively and responsibly perform their duties, coordinating the activities of the other independent directors, and acting as principal liaison between independent directors and management.

201.    Under the Company's Compensation Plan (established in 2005), non-employee directors receive equity awards on the third business day following each annual meeting of shareholders.  These options and RSUs vest monthly in equal increments over a 12-month period following the award's grant date assuming continued service as a director, with the RSU share distribution date occurring on the first anniversary of the grant date.

202.    Pursuant to the Company's Outside Director Compensation program, as revised in July 2016, nonemployee directors of RealNetworks appointed by the Board to serve, on behalf of RealNetworks and the Board, on the board of directors of an entity that is an affiliate or investee of RealNetworks are granted compensation for such RealNetworks-designated service equal to the annual equity awards granted to nonemployee directors of RealNetworks.

203.    Accordingly, on July 19, 2019, the Board approved equity awards to compensate Jaffe for his service as a RealNetworks-designated director on the board of Rhapsody International, Inc., d/b/a Napster.  RealNetworks owned approximately 84% of the issued and outstanding stock of Rhapsody International on December 31, 2019 and, accordingly, it was considered an affiliate.  The equity awards served as compensation for Rhapsody board service for the one-year period following July 19, 2019, were scheduled to vest monthly in equal

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

increments over a 12-month period following the award's grant date assuming continued service as a RealNetworks-designated director of Rhapsody, and were reflected in Jaffe's 2019 Director compensation.

204.    In March 2019, the Board approved further revisions to the Outside Director Compensation program to provide for cash compensation of $7,500 per month to the chair of the Board's Corporate Development Committee, comprised of Jaffe as chair, Glaser and the CFO. Service on the Corporate Development Committee was entirely dependent on Glaser.

205.    As a member of the Corporate Development Committee, Jaffe was expected to assist the Board in its design and analysis of potential corporate development opportunities for the Company.   However, because the bulk of the revenue streams flowing to Jaffe from the Company were attributable to and dependent on the discretion of Glaser, as Jaffe's responsibilities and compensation grew, so did his allegiance to Glaser.

206.    As noted throughout the Company's regulatory filings:

> Mr. Glaser has special rights under our articles of incorporation to appoint or remove members of the strategic transactions committee at his discretion that could make it more difficult for RealNetworks to be sold or to complete another change of control transaction without Mr. Glaser's consent. RealNetworks has also entered into an agreement providing Mr. Glaser with certain contractual rights relating to the enforcement of our charter documents and Mr. Glaser's roles and authority within RealNetworks. These rights and his role as Chairman of the Board of Directors, together with Mr. Glaser's significant beneficial ownership, create unique potential for concentrated influence of Mr. Glaser over potentially material transactions involving RealNetworks and decisions regarding the future strategy and leadership of RealNetworks.

*See, e.g.,* RealNetworks Form 10-K for year ending December 31, 2021, filed February 25, 2022, at 19.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

207.    In 2019, Jaffe served as the Board designated director on the Rhapsody International board of directors (controlled by Glaser), as a member of the Audit Committee, as Lead Independent Director and Chair of the Audit Committee (for the last two months of 2019), as Chair of the Corporate Development Committee (controlled by Glaser) and was paid over $300,000, more than double the total compensation, RSUs and options received by any other non-employee director on the RealNetworks Board.

208.    In 2020, Jaffe served as a Chair of the Audit Committee from January 1 to April 16, as Chair of the Compensation Committee from April 17 to December 31, as Lead Independent Director, as Chair of the Corporate Development Committee and continued to serve as a RealNetworks-designated director of Rhapsody and was paid nearly $315,000, over two and a half times the total compensation, and double the RSUs and options received by any other non-employee director on the RealNetworks Board.  On December 30, 2020, the Company completed the sale of Rhapsody to a third party, and even though he was compensated for that service with RealNetworks RSUs and options (and not of Rhapsody), the sale of the asset triggered the acceleration of their vesting.

209.    Due to apparent, uncorrected cutting and pasting from the Company's 2020 Form 10-K, Jaffe's precise roles throughout 2021 cannot be clearly discerned from the Company's 2021 Form 10-K.  However, it appears that Jaffe continued to serve as Chair of the Compensation Committee, a member of the Nominating & Corporate Governance Committee, Lead Independent Director, as Chair of the Corporate Development Committee and, together with defendant Prusch, as a member of the Special Committee charged with communicating and negotiating with Glaser, during last two months of the year.  Although his total 2021 compensation of $235,000 was lower

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

than in 2020, he was paid 150% more than any other non-employee director on the RealNetworks Board.

210.    According to the Proxy, at 71, on August 19, 2022, (less than a month after the Special Committee and Board approved the Merger Agreement), Glaser rewarded Jaffe with a new appointment as a Board-designated director of Scener and granted the 2022 Jaffe Award. Notably, Glaser is also a director of Scener and has personally invested in Scener.

211.    Due to a purported "inadvertent administrative error", the Form 4 disclosing the 2022 Jaffe Award was not filed until October 28, 2022, over two months late.  As represented in the Form 4, the award was granted on August 19, 2022, during the negotiation and assessment of the Transaction.

212.    The 2022 Jaffe Award was granted an exceptional, rapid, vesting schedule that is not consistent with the Company's Outside Director Compensation program, which provides that "annual awards of options and RSUs vest monthly in equal increments over a 12-month period following the award's grant date assuming continued service as a director, with the RSU share distribution date occurring on the first anniversary of the grant date." *See, e.g.,* 2016 Proxy, at 61. Instead of the terms that ought to apply per the program, the 2022 Jaffe Award vests in four, equal, monthly installments beginning August 19, 2022 until fully vested by December 19, 2022, within a week of the scheduled shareholder vote on the Transaction and prior to December 31, 2022 (the date assumed for closing of the Merger in the Merger Agreement and in connection with the Proxy's disclosures of the Equity Interests of RealNetworks's Executive Officers and Non-Employee Directors).

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

213.     Moreover, the representations that the Jaffe appointment to the Scener board and the 2022 Jaffe Award occurred on August 19, 2022, and the delay in filing the Form 4 was due to an "inadvertent administrative error" strain credulity.  As noted above, the preliminary proxies, last filed on October 20, 2022, omitted the Scener appointment and 2022 Jaffe Awards.  Together with the untimely Form 4, these filings were designed to obscure Jaffe's conflict of interest and the immediate quid pro quo he received from Glaser for facilitating the Transaction.

214.     Assuming an "inadvertent administrative error" delayed the filing of the Form 4, how did this error spill over to the preliminary proxies?  The 2022 Jaffe Award should have been timely recorded in the Company's books and records, such as a treasury ledger or minutes of the Board and Compensation Committee meetings.  If no such records exist, how did the "inadvertent administrative error" get corrected, let alone discovered?

215.     Thus, the terms, timing and circumstances of the Scener appointment and 2022 Jaffe Award, the Form 4 filing, and the Board's acquiescence to and endorsement of the updated disclosures in the Proxy regarding the equity interests implicate the entire Board in the breaches of duty perpetrated by Glaser and demonstrate that none of the Directors are independent.

**DEFENDANTS AUTHORIZED THE PROXY TO BE DISSEMINATED TO REALNETWORKS'S STOCKHOLDERS, WHICH PROVIDED A MATERIALLY MISLEADING PICTURE OF THE SALES PROCESS AND COMPANY'S FUTURE PROSPECTS**

216.     Defendants solicited stockholder approval of the Transaction by causing the filing of the materially misleading Proxy, which omitted material information that was required to be disclosed to RealNetworks's shareholders to enable them to cast an informed vote with respect to the Transaction.

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

217.     The Proxy omitted material information with respect to the process and events leading up to the Transaction, as well as the opinion and analysis of Houlihan Lokey.  This omitted information, if disclosed, would have significantly altered the total mix of information available to RealNetworks's shareholders.

218.     The Proxy failed to disclose material information relating to the process leading up to the Transaction, including:

(i)      The Proxy states that on November 9, 2021, at a meeting of the Board (in advance of its annual shareholder meeting), Glaser "informed the Board that he was considering making a proposal to acquire all of the Company" shares not owned by him or his affiliates. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *ee* RN_Strougo_000092-093.

(ii)     The Proxy misrepresents the timing and selection of Jaffe and Prusch as the sole members of the Special Committee.  According to the Proxy, at 15, "[i]n response to Mr. Glaser's potential plans, the Board formed a special committee of independent and disinterested directors (the "Special Committee") to establish the process by which Mr. Glaser could engage with management of the Company…" ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████. *Id*. at RN_Strougo_0000094.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

(iii)     The Proxy purports to describe the formation and duties of the Special Committee, which were to "(1) conduct a full and independent review of the process by which the Company intends to consider and evaluate the Transaction and to make a recommendation to the Board regarding any Transaction and (2) negotiate the terms and conditions of any Transaction." *Id.* at RN_STROUGO_0000094.  Critically, the Proxy fails to disclose that ███████████████████ █████████████████████████████████████████████████████████████

(iv)     The Proxy fails to disclose the numerous, significant conflicts of interest that Jaffe (the Company's chief negotiator in the Transaction), possessed vis-à-vis Glaser, as described above.  These significant conflicts of interest prevented him from negotiating the best possible price on behalf of the Company's unaffiliated shareholders.

(v)     The Proxy fails to disclose that Houlihan Lokey possessed a potential conflict of interest due to its work on a recent related party transaction involving Glaser acquiring approximately 8 million shares of RealNetworks Series B Preferred Stock for aggregate gross proceeds to the Company of approximately $10 million.

(vi)     In addition, the Proxy ███████████████ the additional near-term capital that management assumed would be necessary to achieve the results forecasted by the investment case. Contrary to the misrepresentation in the Proxy, as reflected above in table from Houlihan Lokey's March 1, 2022 presentation, the "investment case" ██████████████████████ ████████████████████

(vii)     According to the Proxy, on April 11, 2022, in preparation for the regularly scheduled meeting Board meeting on April 21, 2022, Glaser informed the Board that he had ended his efforts to pursue a potential transaction with a third-party investor, including [Imperial

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Capital's] support of those efforts. Having been unable to identify potential partner financing sources, Glaser told the Board that the concept of a transaction supported by a partner financing source was not viable at this time.   However, as with the Proxy's other representations, ██

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████ is intended to lend credibility to Glaser's (fake) purported termination.

(viii)    The Proxy also fails to disclose that Glaser's representation on or about April 2022 that he was no longer pursuing his potential buy-out of the Company was false, and a pretense to allow him access to the Company's confidential financial information that he would have otherwise had access to during the sales process.  Indeed, as soon as Glaser was privy to such information, he reengaged in the sales process by making the May Proposal.

(ix)    The Proxy fails to disclose that, although the minutes of the May 10, 2022 Special Committee meeting indicate that ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

See RN_Strougo_0000026.

(x)    Although the Proxy states that "[o]n May 25, 2022, the Special Committee held a meeting at which its advisors from K&S and Houlihan Lokey participated. Houlihan Lokey again

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

advised the Special Committee of its communications with certain shareholders following the announcement of the Proposed Transaction as well as inbound inquiries from potential buyers.". The Proxy failed to disclose that ███████████████████████████████████████████ ████████████████████████ Indeed, the Special Committee was informed ██████████████ ████████ ███████ ██████ ██ ██ ███████ █████ ██ ██ █████ ███████ ████████ RN_Strougo_0000029.

    (xi)    The Proxy fails to disclose that management's best estimates of the Company's future performance were wholly contingent on receiving a capital infusion from Glaser.

    (xii)    The Proxy states that "[o]n June 12, 2022 and again on June 13, 2022, the Special Committee held meetings at which its advisors from K&S and Houlihan Lokey participated, to discuss Mr. Glaser's position on the issues and how to respond in the form of a merger agreement." The Proxy fails to disclose that on June 12, 2022, the Special Committee ████████ ██████████████████████████████████████████████████████████████████████ RN_Strougo_0000046.

    (xiii)   On July 18, 2022, the Special Committee met and discussed ████████████ ██████████████████████████████████████████████████████████████████████ ██████████████ The Special Committee's apparent bottom line not disclosed to shareholders in the Proxy.

    (xiv) The Proxy fails to disclose ██████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████

CLASS ACTION COMPLAINT - 75

████████████████████████████████████████████████████████████████, the

Proxy omitted this material fact and stated that "to the extent preliminary financial analyses or

information were included in such preliminary discussion materials, *such preliminary financial*

*analyses or information* <u>*may have differed*</u> *from the July 26, 2022 financial presentation* as a

result of, among other things, changes in the Company's internal financial forecasts." Proxy at

54.  The failure to disclose ████████████████████████████████████████████████████

████████████████████ constituted a material omission.

(xv)  As noted in Houlihan Lokey's valuation presentations, the Company was covered by

a single analyst, at Lake Street Capital Markets.  However, in its description of the materials

considered by Houlihan Lokey in arriving at its fairness opinion, the Proxy, at 49, misleadingly

states that Houlihan Lokey "reviewed certain publicly available business and financial

information relating to the Company that it deemed to be relevant, ***including certain publicly***

***available research analyst estimates*** with respect to the future financial performance of the

Company" thereby implying that Houlihan Lokey's opinion was supported by the views of

multiple analysts and therefore more credible than it was in fact.[5]  Similarly, in its description of

Houlihan Lokey's March 24, 2022 Preliminary Discussion Materials, the Proxy misrepresents

that Houlihan Lokey analyzed the Company's historical financial results "relative to guidance

provided by the Company's management and ***research analyst estimates*** based on public filings,

information provided by the Company ***and analyst estimates***." Proxy at 55.

---

[5] The Proxy's use of the phrase "research analyst estimates" is also found in connection with its
description of Houlihan Lokey's source for its estimates of the future financial performance in its
Selected Companies Analysis, at 52, which "were based on certain publicly available *research
analyst estimates* for those companies," which likewise referred to *multiple* analyst estimates.

CLASS ACTION COMPLAINT - 76

(xvi)   According to the Proxy, at 54, the June 3, 2022 preliminary discussion materials were substantially similar to the July 26, 2022 financial presentation and contained, among other things, a preliminary selected companies analysis and a preliminary discounted cash flow analysis, which preliminary analyses generally used the same methodologies as described above under the heading "July 26, 2022 Financial Presentation."  Yet, as described above and reflected in Houlihan Lokey's July 26, 2022 Financial Presentation, at 21, but concealed in the Proxy, █████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████  The Proxy likewise failed to disclose ███

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

219. In sum, the above-referenced statements were materially false or misleading, and misled RealNetworks shareholders with respect to the purported fairness of the Transaction and the actual value of their shares.

220. The Individual Defendants were legally obligated to carefully review the Proxy before they signed it and disseminated it to shareholders to ensure that it did not contain any materially false or misleading statements. They failed to fulfill their obligation by allowing the dissemination of the materially misleading Proxy. As a result, shareholders were misled into voting for the unfair Transaction, thereby causing them to receive less than full value for their shares and lose out on millions of dollars of value in the Company.

221. As directors of the Company, the Individual Defendants were responsible for and significantly involved in the preparation of the Proxy and knew that it represented the best available estimates and judgments of the expected future results of the Company's operations and financial condition. The Individual Defendants nevertheless signed and approved the dissemination of a Proxy that misstated their own genuine belief. They were negligent in approving and signing a Proxy that they knew or should have known contained the above-referenced materially false and misleading statements.

## CLASS ACTION ALLEGATIONS

222. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and on behalf of all other public shareholders of the Company (except the Defendants herein and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants) and their successors in interest, who are or will be threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

223. This action is properly maintainable as a class action.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

224.    The Class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable. As of July 22, 2022, there were over 47 million shares of RealNetworks's common stock outstanding, likely owned by thousands of shareholders of record scattered throughout the United States.

225.    There are questions of law and fact which are common to members of the Class and which predominate over any questions affecting any individual members. The common questions include, inter alia, the following:

a)    whether Individual Defendants except Glaser made any untrue statements of a material fact in the Proxy, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

b)    whether Glaser made any untrue statements of a material fact in the Proxy, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

c)    whether Individual Defendants violated Section 20(a) of the Exchange Act;

d)    whether the Glaser Parties violated Section 20(a) of the Exchange Act; and

e)    whether Plaintiff and other members of the Class suffered damages as a result of the Transaction and Defendants' violations of law.

226.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. The claims of Plaintiff are typical of the claims of the other members of the Class and Plaintiff has the same interest as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

227.    The prosecution of separate action by individual members of the Class would

CLASS ACTION COMPLAINT - 79

create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

228. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

229. For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## **FIRST CAUSE OF ACTION**

**VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9
(Against Each of the Individual Defendants Except Glaser)**

230. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

231. The Individual Defendants caused the Proxy to be issued with the intention of soliciting shareholder support of the Transaction.

232. SEC Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, provides: "No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a-9.

233. The Individual Defendants violated this clause of Section 14(a) because they negligently caused or allowed the Proxy to be issued with the intention of soliciting shareholder

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

support of the Transaction, and the Proxy contained untrue statements of material fact that reasonable and diligent directors would have corrected prior to disseminating the Proxy.

234.    The Individual Defendants were negligent in allowing the Proxy to be disseminated with the above-referenced materially misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Transaction and the reasons that supported its fairness.  As directors of RealNetworks, the Individual Defendants had a duty to carefully review the Proxy before it was disseminated to ensure it did not omit statements of material fact.  The Individual Defendants were negligent in carrying out their duty because, as set forth herein, the Proxy contains materially false and misleading statements.

235.    The Individual Defendants are imputed with the negligence of Glaser, who was the CEO and a director of the company.

236.    As a direct result of the Individual Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, Plaintiff and other RealNetworks shareholders were impeded from making a decision on a fully informed basis and were induced to vote and accept the inadequate Merger Consideration.  The false and/or misleading Proxy used to solicit the shareholder votes impeded Plaintiff and other RealNetworks shareholders from making a fully informed decision regarding the Transaction and was an essential link in consummating the Transaction, which deprived them of the full and fair value for their RealNetworks shares.

237.    At all times relevant to the dissemination of the materially false and/or misleading Proxy, the Individual Defendants were aware of and/or had access to the true facts concerning the process involved in selling RealNetworks, the projections for RealNetworks, and RealNetworks's

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

true value, which is greater than the Merger Consideration that RealNetworks's shareholders received.

238.     The misrepresentations in the Proxy are material in that a reasonable shareholder would consider them important in making an informed decision concerning whether to vote in favor of the Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy and in other information reasonable available to shareholders.

239.     As a direct and proximate result of the dissemination of the misleading Proxy the Individual Defendants used to obtain shareholder approval of the Transaction, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Transaction and the true value of their shares) in an amount to be determined at trial. By reason of the misconduct detailed herein, the Individual Defendants are liable pursuant to Section 14(a) of the Exchange Act.

## SECOND CAUSE OF ACTION

**VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9**
**(Against Glaser)**

240.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

241.     Glaser caused the Proxy to be issued with the intention of soliciting shareholder support of the Transaction.

242.     SEC Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, provides: "No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement

CLASS ACTION COMPLAINT - 82

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a-9.

243.   Glaser violated this clause of Section 14(a) because he negligently caused or allowed the misleading Proxy to be issued with the intention of soliciting shareholder support of the Transaction, and the Proxy contained untrue statements of material fact that a reasonable and diligent chief executive officer would have corrected prior to signing and disseminating the Proxy.

244.   Glaser was negligent in allowing the Proxy to be disseminated with the above-referenced materially misleading statements regarding the Company's projections, the value of the Company, and the purported fairness of the Transaction and the reasons that supported its fairness.  As the CEO and a director of RealNetworks, Glaser had a duty to carefully review the Proxy before it was disseminated to the Company's shareholders to ensure that it did not contain untrue statements of material fact.  Glaser was negligent in carrying out this duty because, as set forth herein, the Proxy contains materially false and misleading statements.

245.   As a direct result of Glaser's negligent preparation, review, and dissemination of the false and/or misleading Proxy, Plaintiff and other RealNetworks shareholders were impeded from making a decision on a fully informed basis and were induced to vote and accept the inadequate Merger Consideration.  The false and/or misleading Proxy used to solicit the shareholder votes impeded Plaintiff and other RealNetworks shareholders from making a fully informed decision regarding the Transaction and was an essential link in consummating the

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1    Transaction, which deprived them of the full and fair value for their RealNetworks shares.

2         246.   At all times relevant to the dissemination of the materially false and/or misleading

3    Proxy, Glaser was aware of and/or had access to the true facts concerning the process involved in

4    selling RealNetworks, the projections for RealNetworks, and RealNetworks's true value, which

5    is greater than the Merger Consideration RealNetworks shareholders received.

6         247.   The misrepresentations in the Proxy are material in that a reasonable shareholder

7    would consider them important in making an informed decision concerning whether to vote in

8    favor of the Transaction.  In addition, a reasonable investor would view a full and accurate

9    disclosure as having significantly altered the "total mix" of information made available in the

10   Proxy and in other information reasonably available to shareholders.

11        248.   As a direct and proximate result of the dissemination of the misleading Proxy that

12   Glaser used to obtain shareholder approval of the Transaction, Plaintiff and the Class have

13   suffered damages and actual economic losses (*i.e.* the difference between the value they received

14   as a result of the Transaction and the true value of their shares) in an amount to be determined at

15   trial.  By reason of the misconduct detailed herein, Glaser is liable pursuant to Section 14(a) of

16   the Exchange Act.

17
18                                **THIRD CAUSE OF ACTION**

19                **VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
                            **(Against Individual Defendants)**

20        249.   Plaintiff repeats and realleges each and every allegation above as if set forth in full

21   herein.

22        250.   The Individual Defendants acted as controlling persons of the Company within the

23   meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their position as

CLASS ACTION COMPLAINT - 84

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and/or misleading.

251.    The Individual Defendants signed the Proxy and were provided with or had unlimited access to copies of the Proxy prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

252.    Glaser had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement is signed by Glaser, and he was thus directly involved in the making of the Proxy.

253.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

254.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act, by their acts and omissions as alleged herein.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### RELIEF REQUESTED

**WHEREFORE,** Plaintiffs demands relief in his favor and against the Defendants jointly and severally, as follows:

1.    Declaring that this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representatives and their

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

counsel as Class Counsel;

    2.    Awarding Plaintiff and the members of the Class compensatory and/or rescissory damages against Defendants, including pre-judgment and post-judgment interest;

    3.    Awarding Plaintiff and the members of the Class reasonable attorneys' fees, expert fees, and other costs;

    4.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

    5.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

    Plaintiff demands a trial by jury.

**DATED** this 4th day of March, 2024.

Respectfully submitted,

BADGLEY MULLINS TURNER, PLLC

/s/ *Duncan C. Turner*
Duncan C. Turner
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
(206) 621-6566
dturner@badgleymullins.com

Gustavo F. Bruckner (*pro hac vice forthcoming*)
Samuel J. Adams (*pro hac vice forthcoming*)
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
gfbruckner@pomlaw.com
sjadams@pomlaw.com

CLASS ACTION COMPLAINT - 86

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Daniel Kuznicki (*pro hac vice forthcoming*)
KUZNICKI LAW PLLC
445 Central Avenue
Cedarhurst, NY 11516
(347) 696-1134
dk@kclasslaw.com

***Attorneys for Plaintiff***

CLASS ACTION COMPLAINT - 87