1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| BARBARA STROUGO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>-against-<br><br>REALNETWORKS, INC., ROBERT GLASER, BRUCE A. JAFFE, CHRISTOPHER R. JONES, DAWN G. LEPORE, ERIK E. PRUSCH, MICHAEL B. SLADE and TIM WAN,<br><br>Defendants. | Case No. 2:24-cv-00297-JCC<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**PUBLIC REDACTED VERSION**<br><br>**JURY TRIAL DEMANDED**<br><br>**1. VIOLATIONS OF SECTION 14(a) OF THE SECURIIES EXCHANGE ACT OF 1934**<br><br>**2. VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

Lead Plaintiff Richard Brender ("Plaintiff"), through undersigned counsel, alleges upon personal knowledge with respect to himself, and, as to all other allegations herein, upon information and belief based upon the investigation of counsel, publicly-available information, and review of documents produced by RealNetworks, Inc. ("RealNetworks" or the "Company") to Plaintiff in connection with Plaintiff's demand pursuant to RCW § 23B.16.020 (the "Demand Production"), as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated former stockholders of RealNetworks against (1) Real Networks and (2)

the former members of the RealNetworks Board of Directors (the "Board" or "Individual Defendants"), for violating Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78n(a) and 78t(a), all in connection with their efforts to effectuate the sale of RealNetworks to Defendant Robert Glaser—the Company's Founder, former Chief Executive Officer and Chairman of the Board, and controlling (38.5%) shareholder—at the unfair price of $0.73 in cash for each share of RealNetworks common stock not already owned by Glaser (the "Buyout" and the "Merger Consideration").

2.      Prior to the Buyout, RealNetworks was a publicly traded company that was transitioning its business from a traditional technology-based digital media company to an AI-based digital media company. Throughout 2021, on quarterly earnings calls, Glaser publicly exuded optimism about the Company's value and future prospects, particularly with respect to its new lines of business focusing on emerging AI technology. The market reacted favorably to RealNetworks' transformation initiatives in early 2021, with its share price exceeding $6.00 per share in March of 2021.

3.      In and around April 2021, RealNetworks' trading price began a steady and substantial decline, which was the **anticipated consequence** of a series of business activities led by Glaser as CEO, including the widely publicized AI "transformation," a $20 million public offering at a per share price significantly *below* RealNetworks' then-market price, the termination of multiple executives, and significant investment in building up the Company's AI-based business segments. Glaser—who knew that RealNetworks was going through an expected short-term dip in order to achieve better long-term results—saw this decline in the Company's value as an opportunity to purchase the Company for cheap.

4.      To that end, on or around November 9, 2021, Glaser informed the Board that he was considering an acquisition of RealNetworks. At that time, the Company's stock was trading at $1.40. In response, the Board formed an ostensibly independent special committee ("Special Committee") to, among other things, engage independent legal and financial advisors, obtain

1 information from management (which was led by Glaser), and negotiate with Glaser on the terms
2 of a potential transaction. However, due to Glaser's resounding control over RealNetworks and
3 the pressure tactics he employed during the negotiation process, the Buyout was inevitable, and
4 the self-described "neutered" Special Committee could do little to counteract Glaser's scheme or
5 protect the interests of minority shareholders.

6      5.      In fact, in the *nine-month* period between Glaser declaring his intention to acquire
7 the Company and executing the Merger Agreement, Glaser's sole focus was figuring out ways to
8 acquire RealNetworks at the cheapest price possible for himself, to the detriment of the Company's
9 minority shareholders. In the process, he intentionally failed to make the best decisions for the
10 Company to prosper, including by addressing the Company's need for capital to fund its AI growth
11 initiatives or by auctioning the Company to identify third parties that could provide a superior
12 proposal to his. Indeed, Glaser put machinations in motion to *depress* the Company's value so that
13 he could steal the Company from shareholders at the lowest possible price, and he did just that.

14      6.      In preparation for the evaluation of Glaser's pending proposal, on January 26, 2022,
15 the Board met and discussed three-year financial forecasts that were prepared by the Company's
16 management (**in consultation with Glaser**), with a view toward approving a budget for FY 2022.
17 These forecasts included two scenarios:

18    • "[A] 'baseline forecast' that did not reflect any additional near-term capital
19      investment" (the "Baseline Forecast"); and
20    • A higher, more optimistic "forecast that assumed the Company would receive
21      approximately $15 million of additional near-term capital to fund its growth
22      projects" (the "Investment Scenario").

23 The table below highlights that, among other metrics, ████████████████████████
24 ████████████████████████████████████████

|  |  | **2023** | **2024** |
|---|---|---|---|
| **Revenue** | Baseline Forecast | ██ | ██ |
|  | Investment Scenario | ██ | ██ |

7.     However, Glaser made sure the Company did not raise the additional capital it needed to fund the growth initiatives outlined in the Investment Scenario, so that he could ensure that RealNetworks' stock price would bottom out. As a result, on March 1, 2022, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), RealNetworks' financial advisor in connection with the Buyout, informed the Special Committee that the depressed Baseline Forecast presented at the January 26, 2022 Board meeting represented management's best estimates of the Company's future performance (hereinafter referred to as the "January Baseline Projections"), and the Special Committee then directed Houlihan Lokey to use the depressed January Baseline Projections to value the Company.

8.     Indeed, Glaser patiently waited for the Company's stock price to drop as he starved it for capital, all while he purportedly sought financing for himself to acquire the Company. Finally, on May 6, 2022—six months after Glaser first informed the Board of his intent to acquire RealNetworks, and after the Company's stock price had declined another 66.5%—Glaser *finally* made his initial proposal to acquire the shares of RealNetworks common stock that he did not already own for **just $0.67** in cash per share. Despite *waiting six months* between making his intent known and actually providing the Board with an offer, Glaser now stressed that the Special Committee should complete the Buyout in an expedited manner through a single-bidder process, going as far as making his offer contingent on reaching a definitive agreement in **just one month**, by June 8, 2022. Notably, Glaser also pursued his offer without consideration for the Company's minority shareholders, as his offer was <u>not</u> contingent on a majority of the minority voting provision.[1] Moreover, Glaser's position afforded him unique insight into the Company's future,

---

[1]     Under Delaware law, which many state and federal courts follow, there are strict protections that are meant to be put in place from the get-go in a controller buyout like this. *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (holding that the business judgment review applies to a merger proposed by a controlling stockholder conditioned "*ab initio*" on two procedural protections: (1) the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and (2) the uncoerced, informed vote of a majority of the minority stockholders.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1   and he sought to acquire the Company at a time when he knew it was at the cusp of achieving

2   success following substantial investments in transformative AI technology.

3        9.      This coercive offer did not reflect fair value. On May 10, 2022, Houlihan Lokey

4   informed the Special Committee that Glaser's initial proposal was ███████████████████

5   ████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████

9        10.     Shortly thereafter, the Special Committee—which, as outlined below, was not

10  independent—decided that management (with the conflicted Glaser at the helm) needed to

11  "update" the January Baseline Projections. ████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████, and which the Special Committee had

14  just determined represented the Company's best estimates *only* two months prior. In other words,

15  *after* receiving Glaser's lowball offer and *after* receiving ███████████████████████

16  ████████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████.

19       11.     Just two months after they determined that the January Baseline Projections were

20  the best estimates of RealNetworks future performance, on May 29, 2022, the Special Committee

21  concluded that these new, "updated" projections prepared by management (**with input from**

22  **Glaser**) now represented the best estimates of RealNetworks' future financial performance

23  (hereinafter referred to as the "May Projections"). As shown in the table below and outlined in

24  further detail herein, ██████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████████

27

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

| | | | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| ████ | ████████ | ███ | ██ | ██ | ██ |
| | ███ | ██ | | | |
| ████ | ████████ | | ██ | ██ | ██ |
| ███ | ████ | | ██ | ██ | ██ |
| ███ | ████████ | ███ | ██ | ██ | ██ |
| | ████ | ██ | ██ | ██ | ██ |

12.    In addition to overseeing management's slashes to the Company's projections to make his lowball offer seem fair, Glaser also pressured the Special Committee throughout the negotiation process, by: (1) refusing to address the Company's purported "cash burn" or capital needs, thereby placing the Board in an untenable position to properly run the Company during a transitive period; (2) dragging out his acceptance of the majority of the minority provision, and instead using the provision as a bargaining tool during the parties' economic negotiations; (3) preventing the Special Committee from soliciting acquisition proposals from any third parties by way of his role as Chairman of a self-created Strategic Transactions Committee, **which provided him with veto power over *any* alternative, superior transaction**; (4) pressuring the Special Committee with his unreasonable timelines; and (5) threatening to withdraw his public offer, which he knew would cause the Company's stock price to decrease so that he could purchase the Company at an even lower price.

13.    On June 3, 2022, Houlihan Lokey presented to the Special Committee its updated financial analysis of Glaser's initial proposal of $0.67 per share based upon the ████████ ████████. This time Houlihan Lokey's financial analysis concluded that the $0.67 per share offer was ████████████████. In other

TOWNSEND LEGAL CORP
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1    words, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

3         14.     Ultimately, on July 19, 2022, the Special Committee agreed to Glaser's final offer

4    of just $0.73 per share. Then, on July 22, 2022, **just four days before Houlihan Lokey rendered**

5    **its fairness opinion** in connection with the Buyout, **and three days after the Merger**

6    **Consideration was agreed to**, management (again with Glaser at the helm) prepared another,

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Proxy Projections"). The Individual Defendants then directed

8    Houlihan Lokey to use the Proxy Projections, which *they knew* were the product of ▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮, to render a fairness opinion, which enabled Houlihan Lokey to opine that Glaser's

10   offer of $0.73 was now somehow "fair."

11        15.     <u>**The January Baseline and May Projections were not disclosed to the**</u>

12   <u>**Company's shareholders in the Proxy itself.**</u> If the January Baseline Projections had been used,

13   Houlihan Lokey could not have concluded that the Merger Consideration was fair.

14        16.     On July 27, 2022, RealNetworks entered into the Agreement and Plan of Merger

15   (the "Merger Agreement") with Greater Heights LLC and Greater Heights Acquisition LLC, a

16   wholly-owned subsidiary of Greater Heights LLC, both of which were affiliates of Glaser,

17   whereby Glaser would purchase all outstanding shares of RealNetworks common stock that he did

18   not already own at $0.73 in cash per share.

19        17.     On November 7, 2022, the Company filed a materially incomplete and misleading

20   Definitive Proxy Statement ("Proxy") with the U.S. Securities and Exchange Commission

21   ("SEC").[2] As elaborated below, the Proxy was materially false and/or omissive because it: (1)

22   falsely stated that management believed that the Proxy Projections were prepared in good faith

23   and reflected management's reasonable best estimates of the Company's prospects; (2) omitted

24   the January Baseline Projections or any description of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, thereby

25

26      [2]     On December 2, 2022, RealNetworks filed certain supplemental disclosures to the Proxy

27   in a Form 8-K with the SEC (the "Supplemental Disclosures"). None of the Supplemental
     Disclosures addressed the issues identified herein.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

rendering the Proxy's vague references to those projections being "Updated" misleading half-truths; and (3) omitted that the ████████████ to create the Proxy Projections.

18.     On December 14, 2022, the Company's shareholders (excluding the shares held by Glaser), relying upon the materially incomplete and misleading Proxy, voted to approve the Buyout (the "Shareholder Vote"). As a result of the material omissions and misstatements in the Proxy, shareholders were deceived into approving the Buyout, and the Buyout closed on December 21, 2022. The materially false and misleading Proxy was an essential link in the completion of the Buyout, as it could not have occurred without the dissemination of the Proxy.

19.     The Individual Defendants reduced the Company's projections, issued the materially false and misleading Proxy, and caused the Company's shareholders to be cashed out of their shares at the unfair Merger Consideration that did not adequately value RealNetworks' future potential.

20.     Accordingly, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

21.     This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

22.     Personal jurisdiction exists over each Defendant either because each Defendant conducted business in or maintained operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

had an effect in this District; (ii) RealNetworks maintained its headquarters in this District and each of the Individual Defendants, as Company officers and/or directors, either reside in this District or have extensive contacts within this District; (iii) a substantial portion of the actions in furtherance of the Buyout and wrongs complained of herein occurred in this District; (iv) relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

24.    Lead Plaintiff Richard Brender (defined above as "Plaintiff") was, at all relevant times, a stockholder of RealNetworks.

25.    Defendant Robert Glaser (defined above as "Glaser") was, at all relevant times, the Company's Founder, Chairman of the Board, Chief Executive Officer, and largest shareholder. He owned 38.5% of RealNetworks' common stock at the time of the Buyout.

26.    Defendant Bruce A. Jaffe ("Jaffe") served as a director of the Company since 2015, as Lead Independent director of the Company since 2019, and as Chairman of the Special Committee at all relevant times. Between 2019 and the Buyout, Jaffe served in various high-ranking roles for the Company, including as the Company's lead independent director, chair of the audit committee, chair of the corporate development committee, chair of the compensation committee, as the Board's designated director on the Rhapsody International board (controlled by Glaser), and as a member of the two-man Special Committee. During those years, he was paid between 1.5 to 2 times any other employee director on the RealNetworks Board.

27.    Defendant Erik E. Prusch ("Prusch") was, at all relevant times, a director of the Company and a member of the Special Committee.

28.    Defendant Christopher R. Jones was, at all relevant times, a director of the Company.

29.    Defendant Dawn G. Lepore was, at all relevant times, a director of the Company.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

30.     Defendant Michael B. Slade was, at all relevant times, a director of the Company.

31.     Defendant Tim Wan was, at all relevant times, a director of the Company.

32.     Defendants identified in paragraphs 25-31 are collectively referred to as the "Individual Defendants" or the "Board."

33.     Defendant RealNetworks, Inc. was a Washington Corporation with its principal executive offices located at 1501 First Avenue South, Seattle, WA98134. Upon consummation of the Buyout, RealNetworks, Inc. merged with and into Greater Heights Acquisition LLC, a Washington limited liability company that Glaser formed on July 25, 2022, for purposes of effectuating the Buyout. Greater Heights Acquisition LLC was the surviving entity in the merger with RealNetworks, Inc., and its name was changed to RealNetworks LLC immediately following the effectuation of the Buyout. RealNetworks LLC maintains its principal office address at 1501 1st Ave S Ste 600, Seattle, WA 98134.

34.     Nonparty Greater Heights LLC, an affiliate of Glaser, is a Washington limited liability company formed by Glaser on December 12, 2021, solely for the purpose of engaging in the Buyout. Greater Heights LLC's principal executive offices are located at 1501 First Avenue South, Suite 600, Seattle, WA 98134.

35.     Nonparties RealNetworks LLC (f/k/a Greater Heights Acquisition LLC) and Greater Heights LLC were and/or are controlled by Defendant Glaser, and were the corporate vehicles through which he effectuated his unlawful scheme to acquire all of the outstanding stock of RealNetworks, Inc.

## SUBSTANTIVE ALLEGATIONS

A.     RELEVANT CORPORATE BACKGROUND

36.     RealNetworks (formerly known as Progressive Networks) was founded in 1994 by Glaser, a former Microsoft executive. Originally created to provide a distribution channel for politically progressive content, the Company quickly evolved into a technology venture focused on developing streaming software that delivered audio and video files over the Internet to personal

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

computers through RealAudio, RealVideo, and RealPlayer, among other products and services. The Company went public via IPO in October 1997 and became a dominant player in the streaming media industry.

37.    At the time of the Buyout, RealNetworks was in the midst of a transformation, moving from its roots as a traditional technology-based digital media company to becoming an AI-based digital media company. The Company was actively shifting away from unprofitable legacy businesses and investing resources into three primary business units: SAFR, KONTXT, and Games.

38.    SAFR (Secure Accurate Facial Recognition) is a machine learning facial recognition platform that was launched by the Company in 2018 and updated in 2020 with COVID-19 response features, including the ability to identify people wearing masks with 98.85% accuracy. On April 27, 2021, SAFR received a grant from the U.S. Air Force to develop its AI-powered analytics for rescue missions, perimeter protection, and domestic search operations.

39.    In 2017, RealNetworks launched KONTXT, a Natural Language Processing platform for text and multi-media analysis. In March 2021, the Company unveiled KONTXT for Voice to identify and stop scam robocalls.

40.    RealNetworks entered the computer game market in October 2001 with RealArcade, a PC game distribution application that allowed users to play casual video games for free for 60 minutes. Many of the games were developed by GameHouse, which RealNetworks acquired in 2004. In 2010, RealNetworks re-branded its Games division under the name GameHouse, which focuses on social games, such as Facebook applets.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**B.**    U̲N̲D̲E̲RLIN̲E̲D̲: E̲VENTS L̲EADING TO THE B̲UYOUT

    **1.    As the Company Transitions Toward AI in 2021, Glaser Publicly Expresses Optimism Regarding the Company's Value and Future Prospects**

41.    During the Company's Q4 2020 earnings call held on February 10, 2021, despite the challenges of the COVID-19 Pandemic, Glaser reported positive results for 2020 and expressed optimism about the Company's future. In particular, Glaser reported that in Q4 2020, the Company completed the sale of Napster and ended the year with $23.9 million in unrestricted cash, up from $8.5 million at the end of 2019, and very little debt (just $2.9 million). Glaser summarized the Company's positive results as follows:

> **2020 was a year of strong achievements for RealNetworks** in spite of the challenges associated with the Global Pandemic that had a huge impact on businesses and people around the globe. **Revenue from two of our key growth initiatives – free-to-play mobile Games and SAFR – grew over 110% from 2019**. We are also pleased to have **completed the sale of Napster to MelodyVR. We believe the sale of Napster simplifies Real and will help us deepen our focus on our growth initiatives and create long-term shareholder value.**

42.    During the same call, Glaser elaborated on the Company's AI transformation, a major focus for RealNetworks, and the Company's future prospects in that realm of rapid advancement:

> Now I'd like to share a few details about our strategy going forward and our success with SAFR and free-to-play mobile games in 2020. **Real is in the middle of a transformation from being a traditional technology-based digital media company to being an AI-based digital media company.**
>
> Over the last four years, we've gone from being a company with great digital media technology to a company that also has deep expertise and talent in machine learning applied to digital media. **This has been a conscious multiyear transition that applies in different ways to each of our businesses. The two most significant examples of this transition are our Kontxt's natural language processing platform and our SAFR computer vision platform.**

43.    The market reacted positively to the Company's performance, and RealNetworks shares climbed to **over $6.00 per share in March 2021**, up from $1.57 per share at the beginning

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

of 2021. Market analysts likewise acknowledged the improvement to the Company's balance sheet and growth opportunities:

> RealNetworks is in the middle of a transformation from being a traditional technology-based digital media company to being an AI-based digital media company, shifting from Napster (divested) and RealPlayer towards free-to-play mobile games, SAFR and Kontxt.

***

> Things are clearly coming together for the company which has cleaned up its balance sheet after the sale of Napster, freeing resources to concentrate on the development of its growing businesses. . . . It looks like the free-to-play mobile games is their biggest growth business and it's growing at triple rate digits. . . .The company has substantially reduced its cash bleed and has plenty left to provide a runway for this growth to give the company a shot towards cash-generating and profitability, and that seems to be what investors are banking on.[3]

44.     In the latter half of March and in April 2021, the Company's stock began trending downward, but Glaser's positive outlook regarding the Company's future remained intact. On April 26, 2021, the Company announced preliminary results for Q1 2021, including guidance that it expected to see **double-digit revenue growth in 2022 and 2023**, and that it was commencing a proposed underwritten 8,250,000 share public offering—the net proceeds of which would be used for working capital and general corporate purposes. **The next day, RealNetworks announced that it was pricing the offering at *just* $2.70 per share, well below the Company's then-current trading price. As a result, the Company's share price tumbled from a close of $3.41 on April 26, 2021, to $2.56 on April 27, 2021.**

45.     Notably, in discussing the Company's continued AI transformation, during a conference call on May 12, 2021, Glaser noted:

> **During the first quarter, we achieved significant growth in SAFR and KONTXT. Revenue for SAFR increased approximately 160% year over-year, and KONTXT increased 10% year-over-year.** SAFR and KONTXT together grew to represent 29% of our Mobile Services segment revenue in Q1, up from 23% in 2020. . . . **Then in April, we went out to the public market for the first**

---

[3]     *See RealNetworks Turns a Corner*, SEEKINGALPHA (Mar. 15, 2021), available at: https://seekingalpha.com/article/4414071-realnetworks-turns-corner.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**time in an organized fashion to tell the story of our transition to an AI centric company. As a result, we raised approximately $20.3 million in net proceeds, which we will use to fuel our growth in 2022 and beyond.** Indeed, in the context of that program, <u>**we told investors that with those investments, we expect to achieve double-digit revenue growth in both 2022 and 2023.**</u>

46.    Glaser was also optimistic about RealNetworks' investment in Scener, a virtual movie theater service that allows consumers to watch shows virtually through about a dozen video services, including Netflix, Disney Plus, and HBO Max. Glaser stated:

> Our next step in simplifying and aligning our balance sheet for the growth opportunities in front of us is the completion of the spin out of Scener. . . Recently I stepped down as Chairman of Scener and we brought in an esteemed tech and entertainment industry executive and entrepreneur, Richard Walberg to be Scener's Executive Chairman. Daniel Strickland remains senior CEO. Richard, Daniel and the rest of the senior team are doing incredible job scaling up Scener.
>
> Scener has grown its audience by over 100 times, not 100%, 10,000% over the past year. Consumers are now using Scener to watch over 100 million minutes of video each month. Given this rapid growth, Scener is in the process of raising additional expansion capital. **I'll continue to serve on Scener's Board as well Mike Ensing. I believe Real has a great opportunity as a shareholder to participate in Scener's success. As I said earlier, I'm very pleased with and proud of the progress we will –has made in setting our company up for success and growing our AI business operationally.**

47.    During the same call, in response to a question from Lake Street Capital, Michael Ensing (RealNetworks' then President and Chief Operating Officer[4]) noted, "from a foundation perspective, we do have long-term contracts, and **very, very good visibility**, and then from even an AI component, **strong visibility to a large portion of the revenues**." Glaser then elaborated, "obviously, **you have a pipeline, you have a methodology for business that hasn't closed yet. We've visibility on what the closing expectation is for future revenue**."

---

[4]    Ensing resigned as President and COO of the Company for undisclosed reasons, effective June 30, 2022, and continued as a Strategic Advisor through August 19, 2022, when his service relationship with the Company terminated.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

48.     Glaser and Company insiders continued to tout the Company's transformation and prospects over the next several quarters. For example, during the Company's Q2 2021 earnings call on August 4, 2021, Glaser commented:

> In Q2, we continued our progress towards becoming a company and business centered on machine learning-based AI products and services. **In Q2, we more than doubled our AI revenue compared to Q2 of 2020. As a reminder, this transformation is centered on two AI-based products and services, SAFR, our computer vision platform and KONTXT, our natural language processing platform.** SAFR continue to be our AI pace car with revenue increasing 282% year-over-year. KONTXT continue to steady progress increasing 15% year-over-year. **This results in a blended average of 101% growth.** SAFR and KONTXT together now represent 37% of our total number of services, second revenue in Q2, up from 29% in Q1 2021 and from 18% in 2020 Q2. . . .
>
> **Next, I'd like to discuss depth we've taken in Q2 to focus Real and resource those AI businesses, and therefore, Real as a whole for growth. As you likely recall, in April, we raised $20.1 million in net proceed through a public offering. <u>We're primarily using these proceeds to make targeted investments in our AI-based growth conditions.</u>**
>
> **A second step we've taken is to support Scener's progression as an independent company.** In Q2, consumers watched over 100 million minutes a month of video using Scener. Moreover, Scener has raised a meaningful amount of money independently with Real and is now substitution financially. As a result, as of June 30th, Scener has moved to a next phase of independence and is no longer part of our consolidated results or operations. **Factoring an upcoming investments into Scener, we expect that going forward Real will own approximately 40% of Scener. This important step better aligns our balance sheet with the growth opportunities ahead of us, while also providing Scener with the capital it needs to grow and thrive. I look forward to continue serve on seniors Board along with Mike Ensing. We believe Real shareholders have a great opportunity over time to benefit from Scener successes as an independent company.**

49.     Glaser concluded that the Company's "results reflect[ed] judicious increases in investments in AI growth businesses," which would "pay off in the form of continued growth. . . not only [] in our AI businesses, but also **double-digit consolidated revenue growth in 2022 and 2023**."

50.     When the Company reported its Q3 2021 earnings on November 3, 2021, Glaser continued to make optimistic remarks:

> First, the update on an overall strategy. Earlier this year, we told the public that it was our plan to pivot Real to become an AI center company. We also described our growth plans and expectations for 2022 and 2023, which included our belief that our Games business would again be a significant contributor growth beginning in 2022. The core of the strategy hasn't changed. **Our AI business is SAFR and KONTXT are continuing to grow and we believe that they will drive significant growth in the future.**
>
> That said, issues with our Games business, which I'll discuss shortly now lead us to believe that Games will likely not be a significant growth contribute in 2022 as we retool it for future success. As a result while we're still putting our 2022 plan together, **I think it's fair to say that while we believe we will have significant growth in 2022, you should view our expectations of double-digit growth as now excluding Games from the calculations.**
>
> Now onto our AI businesses. We have two main AI products and services, SAFR, which is our computer vision platform and KONTXT, which is our natural language processing platform. In Q3, more than double SAFR revenue compared to Q3 2022. SAFR continues to be the biggest driver of growth in our AI businesses with quarterly revenue increasing 124% year-over-year compared to 2020.
>
> ***
>
> **We remain bullish about the progress we're making.** In April, we raised 20 – we raised $20.1 million to a public offering and intend to use the proceeds to make targeted investments in our AI based growth businesses. . . . **We continue to have a strong balance sheet with $29 million of cash available to us, which we'll use judiciously to set us up for future growth.**

**2.    As the Company's Stock Price Declines and Shareholders Revolt, Glaser Recognizes an Opportunity to Take the Company Private on the Cheap**

51.     As the Company's share price declined in the latter half of 2021 in the face of Glaser's foundational changes to the business and his below-market secondary offering, the Company's shareholders made their feelings known at the ballot box. At the Company's November 30, 2021, Annual Meeting, shareholders representing only 65.15% of RealNetworks common stock entitled to vote actually voted, and, of those shares, **only *approximately 37% of the Company's outstanding shares* voted to re-elect Glaser and Jaffe to another Board term.**

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

52.    Facing a potential ouster from the Company *he* founded and historically low stock prices caused by the foundational transformation *he* was overseeing, Glaser recognized a personal opportunity and "began to consider" a go-private transaction. According to the Proxy, at the Board's November 9, 2021, meeting, when the Company's stock was trading at just $1.40 per share (down from a high of $6.35 in March 2021), Glaser informed the Board that he was considering an acquisition of all of the remaining shares of RealNetworks not already owned by him. However, the minutes of the November 9, 2021 Board meeting ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████. Consequently, in December of 2021, Glaser created a special purpose entity for the Buyout, Greater Heights LLC, in order to carry out his scheme.

53.    In response to Glaser's potential plans, the Board formed a purportedly "independent" Special Committee to, among other things, engage independent legal and financial advisors, obtain information from management (which was led by Glaser), and evaluate and negotiate with Glaser on the terms of a potential Buyout. The Board appointed Jaffe and Prusch as members of the "independent" Special Committee, with Jaffe later designated as Chairman.

54.    Jaffe was deemed "independent" and "disinterested" despite the fact that he was controlled by and conflicted regarding Glaser. By way of example, Glaser (a) facilitated Jaffe's appointment as a director of the Company; (b) provided Jaffe with well-paid chair roles on Board committees, including chair of the Corporate Development Committee and Lead Independent Director; (c) appointed Jaffe as the RealNetworks-designated director of Rhapsody (in which Glaser invested directly); and (d) appointed Jaffe as the RealNetworks-designated director of Scener. Additionally, Glaser and Jaffe (two former Microsoft executives) were known to engage socially together. ██████████████████████████████████████████████████

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1

2

3

4

5      55.    At the Special Committee's November 17, 2021,

6

7

8

9

10

11

12

13

14      56.    Over the next few months, the Special Committee retained King & Spalding LLP as

15  legal counsel and Houlihan Lokey as financial advisor, while Glaser lined up financing for the Buyout.

16      57.    In December 2021, Glaser informed Jaffe that he was only considering making a

17  proposal if additional investors could be identified to provide a portion of the needed capital, and

18  that Glaser did not anticipate that he would be in a position to make a formal proposal until late in

19  the first quarter of 2022. Jaffe also advised the Special Committee in December of 2021

20

21

22

23

24  . Already, Glaser was asserting his control over the Special

25  Committee and the process.

26

27



**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

58.     Moreover, Glaser's plan to drag out the sales process purposefully interfered with the Company's development of its annual budget and 2022 strategic plan, which Glaser knew required an imminent capital infusion to lead the Company and its various initiatives to their anticipated positive earnings. Indeed, at the Special Committee's December 2, 2021 meeting, the Committee discussed the Company's fiscal year 2022 outlook and financial budget and acknowledged

59.     When the Special Committee met again on December 23, 2021, it still had not retained a financial advisor. Despite this fact, and the Committee's acknowledgment that it was difficult to evaluate the Company's future as a result of the delayed transaction process,

60.     On January 11, 2022, the Special Committee met to finally select a financial advisor and determined to retain Houlihan Lokey,

While the Proxy discloses that Houlihan Lokey had in the past provided "services to a committee of the Board of Directors, including a financial opinion rendered in 2020 in connection with a related party transaction," the Proxy fails to disclose (1) that that transaction was **between Glaser and the Company**; (2) that, in it, Glaser had acquired approximately 8 million shares of RealNetworks

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1  Series B Preferred Stock for approximately $10 million; and (3) that the special committee

2  responsible for approving the transaction and to which Houlihan Lokey rendered its fairness

3  opinion **was also led by Jaffe**.

### 3. Glaser-Led Management Creates the January Baseline Projections as Glaser Continues Publicly Extolling the Company's Future Prospects

61.    On January 26, 2022, the Board held a meeting, at which it "discussed three-year financial forecasts prepared by the Company's management team, with a view to approving a budget for FY 2022," including "a 'baseline forecast' that did not reflect any additional near-term capital investment" (*i.e.*, the Baseline Forecast) **and** a higher, more optimistic "financial forecast that assumed the Company would receive approximately $15 million of additional near-term capital to fund its growth projects" (*i.e.*, the Investment Scenario). Then, aware that a sale to Glaser was a *fait accompli*, and supposedly "[i]n light of business uncertainty and related open questions around additional capital required, the Board approved a budget for <u>only</u> the first six months of 2022 and requested more detail from management regarding financial outlays and projections for the second half of 2022." :

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1
2
3
4
5
6
7
8
9
10
11
12
13
14

15    62.    Following the Board's discussion of the Company's projections, **which included**

16 **Glaser and his management team**, and the Glaser-led management team's warnings of "business

17 uncertainty" and "open questions around additional capital required" for the Company's future,

18 the Board noted that, "if a potential transaction were not possible, the Board may have to consider

19 paring back the Company's financial outlay to preserve cash, which would necessarily impact the

20 Company's potential growth prospects."

21    63.    **However, that is not what the Company told shareholders.** Rather, the Glaser-

22 led management team's private skepticism to the Board was directly contrary to Glaser's public

23 statements, which touted "strong visibility" on future revenue, "bullish" expectations of double-

24 digit growth in its expanding AI sectors, and unrestricted cash and cash equivalents of $27.1

25 million.

26
27

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

64.     For example, during the February 9, 2022, Q4 2021 earnings call, Glaser stated: "[w]e continued to have a strong balance sheet with $27 million of cash available to us and no debt. We'll use these resources judiciously to set us up for future growth." He continued:

We **remain very bullish on Real's prospects**. Our lineup of current and new AI products is very strong as is our sales pipeline. And our new games leadership team has put together an excellent plan that I believe will set Games up for significant growth in 2023 and beyond. Taken together **we believe that in 2022, we will achieve double digit overall growth excluding Games**, and we expect games to be approximately flat.

65.     Later in the call, in response to a question regarding the Company's use of capital, members of RealNetworks management responded as follows:

**Christine Chambers**

Yes. So, we ended the year with just over $27 million in cash. And like I said in my remarks, **we are allocating that judiciously as we go into 2022, and we remain a focus of investment around our AI products** and as Mike talked about, the investments in SAFR and KONTXT.

**Mike Ensing**

Yes, Mark, just a little bit more around that. So, with our cash, **we are pretty focused on making investments over the next year in the AI-based businesses.** And then regarding acquisitions, we're always open to things. But the first priority is our AI-based businesses.

**Glaser**

Yes. I don't know if I can add too much on top of that, Mark. **I think it's fair to say that we see a very strong prospect for return based on investing in our growth initiatives.** And we're going to make those investments carefully, I guess, I would say. But our belief is that having great products, having people that are in the position to sell them and put them in customers' hands, that those are investments that are to have a pretty good return on them assuming we pick the right people to build the products, the right people to sell and market the products and pick the right products to make. And that's our job to make good choice on all three of those.

66.     Simply put, management's purported private concerns were contradicted by the optimism in the Company's capital allocation and growth prospects communicated to shareholders, and the Company's actual cash burn.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

67.     In the ensuing weeks, Glaser continued his efforts to secure financing partners for the Buyout.  Meanwhile, on February 25, 2022, **Jaffe and Glaser attended another social event together**, which further affirmed their friendship and Jaffe's lack of independence. During the event, Glaser updated Jaffe on the financing outreach process.

68.     Predictably, with its preoccupied and conflicted CEO at the helm, the Company did not obtain the additional capital it needed to fund the growth initiatives. As a result, on March 1, 2022, Houlihan Lokey informed the Special Committee that the depressed Baseline Forecast presented at the January 26, 2022, Board meeting represented management's best estimates of the Company's future performance, and the Special Committee directed Houlihan Lokey to use those projections to value the Company (previously defined as the "January Baseline Projections").

69.     **The January Baseline Projections were never disclosed to shareholders in the Proxy.**

70.     On March 23, 2022, the Company issued a press release announcing the launch of SAFR SCAN, a touchless biometrics solution more secure reliable and accurate than key-card based systems, and the Company's "first integrated hardware-software product." The release noted that SAFR SCAN would be sold in North America through a network of system integrators and had an MSRP of $1,199.

71.     On March 24, 2022, Houlihan utilized the January Baseline Projections to conduct valuation analyses of the Company.

72.     According to the Proxy, on April 11, 2022, in preparation for the regularly-scheduled Board meeting on April 21, 2022, Glaser informed the Board that he had ended his efforts to pursue a potential transaction with a third-party investor. ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

73.    At an April 26, 2022 Special Committee meeting, Glaser informed the Committee that he was unable to identify an acceptable financing partner and was therefore terminating the Buyout process—for now.

In other words,

74.    The Special Committee also discussed the possibility of Glaser acquiring the Company without the support of third-party financing, or the Committee reaching out to potential third-party acquirers.

75.    By way of background, RealNetworks' Charter required that its Strategic Transactions Committee, which Glaser chaired permanently, approve *any* transaction. Under the Charter, neither the Board nor the Company's shareholders were authorized to remove any member of the Strategic Transactions Committee or otherwise reconstitute the Committee or its membership. Moreover, Glaser had special rights under the Company's articles of incorporation to appoint or remove members of the Strategic Transactions Committee at his discretion. **Thus, Glaser had the unilateral ability to stop RealNetworks from engaging in any transaction, even if it was a superior transaction to the one he was offering.**

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**4. Glaser Makes a Low-Ball Buyout Offer Without a Majority of the Minority Protection in Place, Pressures the Board to Move Quickly, and Prevents the Special Committee from Canvasing the Market for a Better Offer**

76. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████,
on May 6, 2022, Glaser submitted a written preliminary nonbinding proposal to acquire the Company for $0.67 in cash per share of RealNetworks common stock not already owned by him. No explanation was given for Mr. Glaser's abrupt about-face, given that he had recently stated that he was withdrawing his interest and had represented that he did not have the financial means to take the Company private on his own without engaging with partners. Nevertheless, he noted that he had *already* formed a special purpose entity for the Buyout (*i.e.*, Greater Heights LLC) and was prepared to fully fund the Buyout himself. In his written offer, Glaser also now sought to create a false sense of urgency and demanded that the Special Committee sell to him in an "expedited manner" and through a single-bidder process:

> I believe it would be in the best interests of the Company for the special committee to **negotiate exclusively with me** toward definitive agreements and **not attempt to commence an auction process** in parallel with our negotiation. Such a process would introduce uncertainty and delay at a time when the Company can afford neither.

77. In his proposal, Glaser further noted that he had "the most to lose if the Company does not address its cash burn in the near term" and that the proposal "reflects an attractive value for the Company's shareholders under the difficult circumstances, and a unique opportunity for them to monetize their investment at a premium to the Company's current and recent stock price."

78. Glaser's tenor regarding the Company's "difficult circumstances" again contradicted his public representations to shareholders. For example, on May 4, 2022—**two days before Glaser's proposal**—the Company announced its financial results for Q1 2022, including cash and cash equivalents of $21.8 million and no debt, which was "adequate to fund the Company's operations *for at least one year*." Indeed, Glaser continued to reassure shareholders

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

that the Company was "in the sausage making phase of [its] growth initiatives" and that he "remain[ed] very optimistic about Real's long-term prospects." Further, the Company's earnings announcement reported stable revenue and EBITDA, with revenue of $13.3 million (as compared to $13.4 million in the prior quarter) and EBITDA of -$3.8 million (as compared to -$3.7 million in the prior quarter). Importantly, these results were within or above the Company's prior guidance for Q1 2022, as stated in its prior earnings announcement published February 9, 2022, which had stated that the Company expected to achieve $12-14 million in revenue and -$5.5-4.0 million in EBITDA in the quarter, thus indicating that the Company was operating as expected or beating expectations. Moreover—and as further discussed below—while net income decreased to -$5.2 million from -$1.8 million in the prior quarter, this decrease would reverse by the end of the following month, the conclusion of Q2 2024.[3]

79.    Notably, Glaser's proposal (i) was contingent on reaching a definitive agreement with the Board within *just one month*, by June 8, 2022; (ii) signaled that he intended to keep the management team and "valuable employee base" at closing; and (iii) was **not** conditioned upon a majority of the minority voting provision. In other words, Glaser—recognizing the Company's vulnerability to market dynamics in the midst of its investor-funded AI transformation—submitted his professed fully-funded proposal at insufficient economic terms and without a majority of the minority vote requirement. His proposal serves as a clear indicator of his prior deceptions: despite being the Company's CEO, chairman, and largest shareholder, Glaser professed no concern for the near-term health and growth of the Company for the six months prior to the proposal, but now feigned urgency and sensitivity to the precariousness of the Company's situation when he needed to exert pressure on the Board to accede to a sale to him.

---

[3]    As discussed below, the Company's net losses would stabilize and in fact decrease from Q1 to Q2 2022.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

80.    On May 9, 2022, the Company publicly announced the receipt of Glaser's proposal, which would thereafter artificially cap the Company's market value and set the field of play for negotiations to follow.[5]

81.    On May 10, 2022, the original Special Committee met, and sought clarification on certain key points in a letter to Glaser, including: (i) **whether the Buyout would be conditioned upon the approval of a majority of the minority vote**; (ii) whether Glaser would sell his shares in a transaction with an alternative party at a higher price; and (iii) whether Glaser would veto any alternative transaction via his role as Chairman of the Strategic Transactions Committee.

82.    During this meeting, and undisclosed in the Proxy,



.

83.

.

84.    On May 12, 2022, Glaser sent a letter to the Special Committee, wherein he: (i) "acknowledge[ed] that the Board [] may wish to make the consummation of the proposed transaction contingent upon the approval of the special committee, the Company's full board, and/or the approval of a majority of the shareholders that are not affiliated with me"; (ii) stated that he "d[id] not have a position on this issue **at this time**"; and (iii) believed it was *unnecessary*

---

[5]    Notably, it appears that, on the same day, Thomas Satterfield, Jr., the Company's second-largest shareholder, increased his holdings in RealNetworks by 1,520,000 million shares, from 7.3% on February 14, 2022, to approximately 10.5% of the Company's outstanding shares. Curiously, the Proxy notes that, on multiple occasions, the Special Committee and/or its advisors communicated with certain Company shareholders following the announcement of Glaser's May 6 proposal. Yet, it is unclear exactly which shareholders were in communication with the Special Committee and the nature of those communications.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

for the Special Committee to delay its evaluation of his proposal to resolve these matters. As noted below, rather than accede to including a majority of the minority requirement from the outset, Glaser used it as a bargaining tool to extract value and keep his offers at bargain basement prices, which is exactly why a majority of the minority requirement should be in place from the outset.

85.    Glaser also told the Special Committee ███████████████████████████ ███████████████████████████████████, and, as for the issue of whether Glaser would waive his veto power of any alternative transaction by virtue of his position as Chair of the Strategic Transactions Committee, he predictably declined to do so:

> With respect to the Strategic Transactions Committee, as you know this structure has been in the Company's charter since before the Company went public in 1997. **I do not anticipate that we would terminate the committee in connection with my proposed transaction or any other transaction.**

86.    Then, apparently growing impatient with the Special Committee's failure to immediately rubber-stamp his subpar offer, on May 16, 2022, Glaser sent another letter to the Special Committee, in which he "reiterated . . . the importance of commencing substantive negotiations . . . as soon as possible" and stated that, "[u]pon further consideration, [he was] *willing to confirm* . . . that the Proposal [would] be contingent on the approval of Special Committee and the approval of the holders of a majority of the vote of shares of the Company" not held by Glaser and his affiliates. Clearly, Glaser was pushing the Special Committee to *respond* to his May 6 proposal—which *was not conditioned ab initio on a majority of the minority vote*—and instead used it as a bargaining chip **in lieu of a price improvement**. Glaser also reiterated that he was "highly concerned about the Company's financial position and thus was focused on a timely response to his proposal from the Special Committee."

87.    On May 17, 2022, Glaser called his friend Jaffe to reiterate his concern that the Special Committee had a "lack of urgency," warning that time was of the essence given the Company's alleged "increasingly financially challenging position" (which was, again, *contrary to his optimistic public statements*), and going as far as urging the Special Committee to work on the updated financial forecasts needed to evaluate his offer on a "parallel path" with the negotiations

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

of his proposal. Glaser also made the veiled threat that "the absence of an agreed upon transaction could potentially put the Company at risk."

**5. Glaser's Management Team ████████ ████ the Company's Projections to Make Glaser's Offer Seem Fair**

88.    *After* receiving Glaser's lowball offer and ████████████████, on May 10, 2022, the Special Committee decided that management (with the conflicted Glaser at the helm) needed to "update" the January Baseline Projections.

89.    At the Special Committee meeting on May 18, 2022, ████████████ Houlihan Lokey also discussed interest from a number of potential third-party bidders in a proposed transaction, ████████████████████████████.

90.    On May 24, 2022, Glaser and Jaffe discussed the updated financial forecast to be presented at an upcoming Board meeting in two days. ████████████████:

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480



91.     As displayed in the chart directly below, ███████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████████:

| | | | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| ███ | ████████████ | | ████ | ████ | ████ |
| | ██████ | | ████ | ████ | ████ |
| ███ | █████████████ | | ████ | ████ | ████ |
| | █████████ | | ████ | ████ | ████ |
| ███ | ████████████ | | ████ | ████ | ████ |
| | ███████ | | ████ | ████ | ████ |

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

92. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████.

93.     The May Projections were fraudulent: (i) they did not reflect management's true beliefs regarding the Company's financial future; (ii) they were only created *after* receiving Glaser's lowball offer and ████████████████████████████████████
███████████████████████████; and (iii) they were entirely inconsistent with the Company's prior projections, and they wholly contradicted Glaser's own repeated public comments regarding the Company's future, in which he repeatedly touted projected double-digit growth in RealNetworks' AI sectors in 2022 and beyond. Simply put, the sole purpose of the May Projections was to provide Houlihan Lokey with a basis to conclude that Glaser's Buyout offer was fair.

94.     At a May 25, 2022 Special Committee meeting, Houlihan Lokey again described interest from "potential third party bidders in connection with the Proposed Transaction" and ████████████████████████████████████
████████████████████████████████████████
████████████.

95.     On May 29, 2022, the Special Committee met to discuss the May Projections. During that meeting—which was barely two months after the Special Committee determined that the January Baseline Projections were the best estimates of RealNetworks' future performance— the Special Committee instructed Houlihan Lokey to use the May Projections for its financial analyses, notwithstanding the conflicted and fraudulent circumstances under which they were created.

96.     At a June 3, 2022, Special Committee meeting, Houlihan Lokey presented its *updated* preliminary financial analysis of Glaser's $0.67 per share offer ████████████

1

2 ███. Notably, Houlihan Lokey noted

3 that ███

4 ███

5 ███

6 ███

7      97.     On June 4, 2022, the Special Committee informed Glaser that his $0.67 per share

8 offer **undervalued** the Company ███ but that the Special

9 Committee was willing to support a Buyout at $0.90 per share. ███

10 ███

11 ███

12      98.     In response, two days later, Glaser submitted a counterproposal at a price of $0.70

13 per share, and the Special Committee responded the following day with an offer of $0.80 per share,

14 which it believed was a "**substantial concession**" for the sake of finalizing the Buyout. **Indeed,**

15 **the Special Committee acknowledged the "<u>neutered</u>" nature of the process that Glaser was**

16 **trying to rush through, and his refusal to support any superior transaction.**

17      99.     To further pressure the Special Committee, on June 8, 2022, Glaser began to

18 "express his concern with the potential expenses incurred by the Company and the Special

19 Committee in connection with the [Buyout]." ███

20 ███

21 ███

22 ███.

23      100.    Despite Glaser's apparent frustration with Houlihan Lokey's fees, ███

24 ███

25 ███.

26

27

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

101.    On June 13, 2022, the Special Committee provided Glaser with a responsive draft of the Merger Agreement, ███████████████████████████████████████████ ███████████████████████████████████████████ Recognizing Glaser's control of the situation, however, the Committee also noted ███████████████████████████████████████ ███████████████████████████████████████████.

102.    At a June 15, 2022 Special Committee meeting, the Committee discussed recent communications with Glaser that ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████.

103.    On June 16, 2022, with the parties' respective positions continuing to diverge, Jaffe called Glaser to inform him that the Special Committee believed that the Buyout negotiations should terminate. Notably, in a letter to Glaser, the Special Committee explicitly acknowledged "certain complications when it comes to the operation of the business pending a transaction and requires the Special Committee to negotiate certain terms **at a significant information disadvantage**", and advocated for its ability to undertake a "robust Go Shop process" and "**true price discovery**." Unwilling to let the Buyout that he had been working toward for months fall through, Glaser claimed that the parties' positions were not diverging, and "that he primarily cared about the issue of transaction fees, and that further **he might have flexibility on price** but was not

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1  specific." Thereafter, the negotiations continued, making clear that it was Glaser (and not the
2  Special Committee) driving the negotiation process.

3          104.    Negotiations between the advisors continued over the next ten days. On June 20,
4  2022, Glaser reiterated that he was not willing to waive the role of the Strategic Transactions
5  Committee or support a go-shop, but that he may have "more flexibility than previously indicated
6  on the purchase price."

7          105.    It is not clear whether Glaser indicated an actual price range, but curiously,
8  following additional discussions amongst the parties' advisors, on June 27, 2022, Glaser called
9  Jaffe to inform him that several major issues were yet to be resolved, with Jaffe responding that
10 "he was under the impression that the issues were manageable."

11         106.    Also on June 27, 2022, for undisclosed reasons, but no doubt seeing the writing on
12 the wall and hoping to avoid being named in a lawsuit just like this, Ensing tendered his resignation
13 as President and COO of the Company, effective as of June 30, 2022. He would continue his
14 employment with the Company as a Strategic Advisor until August 19, 2022. In connection with
15 this transition, Ensing entered into a Transition and Release Agreement, whereby the Company
16 agreed to provide Ensing with the following benefits, subject in each case to Ensing's signing and
17 not revoking a release of claims in favor of the Company and the performance of transition
18 services: (1) continuing salary during the Transition Period at the rate of $9,895 per month; (2)
19 continued eligibility to participate in the Company's management bonus program for the first half
20 of fiscal year 2022, to be paid, as provided under the bonus program, no later than March 15, 2023;
21 (3) **a one-time cash transition bonus of $100,000**; (4) RealNetworks payment of Ensing's
22 COBRA premiums for 2022; (5) continued vesting during the Transition Period of outstanding
23 RealNetworks stock options and restricted stock units; and (6) if, by December 31, 2022, the
24 Company closed the Buyout with Glaser, then Ensing's 200,000 of outstanding RealNetworks
25 restricted stock units would receive accelerated vesting.
26
27

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1    107.   On June 29, 2022, the Special Committee—

2    —decided, in yet another empty threat, to put its "best and final"

3    version of the key open terms on the table, and if Glaser did not accept them, the Special

4    Committee would cease discussions with him. Glaser *claimed* to be "in general substantive

5    agreement with the terms proposed," yet he continued to balk over price. Nonetheless, the neutered

6    Special Committee continued to negotiate with Glaser.

7    108.   On July 14, 2022, Glaser held a meeting with the Special Committee to inform them

8    that he was reducing his offer from $0.70 to $0.68 per share,

9    .

10

11

12

13

14    .

15    109.   In their assessment of this reduced offer on July 15, 2022, the Special Committee

16

17

18    .

19    110.   At the July 18, 2022, meeting, the Special Committee determined that, "if there was

20    not a deal to be reached, the Board could focus on how to manage the Company's deteriorating

21    cash situation" and

22    a tacit admission that these issues were deliberately being neglected

23    while the Individual Defendants exclusively focused on the Buyout, to the detriment of

24    RealNetworks shareholders. Nonetheless, rather than ceasing negotiations or seeking out the

25    possibility of alternative superior offers, the Special Committee pressed on,

26

27

1

2  .

3     111.   Ultimately, however, on July 19, 2022, the Special Committee agreed to Glaser's

4 final offer of $0.73 per share—**$0.17 per share less** than what the Special Committee initially

5 recommended based on their review of Houlihan Lokey's financial analysis, which already

6 accounted for the      in the May Projections,

7  . In agreeing to the Buyout, the Special

8 Committee considered "the pending loss of key executives[7] and the certainty of a cash offer."

9     112.   On July 28, 2022, the Company announced the Merger Agreement and its Q2 2022

10 financial results. Revenue was $11.9 million (as compared to $13.3 million in the prior quarter) (a

11 10.5% decrease), EBITDA was -$4.2 million (as compared to -$3.8 million in the prior quarter)

12 (also a 10.5% decrease), and net income was -$5.1 million (as compared to -$5.2 million in the

13 prior quarter) (a 2% *increase*). *I.e.*,      in revenue and adjusted EBITDA, the

14 Company's net losses stabilized and decreased. Additionally, these results were within

15 RealNetwork's public guidance for the quarter, as provided in its earnings release for Q1 2022

16 (published May 4, 2022), which had advised that the Company expected to generate $11-12.5

17 million in revenue and -$6 to -$4.5 million in EBITDA.

18     113.

19

20  .

21

22

23

24

---

25 [7]    As noted above, Ensing tendered his resignation as President and COO. Then, on July 14,

26 2022, the Company announced that Christine Chambers, Senior Vice President, Chief Financial Officer, and Treasurer had also tendered her resignation, effective July 31, 2022, and that Brian

27 McClain would replace her as interim Chief Financial Officer, effective August 1, 2022. McClain commenced his engagement with the Company on July 6, 2022, as a Strategic Advisor.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**6.**  __After the Merger Consideration Is Agreed To, Management ████████████__
██████████████████████ __for Use in the Fairness Opinion__

114.    After the Merger Consideration was agreed, management revised its projections *yet again* █████████████████ ████████████████████ On July 22, 2022, **just four days before Houlihan Lokey rendered its fairness opinion and for the sole purpose of the fairness opinion, and three days** *after* **the Merger Consideration was agreed to**, management—which presumably included soon-to-be-departed Ensing and Chambers, and the new-to-the-job Strategic Advisor, McClain—**through discussions with Glaser**, prepared a new set of projections that were disclosed in the Proxy (previously defined as the "Proxy Projections").

115.    That same day, these Proxy Projections (reproduced below) were approved by the Special Committee and provided to Houlihan Lokey for use in rendering the fairness opinion on the Buyout.

116.    **The Proxy Projections were the _only_ projections for the Company disclosed in the Proxy.**

| Consolidated (in $000s) | 2022 | 2023 | 2024 |
|---|---|---|---|
| **Revenue** | | | |
| Mobile Services | 20,461 | 28,364 | 40,358 |
| Consumer Media | 12,890 | 8,569 | 8,859 |
| Games | 20,981 | 25,543 | 35,564 |
| **Total Revenue** | **54,333** | **62,476** | **84,781** |
| **Cost of Sales** | | | |
| Mobile Services | 4,239 | 5,048 | 7,094 |
| Consumer Media | 1,547 | 1,674 | 1,830 |
| Games | 5,335 | 7,342 | 10,676 |
| **Total Cost of Sales** | **11,155** | **14,096** | **19,633** |
| **Total Gross Profit** | **43,178** | **48,380** | **65,148** |
| *Gross Profit %* | *79.5%* | *77.4%* | *76.8%* |
| **Operating Expenses** | | | |
| S&M | 17,856 | 18,837 | 24,830 |
| R&D | 20,325 | 20,951 | 23,753 |
| Direct G&A | 18,789 | 15,962 | 15,505 |
| **Total Operating Expenses** | **56,702** | **55,515** | **63,853** |
| **EBITDA** | **(13,524)** | **(7,135)** | **1,295** |

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

117.    As depicted in the chart below, ███████████████

██████████████████████████████████████

████████████████████████████.



118.    At the Special Committee meeting on July 26, 2022, Houlihan Lokey presented its

financial analyses on the Buyout based upon these ███████████ Proxy Projections, and

concluded that the Merger Consideration was "fair" from a financial point of view to the

Company's minority shareholders.

119.    At the same meeting, the Special Committee █████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████.

120.    Thereafter, the Special Committee resolved to recommend approval of the Merger

Agreement to the Board. Later that day, the Board approved the Merger Agreement.

121.    On August 19, 2022, less than a month after the Special Committee and Board

approved the Buyout, Glaser awarded Jaffe with a new appointment as a Board-designated director

of Scener and granted Jaffe an award of 5,000 stock options and 21,596 RSUs in the Company.

This award granted a rapid vesting schedule that was not consistent with the Company's Outside

Director Program, which provided that "annual awards of options and RSUs vest monthly in equal increments over a 12-month period following the award's grant date assuming continued service as a director, with the RSU share distribution date occurring on the first anniversary of the grant date." Instead, this award vests in four, equal monthly installments beginning August 19, 2022 until fully vested by December 19, 2022, **within a week of the scheduled shareholder vote on the Buyout and prior to December 31, 2022** (the date assumed for closing of the merger and in connection with the Proxy's disclosure of the Equity Interests of RealNetwork's Executive Officers and Non-Employee Directors). Notably, this award was deceptively disclosed over **two months late** with the SEC—on October 28, 2022—purportedly as a result of "an inadvertent administrative error," when in fact the delay was designed to obscure Jaffe's conflict of interest and the immediacy of a reward granted by Glaser to Jaffe for facilitating the Buyout.

## C.    THE BUYOUT WAS THE RESULT OF A FRAUDULENT AND CONFLICTED PROCESS

122.    As outlined above, the Buyout was the result of a conflicted and fraudulent process that benefited the Company's Chairman, CEO, and controller, to the detriment of the minority shareholders.

123.    Specifically, as outlined above, the Buyout was not the result of an arms-length negotiation but was instead marred by numerous conflicts of interest. By way of example:

  a.  By serving as the Company's Chairman, CEO, and controller – *and* acquirer – Glaser stood on both sides of the Buyout.

  b.  In his role as acquirer, Glaser was personally incentivized to suppress the Company's value in order to acquire RealNetworks for the lowest price possible.

  c.  The Board and the Special Committee were explicitly aware of Glaser's intentions and the inherent conflict of interest that he faced, but did not implement any protections to shield Glaser from participation in creating the Company's projections utilized for the Buyout.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

d. Instead, Glaser remained intimately involved in his role as CEO in creating the January Baseline Projections, the May Projections, and the Proxy Projections, which were specifically created for purposes of valuing the Company in the Buyout.

124. Simply put, the timing and circumstances of the creation of the May Projections and the Proxy Projections demonstrate that they were prepared solely to justify Houlihan Lokey's fairness opinion and did not represent the true opinions of management. Even worse, the January Baseline Projections and the May Projections were excluded from the Proxy altogether, such that shareholders could not have independently assessed the material falsity of the Proxy Projections or compared the Merger Consideration to the earlier sets of projections.

125. Moreover, although Glaser agreed to condition the Buyout upon approval of an independent Special Committee, he constrained the Special Committee's ability to actually protect the minority shareholders' interests and coerced them into the Buyout. By way of example:

a. Glaser placed his friend, Jaffe, whom he controlled through various economic means, into the role as chair of the "independent" Special Committee when Jaffe was anything but independent.

a. Glaser refused to waive his veto rights pursuant to his role on the Company's Strategic Transactions Committee, thereby eliminating the Special Committee's ability to ascertain the Company's value on the open market by encouraging potential third-party bidders.

b. Throughout the negotiation process, Glaser continuously threatened the Board and the Special Committee with what he called the Company's dire cash situation (which contradicted his public statements), but failed in his role as CEO to address it, instead placing the Board and the Special Committee in a difficult position were they to not accede to the Buyout.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

c.  Glaser initially refused to agree to a majority of the minority condition, using his acceptance of the critical condition as a bargaining chip during economic negotiations.

d.  When the Special Committee was not acting in accordance with his unreasonable timeline, Glaser threatened to withdraw his bid in order to allow the stock to dip even further so that he could purchase the Company for an even cheaper price.

126.    The Special Committee knew that Glaser's opportunistic move to take over RealNetworks came at a time when the Company's stock was trading near all-time lows as a result of a Glaser-led AI transformation that the Company expected to yield long-term results for the benefit of its shareholders. Yet, because of the above-referenced manipulative and fraudulent actions by Glaser, he was able to effectively cap the Company's stock price and prohibit the Special Committee from adequately representing the minority shareholders' interests.

**D.    DEFENDANTS AUTHORIZED THE DISSEMINATION OF THE PROXY TO SHAREHOLDERS, WHICH CONTAINED MATERIAL MISREPRESENTATIONS AND OMITTED MATERIAL FACTS**

127.    On November 7, 2022, the Individual Defendants authorized the filing of the Proxy with the SEC, which recommended that the Company's minority shareholders vote in favor of the Buyout. The Individual Defendants were obligated to carefully review the Proxy prior to its filing and dissemination to the Company's shareholders. However, the Proxy misrepresented and/or omitted material information that was necessary for the Company's minority shareholders to make a fully-informed decision regarding whether to vote in favor of the Buyout at the Shareholder Vote and deceived shareholders into approving the unfair Buyout.

**(1)    The Materially False and Misleading Statements That Management Believed that the Proxy Projections Were Prepared in Good Faith and Reflected Management's Reasonable Best Estimates.**

128.    The Proxy falsely and misleadingly states that the Proxy Projections represented management's good faith and best estimates of the Company's future financial results and condition:

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1

**Challenged Statement I**

2

3    "The Projections were prepared in good faith by Company management based on
the best currently available estimates and judgments of Company management with
4    respect to the expected future financial results and condition of the Company at the
time the Projections were prepared and speak only as of that time, which was
5    July 22, 2022."

6    Proxy at 59.

7        129.    As detailed above, the Proxy Projections were not management's best, good faith

8    estimates of the Company's financial prospects:

9        •    The ████████████ leading to the Proxy Projections were inconsistent with

10            Glaser's numerous optimistic statements about the Company's prospects;

11        •    The Proxy Projections were prepared three days after the Merger Consideration was

12            agreed to, allowing Glaser to tailor the Proxy Projections to the price he would be

13            paying for the Company;

14        •    As late as March 2022, management had affirmed that the January Baseline

15            Projections represented management's best estimates for the Company;



23        130.    The foregoing misrepresentation was material because, in deciding whether to vote

24    to approve the Buyout, a reasonable investor would have considered it material to know that the

25    Proxy Projections were **not** reasonably prepared and did **not** represent management's good faith

26    estimates and judgments. Indeed, Houlihan Lokey used the Proxy Projections to prepare financial

27

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1    analyses of the Company's value to support its fairness opinion concerning the Buyout, and the

2    credibility of this fairness opinion and Houlihan Lokey's related analyses were critical issues

3    facing stockholders deciding whether to support (or reject) the Buyout.

4        131.    Whether the Proxy Projections were trustworthy—i.e., actually prepared in good faith

5    and as a best estimate of the Company's genuinely anticipated performance—was thus highly material

6    to stockholders deciding whether the Buyout and Merger Consideration were financially fair.

7        **(2)    The Omission of the January Baseline Projections or Any Description of the**
         ████████████████████████████████ **Rendered the Proxy's Vague References to**

8        **Those Projections Being "Updated" Misleading Half-Truths.**

9        132.    The Proxy stated that the January Baseline Projections were "updated" to create the

10   May Projections. However, ████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████.

13                          **Challenged Statement II**

14   
15   On May 10, 2022, the Special Committee and its advisors held a meeting to discuss
     the terms of the Proposed Transaction and the process to evaluate it. The Special

16   Committee noted items that they believed required clarification from Mr. Glaser,
     including: (i) whether the completion of the Proposed Transaction was conditioned

17   on (a) the approval of the Special Committee and/or (b) the approval of a majority
     of the shares not owned by Mr. Glaser and his affiliates; (ii) whether Mr. Glaser

18   would be interested in selling his shares in a transaction with an alternative party at
     a higher price, if such a proposal should arise; (iii) whether Mr. Glaser would veto

19   any alternative transaction via his role as the Chairman of the Board's Strategic
     Transactions Committee; (iv) intended transaction structure and financing sources

20   and (v) what sort of due diligence Mr. Glaser would require. Further, the Special
     Committee discussed the Company's performance relative to the "baseline"

21   financial forecast provided in January, noting that the Company had materially
     failed to achieve projected performance since such time. The Special Committee

22   discussed these matters with its advisors and concluded that Company management
     should prepare an **updated financial forecast** reflecting Company

23   management's then-existing best estimates of future financial performance to
     accurately assess any proposal. Finally, in response to a request from the Special

24   Committee, Company management provided the Special Committee and its
     advisors a summary of all ongoing discussions with third parties about potential

25   strategic transactions so that the Special Committee could evaluate the Proposed
     Transaction in light of potential alternative transactions.

26   
27   

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

Proxy at 19.

## Challenged Statement III

Beginning on May 10, 2022 and throughout the remainder of the month, representatives of Houlihan Lokey met with Company management in connection with Houlihan Lokey's financial analysis of the Company. Company management discussed with Houlihan Lokey the Company's recent performance, business plan and strategic initiatives, and Houlihan Lokey discussed with Company management the market environment for the various business segments and other matters related to the financial analysis being prepared by Houlihan Lokey, including an **updated financial forecast** being prepared by the Company's management.

*Id.* at 20.

## Challenged Statement IV

On May 17, 2022, Mr. Glaser called Mr. Jaffe and reiterated his concern at what he viewed as a lack of urgency on the part of the Special Committee. Mr. Glaser shared his perspective that the Company was in an increasingly financially challenging position and that each day of delay created additional cost and risk that Mr. Glaser would determine that the Proposed Transaction would not be a prudent use of his personal financial resources. Further, the absence of an agreed upon transaction could potentially put the Company at risk. Mr. Glaser acknowledged that the Special Committee would require an **updated financial forecast** in order to analyze a transaction but requested that the Special Committee engage in negotiations regarding the Proposed Transaction on a parallel path. Mr. Jaffe informed Mr. Glaser that the Special Committee anticipated using the management plan/forecast that would be presented shortly to the Board. Finally, Mr. Glaser reminded Mr. Jaffe that his proposal would expire if the Special Committee and Mr. Glaser had not resolved substantive terms by June 8, 2022.

*Id.* at 23.

## Challenged Statement V

On May 19, 2022, Mr. Glaser spoke with Mr. Jaffe and informed Mr. Jaffe that Mr. Glaser did not think it was financially prudent to direct his attorneys to begin preparing a draft of the merger agreement prior to receiving a formal response to his proposal. Mr. Jaffe outlined the steps needed to respond, including the need for a final version of Company management's financial forecast and time for the Special Committee's advisors to review such plan and prepare resulting financial analysis. Specifically, Mr. Jaffe and Mr. Glaser agreed that Company management should prioritize completion of its **updated financial forecast**.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**Challenged Statement VI**

On May 24, 2022, Mr. Glaser and Mr. Jaffe held a call to discuss the status of the **updated management plan and financial forecast** to be presented at the upcoming May 26, 2022 meeting of the Board, including Mr. Glaser's position that the forecast would be extremely challenging to achieve, and Mr. Glaser's intention to present his own alternative financial forecast to the Board, in addition to the forecast to be presented by the Company's CFO and its President. Mr. Jaffe communicated the Special Committee's intent to move expeditiously after it had the opportunity to review all relevant materials and consult with its advisors. Accordingly, Mr. Glaser instructed his attorneys to prepare an initial draft of the merger agreement.

*Id.* at 25.

**Challenged Statement VII**

On May 25, 2022, the Special Committee held a meeting at which its advisors from K&S and Houlihan Lokey participated. Houlihan Lokey again advised the Special Committee of its communications with certain shareholders following the announcement of the Proposed Transaction as well as inbound inquiries from potential buyers. Again, the Special Committee and its advisors discussed the low likelihood of consummating any such alternative transactions. The Special Committee also discussed the outlook for the Company's businesses, the **updated financial forecast** and the preparation by Company management for the Special Committee of an illustrative plan, to the extent feasible, to operate without the need for additional capital, including by separating and/or eliminating lines of business. The Special Committee and its advisors discussed the practical challenges associated with implementing such a plan, including personnel and customer retention, operating complexity and the potential role of the Strategic Transactions Committee. Ultimately the Special Committee concluded that it was not in a position to communicate anything more definitive than that the Special Committee would need the information and the time it determined were required to respond properly and that it was not prepared to approve a transaction based on $0.67 per share as set forth in Mr. Glaser's proposal.

*Id.* at 25.

133.    Shareholders were entitled to disclosure of the January Baseline Projections and the May Projections in the Proxy or a description of the ████████████████, because that information would have enabled them to see the ████████████ that management made in the span of seven months to justify the inadequate Merger Consideration.

134.    Moreover, even if stockholders had inferred that the "updates" were ████████
████████████████████████████████████████
████████████████████████████████████████

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1

2

3                                                            .

4    **(3)    The Undisclosed and Disproportionate Cut to the May Projections to Create**
     **the Proxy Projections.**
5

6    135.    The last reference to the Company's "forecast" in the Background section of the

7    Proxy appears on page 26, and explains how, at a May 29, 2022 Special Committee meeting, "the

8    Special Committee and its advisors concluded that [the May Projections] represented the best

9    estimates of future financial performance available to the Special Committee."



10         However,

11

12

13

14

15

16   137.

17

18                .

19

20                                **Challenged Statement VIII**

21   On both May 27 and May 29, 2022, the Special Committee held meetings at which its
     advisors from K&S and Houlihan Lokey participated to discuss the financial forecast
22   prepared by Company management. The Special Committee and its advisors
     acknowledged that the forecast prepared by management assumed the Company would
23   raise additional capital to fund operations, but that achievement of such forecast was
     uncertain given that there was no source of such funding identified nor any apparent
24   strategy to raise such capital. Nevertheless, **the Special Committee and its advisors**
     **concluded that such forecast represented the best estimates of future financial**
25   **performance available to the Special Committee.**

26   Proxy at 26.

27                                **Challenged Statement IX**

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

**On July 19, 2022**, committee meetings of the Board commenced. Representatives of Houlihan Lokey also continued price discussions with representatives of Imperial, during which Houlihan Lokey was informed that Mr. Glaser was willing to increase his proposed price per share to $0.73, but would not go further. Following the completion of committee meetings, **the Special Committee met with its advisors to discuss** Mr. Glaser's latest proposal as well as a preview of the Company's quarterly results and outlook for the remainder of 2022. In light of the Company's deteriorating performance, the pending loss of key executives and the certainty of a cash offer, the Special Committee concluded that on the terms negotiated and substantially agreed in the current draft of the merger agreement, it would support a transaction at $0.73 per share.

*Id.* at 37.

138. ███████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████.

E. **THE FALSE AND MISLEADING PROXY CAUSED SHAREHOLDERS ECONOMIC HARM BY DECEIVING THEM INTO APPROVING THE UNFAIR MERGER CONSIDERATION**

139.     Pursuant to the terms of the Merger Agreement, RealNetworks shareholders received <u>just</u> $0.73 in cash for each share of RealNetworks common stock that they owned. This Merger Consideration was inadequate and undervalued the Company. The Board—and especially Glaser, who was on both sides of the Buyout as the Company's CEO **and** the acquirer—knew this and caused the Company's projections to be ████████████████ in order to justify a Merger Consideration that they *knew* was inadequate. Defendants then authorized the materially false and misleading Proxy, which deceived shareholders regarding the cuts to the projections, the magnitude of the cuts, and the purported reasonableness of the projections. As a result, shareholders were deceived into approving the unfair Buyout.

140.     Indeed, when Glaser made his initial proposal on May 6, 2022, of $0.67 per share, Houlihan Lokey concluded that, based on the January Baseline Projections, ██████████████████████████████████████. As discussed above, ██████████████████████████████████████████████████ in order for Houlihan Lokey to provide an opinion that the price was fair to the common shareholders.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1    141.    Further, as discussed herein, the Company was in the midst of a transformation

2   from its legacy ventures to AI initiatives, which required time, capital outlay, and a turnover of

3   key leadership positions, all of which Glaser was leading and which Glaser believed would yield

4   substantial returns on investment. The Merger Consideration does not reflect RealNetworks'

5   promising growth prospects, as repeatedly confirmed by Glaser and other members of

6   management.

7    142.    Specifically, the Merger Consideration did not account for the Company's altered

8   business strategy and investments in bringing SAFR and KONTXT to market. As discussed herein,

9   RealNetworks had devoted substantial resources to altering its business strategy away from legacy

10   products and toward AI products, as well as focusing on its mobile games sales, and the Company

11   expected its initiatives to increase revenues and profit going forward. The success of these

12   initiatives required significant capital investment. Indeed, as noted, on or about February 10, 2020,

13   Glaser acquired approximately 8 million shares of Series B preferred stock for approximately $10

14   million, demonstrating Glaser's confidence in the Company's future. The Company also

15   conducted an April 2021 share issuance that raised $21 million. The April 2021 Prospectus noted

16   that for the fiscal year ended December 31, 2020, revenue from SAFR grew by 169%, and revenue

17   from KONTXT grew by 131% over the prior year. The April 2021 Prospectus also noted that the

18   Company expected double-digit revenue growth in fiscal year 2022 and fiscal year 2023 driven by

19   SAFR, KONTXT and Games. Moreover, in the Company's November 3, 2021 press release

20   announcing its financial results for the third quarter of 2021 – less than a week before Glaser told

21   the Board he was interested in acquiring the Company – the Company represented that "2021 is a

22   year of investment that will position the Company for double-digit growth beginning in 2022."

23   This anticipated growth was not accounted for in the Merger Consideration.

24    143.    Additionally, the Merger Consideration failed to account for the value of the

25   Company's NOLs and tax credits. As of September 30, 2022, the Company had an accumulated

26   deficit of $587.9 million. As of December 31, 2021, the Company maintained a valuation

27

TOWNSEND LEGAL CORP
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

allowance of $131.5 million for deferred tax assets that it believed were "not more likely than not to be realized." As of the same date, the Company's U.S. federal net operating loss carryforwards totaled $336 million, which were prior taxable losses and from acquired subsidiaries. These net operating loss carryforwards expire between 2024 and 2037. Finally, the Company possessed a U.S. federal research and development tax credit carryforward of $13.4 million as of December 31, 2021, which expires between 2022 and 2041. Shockingly, the Board failed to assess the value and utility of these massive, accumulated carryforwards in the transaction. Neither did the Special Committee assess this value or request that Houlihan Lokey do so.

144.    The Merger Consideration also failed to properly account for the Company's interest in Scener, a subsidiary of RealNetworks, in which Glaser had directly invested. During a May 12, 2021 earnings call, Glaser stated: "Scener has grown its audience by over 100 times, not 100%, 10,000% over the past year. Consumers are now using Scener to watch over 100 million minutes of video each month. Given this rapid growth…I will continue to serve on Scener's Board…**I believe [RealNetworks] has a great opportunity as a shareholder to participate in Scener's success**." As of June 3, 2022, RealNetworks owned approximately 48% of Scener.

145.    The $0.73 per share Merger Consideration is also 63% less than RealNetworks' 52-week high of $1.97, and represented a startling 88.5% discount from the Company's highs reached only 16 months prior to the Buyout.

146.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

147.    Further, as a result of the materially false and misleading Proxy, shareholders were deceived into foregoing their appraisal rights under Washington law. If the Proxy had not deceived shareholders regarding the Company's fair value, and the cuts to the projections, and the reasonableness of the Proxy Projections, shareholders would have elected to exercise their

appraisal rights under Washington law, and would have received more than the Merger Consideration in an appraisal, as the Company's fair value exceeded the Merger Consideration.

148.    Simply put, the Buyout was the result of a conflicted and fraudulent process and was consummated via a materially false and misleading Proxy that deceived shareholders into accepting grossly inadequate Merger Consideration.

## **CLASS ACTION ALLEGATIONS**

149.    Plaintiff bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and all other similarly situated former RealNetworks shareholders (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

150.    This action is properly maintainable as a class action. The Class is so numerous that joinder of all members is impracticable. As of the record date on October 24, 2022, there were approximately 47,694,901 shares of RealNetworks common stock issued and outstanding, and such shares were undoubtedly held by numerous individuals and entities located throughout the country. The actual number of shareholders will be ascertained through discovery.

151.    There are questions of law and fact which are common to the Class, and which predominate over questions affecting any individual Class member. The common questions include the following:

      a.    Whether Defendants misrepresented material information in the Proxy, in violation of Section 14(a) of the Exchange Act;

      b.    Whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

      c.    Whether Plaintiff and other members of the Class were harmed by the misleading Proxy;

152.    Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

153.    Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

154.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

155.    Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

156.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I
### Against Defendants for Violations of Section 14(a) of the Exchange Act

157.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

158.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

159.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

160.    Defendants issued the Proxy and/or permitted the use of their names in the Proxy with the intention of soliciting shareholders' support for the Buyout. Each of the Individual Defendants reviewed and/or authorized the dissemination of the Proxy, which misrepresented the above-identified material information and rendered the above-identified sections of the Proxy materially false and misleading because such sections provided a false and misleading picture of RealNetworks projections and value. The Defendants caused or allowed the Proxy to be issued with the intention of soliciting stockholder support of the Buyout, and the Proxy contained untrue statements of material fact and omitted material facts.

161.    Each of the Individual Defendants, by virtue of their roles as officers and/or directors of RealNetworks, were aware of the RealNetworks's business, its financial projections, and its valuation information, but failed to ensure such information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and Rule 14a-9. Defendants knew or should have known that the Proxy was materially false and misleading in regard to the above-referenced material information. After Glaser successfully dictated the terms of the negotiations and offered the Merger Consideration that he wanted, the Individual Defendants approved the Proxy Projections, which they knew were the product of ███████████████ made by management (through discussions with Glaser), in order to justify a Merger Consideration that they knew was inadequate. The Individual Defendants thereafter withheld the other, more accurate projections from shareholders in the Proxy.

162.    The Individual Defendants also reviewed and relied upon the material information identified above in connection with their decision to approve and recommend the Buyout; indeed, as outlined above Houlihan Lokey reviewed and discussed its financial analyses with the Board and the Board considered those financial analyses and its fairness opinion and the assumptions

TOWNSEND LEGAL CORP
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1   made and matters considered in connection therewith. Further, the Individual Defendants were

2   privy to and had knowledge of the true facts concerning the process involved in selling

3   RealNetworks and RealNetworks' true value, which was far greater than the value of the Merger

4   Consideration shareholders received.

5       163.    Defendants also knew or should have known that the material information

6   identified above had been misrepresented in the Proxy, rendering the sections of the Proxy

7   identified above to be materially false, misleading, and/or incomplete. Indeed, the Individual

8   Defendants were required to review Houlihan Lokey's valuation analyses, question its derivation

9   of fairness, and to be particularly attentive to the procedures followed in preparing the Proxy and

10  review it carefully before it was disseminated, to corroborate that there were no material

11  misstatements or omissions. After reviewing both the underlying materials and the Proxy, the

12  Individual Defendants failed to provide a non-misleading proxy solicitation.

13      164.    RealNetworks is liable for violations of the Exchange Act as the issuing entity of

14  the Proxy and based on the Individual Defendants' violation of the Exchange Act.

15      165.    The above-referenced information that was mispresented in the Proxy was material

16  to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such

17  misrepresentations and omissions were not corrected prior to the vote on the Merger and rendered

18  the above-refenced sections of the Proxy materially false and misleading.

19      166.    As a direct and proximate result of the dissemination of the materially false and

20  misleading Proxy that Defendants used to obtain shareholder approval of the Buyout, Plaintiff and

21  the Class have suffered damages and actual economic losses (i.e., the difference between the value

22  they received as a result of the Buyout and the true value of their shares at the time of the Buyout)

23  in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants

24  are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

25                          <u>**COUNT II**</u>
26  **Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

27

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1      167.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

2 herein.

3      168.    The Individual Defendants acted as controlling persons of RealNetworks within the

4 meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers

5 and/or directors of RealNetworks, and participation in and/or awareness of the Company's operations

6 and/or intimate knowledge of the false and misleading statements contained in the Proxy filed with the

7 SEC, the Individual Defendants had the power to influence and control and did influence and control,

8 directly or indirectly, the decision making of the Company, including the content and dissemination of

9 the various statements that Plaintiff contends are materially false and misleading.

10     169.    Each of the Individual Defendants was provided with or had unlimited access to

11 copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

12 shortly after these statements were issued and had the ability to prevent the issuance of the

13 statements or cause the statements to be corrected.

14     170.    In particular, each of the Individual Defendants had direct and supervisory involvement

15 in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to

16 control or influence the particular transactions giving rise to the Exchange Act violations alleged

17 herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each

18 of the members of the Board to approve the Buyout and was signed By Order of the Board. They were

19 thus directly involved in preparing this document and responsible for its contents.

20     171.    In addition, as the Proxy sets forth at length, and as described herein, the Individual

21 Defendants were involved in (i) negotiating, reviewing, and/or approving the Buyout; and (ii)

22 preparing, reviewing, and/or approving the Proxy Projections. The Proxy describes the various

23 issues and information that the Individual Defendants reviewed and considered.  The Individual

24 Defendants participated in drafting and/or gave their input on the content of those descriptions.

25     172.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

26 of the Exchange Act.

27

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

173.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Buyout and the true value of their shares at the time of the Buyout) in an amount to be determined at trial.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands relief in their favor and against the Defendants jointly and severally, as follows:

1.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative  and his counsel as Class Counsel;

2.    Awarding Plaintiff and the Class damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

3.    Ordering Defendants to disgorge their ill-gotten profits and gains;

4.    Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

5.    Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

6.    Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

//
//
//
//
//

**TOWNSEND LEGAL CORP**
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110 Tel: 206-761-2480

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

DATED: January 14, 2025

**OF COUNSEL**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina (admitted *pro hac vice*)
Gina Palermo
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Tel: (504) 455-1400
Email: Michael.Palestina@ksfcounsel.com
        Gina.Palermo@ksfcounsel.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde (admitted *pro hac vice*)
The Empire State Building
350 Fifth Avenue, Suite 4740
New York, NY 10118
Tel: (212) 971-1341
Email: jmonteverde@monteverdelaw.com

*Counsel for Lead Plaintiff Richard
Brender*

Respectfully submitted,

**TOWNSEND LEGAL CORP.**

/s/ *Roger M. Townsend*
Roger M. Townsend
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Tel: 206-761-2480
Roger@townsendlegal.com

*Counsel for Lead Plaintiff Richard
Brender*