UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BARBARA STROUGO,<br><br>                    Plaintiff(s),<br><br>     v.<br><br>REALNETWORKS INC., et al.,<br><br>                    Defendant(s). | CASE NO. C24-0297-KKE<br><br>ORDER DENYING DEFENDANTS'<br>MOTION TO DISMISS |

## I.      INTRODUCTION

This securities class action arises from a merger allegedly based upon a false or misleading proxy statement.  In July 2022, Defendant RealNetworks merged with and into Greater Heights LLC and Greater Heights Acquisition LLC—both of which are affiliates of RealNetworks founder, former CEO, and board chair Defendant Robert Glaser.  Dkt. No. 56 ¶¶ 1, 16.  A Special Committee of RealNetworks' independent directors (composed of Defendant Bruce Jaffe and Defendant Erik Prusch) presented the proposed merger to RealNetworks shareholders for approval.  *Id*. ¶ 53.  Specifically, shareholders were presented with a proxy statement filed with the Securities and Exchange Commission, containing the reasons why the Special Committee and RealNetworks' board of directors recommended approval.  *Id*. ¶ 127.  The shareholders voted to approve the merger agreement, and as a result, the shareholders unaffiliated with Glaser received $0.73 per share of RealNetworks common stock.  *Id*. ¶¶ 16, 18, 139.

ORDER - 1

Plaintiff Richard Brender is now the lead plaintiff in this putative class-action lawsuit against RealNetworks, Glaser, Jaffe, Prusch, and individual former members of RealNetworks' board of directors.  Dkt. No. 46.  His complaint alleges that the proxy statement contains nine false or misleading statements in violation of Section 14(a) and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a).  Dkt. No. 56.  The challenged statements relate to the July 2022 financial projections included in the proxy; Plaintiff contends that earlier financial projections (from January and May 2022) were more accurate, and that RealNetworks fraudulently revised the projections and justified those revisions to result in a lower share price to benefit Glaser, to the detriment of shareholders.  *See generally id*. ¶¶ 18–19, 122.

Defendants filed a motion to dismiss, arguing that Plaintiff lacks standing to bring the suit, and that even if he does have standing, he has failed to state a valid Section 14(a) claim (and that he therefore cannot maintain a Section 20(a) claim).  Dkt. No. 62.[1]  That motion is fully briefed, and the Court held oral argument.  Dkt. No. 78.  Because the Court finds that Plaintiff has standing to bring this suit, and that his allegations sufficiently state valid claims, the Court will deny Defendants' motion.

## II.    BACKGROUND[2]

In 1994, Glaser founded RealNetworks, which pioneered streaming media through its multiple products.  Dkt. No. 56 ¶ 36.  RealNetworks went public via an initial public offering in 1997.  *Id*.  More recently, RealNetworks shifted away from its "legacy businesses" to become an AI-based digital media company.  *Id*.

---

[1] This order refers to the parties' briefing by CM/ECF page number.

[2] For purposes of resolving the motion to dismiss, the Court assumes the truth of the facts alleged in the operative complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

In August 2021, Glaser told shareholders that he expected "double-digit consolidated revenue growth in 2022 and 2023." Dkt. No. 56 ¶ 49. RealNetworks' posted earnings did not match this optimism, however, and some time before the November 2021 board meeting,[3] Glaser informed board members that he was considering a proposal to buy all RealNetworks shares. *Id*. ¶¶ 4, 52. In response to that news, the board formed a Special Committee (a subgroup of RealNetworks board members) that was charged with negotiating with Glaser on the terms of a potential acquisition. *Id*. The Special Committee retained an independent financial advisor (Houlihan Lokey) and independent legal counsel (King & Spalding LLP). *Id*. ¶ 56. ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ *Id*. ¶ 55.

The board met in January 2022, intending to approve a 2022 budget. Dkt. No. 56 ¶ 61. The board considered three-year financial forecasts, including one forecast (a "baseline" forecast) that did not assume any near-term capital investment, as well as a more optimistic "financial forecast" that assumed RealNetworks would receive $15 million in additional capital to fund its growth projects. *Id*. Given the uncertainty of these forecasts, the board approved a budget for only the first half of 2022. *Id*. Yet RealNetworks told its shareholders (via Glaser) that "double digit overall growth" was still expected, in February 2022. *Id*. ¶ 64. RealNetworks did not share the baseline forecast with shareholders. *Id*. ¶ 69.

---

[3] At the annual shareholder meeting later that month, "shareholders representing <u>only</u> 65.15% of RealNetworks common stock entitled to vote actually voted, and of those shares, **only *approximately 37% of the Company's outstanding shares* voted to re-elect Glaser and Jaffe to another Board term.**" Dkt. No. 56 ¶ 51.

ORDER - 3

In April 2022, Glaser informed the Special Committee that he had been unable to find an acceptable financing partner, and thus was terminating his "go private" effort for now. Dkt. No. 56 ¶ 73. Yet on May 6, 2022, Glaser submitted a written preliminary non-binding proposal to acquire RealNetworks for $0.67 per share of common stock not already owned by him. *Id.* ¶ 76. Glaser's proposal notes that he had already formed a special purpose entity to facilitate this buyout (Greater Heights LLC) and was prepared to fully fund the buyout himself. *Id.* Glaser recommended that, to save time and avoid uncertainty, the Special Committee negotiate directly with him rather than attempt to commence a parallel auction process open to other bidders. *Id.*

The Special Committee sought clarification, querying (among other things) whether the buyout would be conditioned upon the approval of a majority in the minority shareholder vote. Dkt. No. 56 ¶ 81. During its May 2022 meeting, the Special Committee's financial advisor indicated that it could not recommend accepting Glaser's offer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ *Id.* ¶ 82. Glaser responded, but declined to express an opinion about the approval requirement. *Id.* ¶ 84. He contacted Jaffe later in the month to express concern about the Special Committee's lack of urgency, warning that time was of the essence given RealNetworks' increasingly challenging financial position. *Id.* ¶ 87.

Glaser and Jaffe prepared an "updated" version of the baseline forecast from January (hereinafter "the May projection") to present at a board meeting in late May 2022. Dkt. No. 56 ¶ 90. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 91. ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 93. The Special Committee considered ▮▮▮▮ ▮▮▮▮ and found that, based on its financial advisor's recommendation, Glaser's offer still

ORDER - 4

undervalued RealNetworks, and counteroffered with $0.90/share. *Id*. ¶¶ 96–97. Glaser counter-proposed $.70/share, and the Special Committee counteroffered $0.80/share. *Id*. ¶ 98. Negotiations continued for weeks, and by mid-July 2022, Glaser was willing to increase his offer to $0.73/share. *Id*. ¶ 111. The Special Committee subsequently recommended that the board approve the merger agreement on those terms. *Id*. ¶ 119. The board members approved a proxy statement recommending that the minority shareholders approve the buyout. *Id*. ¶ 127. The majority of shareholders (not including Glaser's shares) voted to approve the buyout on December 14, 2022, and the merger closed the next week. *Id*. ¶ 18.

In this action, Plaintiff[4] alleges that nine sections of the proxy statement are materially false or misleading:

**Statement I:**

"The Projections were prepared in good faith by Company management based on the best currently available estimates and judgments of Company management with respect to the expected future financial results and condition of the Company at the time the Projections were prepared and speak only as of that time, which was July 22, 2022."

**Statement II:**

"On May 10, 2022, the Special Committee and its advisors held a meeting to discuss the terms of the Proposed Transaction and the process to evaluate it. The Special Committee noted items that they believed required clarification from Mr. Glaser, including: (i) whether the completion of the Proposed Transaction was conditioned on (a) the approval of the Special Committee and/or (b) the approval of a majority of the shares not owned by Mr. Glaser and his affiliates; (ii) whether Mr. Glaser would be interested in selling his shares in a transaction with an alternative party at a higher price, if such a proposal should arise; (iii) whether Mr. Glaser would veto any alternative transaction via his role as the Chairman of the Board's Strategic Transactions Committee; (iv) intended transaction structure and financing sources and (v) what sort of due diligence Mr. Glaser would require. Further, the Special Committee discussed the Company's performance relative to the "baseline" financial forecast provided in January, noting that the Company had materially failed to achieve projected performance since such time. The Special Committee discussed these matters with its advisors and concluded that Company

---

[4] Brender filed the operative complaint on behalf of himself and all others similarly situated. *See* Dkt. Nos. 46, 56.

ORDER - 5

management should prepare an updated financial forecast reflecting Company management's then-existing best estimates of future financial performance to accurately assess any proposal. Finally, in response to a request from the Special Committee, Company management provided the Special Committee and its advisors a summary of all ongoing discussions with third parties about potential strategic transactions so that the Special Committee could evaluate the Proposed Transaction in light of potential alternative transactions."

**Statement III:**

"Beginning on May 10, 2022 and throughout the remainder of the month, representatives of Houlihan Lokey met with Company management in connection with Houlihan Lokey's financial analysis of the Company. Company management discussed with Houlihan Lokey the Company's recent performance, business plan and strategic initiatives, and Houlihan Lokey discussed with Company management the market environment for the various business segments and other matters related to the financial analysis being prepared by Houlihan Lokey, including an updated financial forecast being prepared by the Company's management."

**Statement IV:**

"On May 17, 2022, Mr. Glaser called Mr. Jaffe and reiterated his concern at what he viewed as a lack of urgency on the part of the Special Committee. Mr. Glaser shared his perspective that the Company was in an increasingly financially challenging position and that each day of delay created additional cost and risk that Mr. Glaser would determine that the Proposed Transaction would not be a prudent use of his personal financial resources. Further, the absence of an agreed upon transaction could potentially put the Company at risk. Mr. Glaser acknowledged that the Special Committee would require an updated financial forecast in order to analyze a transaction but requested that the Special Committee engage in negotiations regarding the Proposed Transaction on a parallel path. Mr. Jaffe informed Mr. Glaser that the Special Committee anticipated using the management plan/forecast that would be presented shortly to the Board. Finally, Mr. Glaser reminded Mr. Jaffe that his proposal would expire if the Special Committee and Mr. Glaser had not resolved substantive terms by June 8, 2022."

**Statement V:**

"On May 19, 2022, Mr. Glaser spoke with Mr. Jaffe and informed Mr. Jaffe that Mr. Glaser did not think it was financially prudent to direct his attorneys to begin preparing a draft of the merger agreement prior to receiving a formal response to his proposal. Mr. Jaffe outlined the steps needed to respond, including the need for a final version of Company management's financial forecast and time for the Special Committee's advisors to review such plan and prepare resulting financial analysis. Specifically, Mr. Jaffe and Mr. Glaser agreed that Company management should prioritize completion of its updated financial forecast."

**Statement VI:**

"On May 24, 2022, Mr. Glaser and Mr. Jaffe held a call to discuss the status of the updated management plan and financial forecast to be presented at the upcoming May 26, 2022 meeting of the Board, including Mr. Glaser's position that the forecast would be extremely challenging to achieve, and Mr. Glaser's intention to present his own alternative financial forecast to the Board, in addition to the forecast to be presented by the Company's CFO and its President. Mr. Jaffe communicated the Special Committee's intent to move expeditiously after it had the opportunity to review all relevant materials and consult with its advisors. Accordingly, Mr. Glaser instructed his attorneys to prepare an initial draft of the merger agreement."

**Statement VII:**

"On May 25, 2022, the Special Committee held a meeting at which its advisors from K&S and Houlihan Lokey participated. Houlihan Lokey again advised the Special Committee of its communications with certain shareholders following the announcement of the Proposed Transaction as well as inbound inquiries from potential buyers. Again, the Special Committee and its advisors discussed the low likelihood of consummating any such alternative transactions. The Special Committee also discussed the outlook for the Company's businesses, the updated financial forecast and the preparation by Company management for the Special Committee of an illustrative plan, to the extent feasible, to operate without the need for additional capital, including by separating and/or eliminating lines of business. The Special Committee and its advisors discussed the practical challenges associated with implementing such a plan, including personnel and customer retention, operating complexity and the potential role of the Strategic Transactions Committee. Ultimately the Special Committee concluded that it was not in a position to communicate anything more definitive than that the Special Committee would need the information and the time it determined were required to respond properly and that it was not prepared to approve a transaction based on $0.67 per share as set forth in Mr. Glaser's proposal."

**Statement VIII:**

"On both May 27 and May 29, 2022, the Special Committee held meetings at which its advisors from K&S and Houlihan Lokey participated to discuss the financial forecast prepared by Company management. The Special Committee and its advisors acknowledged that the forecast prepared by management assumed the Company would raise additional capital to fund operations, but that achievement of such forecast was uncertain given that there was no source of such funding identified nor any apparent strategy to raise such capital. Nevertheless, the Special Committee and its advisors concluded that such forecast represented the best estimates of future financial performance available to the Special Committee."

ORDER - 7

**Statement IX:**

"On July 19, 2022, committee meetings of the Board commenced. Representatives of Houlihan Lokey also continued price discussions with representatives of Imperial, during which Houlihan Lokey was informed that Mr. Glaser was willing to increase his proposed price per share to $0.73, but would not go further. Following the completion of committee meetings, the Special Committee met with its advisors to discuss Mr. Glaser's latest proposal as well as a preview of the Company's quarterly results and outlook for the remainder of 2022. In light of the Company's deteriorating performance, the pending loss of key executives and the certainty of a cash offer, the Special Committee concluded that on the terms negotiated and substantially agreed in the current draft of the merger agreement, it would support a transaction at $0.73 per share."

Dkt. No. 56 at 42–47.

Plaintiff requests that this action proceed as a class action, and that he and the other class members receive an award of "damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre- and post-judgment interest." Dkt. No. 56 at 55. Plaintiff also requests that the Court order Defendants to "disgorge their ill-gotten profits and gains[,]" and award Plaintiff and the class costs, fees, and expenses. *Id*.

Defendants filed a motion to dismiss, which is now ripe for resolution. *See* Dkt. No. 62. The Court will deny the motion for the following reasons.

### III.    ANALYSIS

**A.    The Court Denies Defendants' Motion to Dismiss for Lack of Standing.**

Section 14(a) of the Securities Exchange Act of 1934 creates an implied private right of action that may be pursued directly or derivatively. *J. I. Case Co. v. Borak*, 377 U.S. 426, 431–32 (1964), *abrogated on other grounds by Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001); *see also Bradshaw v. Jenkins*, No. C83-771R, 1984 WL 2457, at *2 (W.D. Wash. Aug. 27, 1984) ("A shareholder can bring a direct action under § 14(a), for damages sustained directly by the corporate shareholders, or a derivative action, for damage done the corporation."). Whether a shareholder's

claim is direct or derivative is determined by a court (not the plaintiff) and the determination is governed by the law of the state of incorporation. *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000). Here, RealNetworks is a Washington corporation, and the parties do not dispute that the Court must apply Washington law. Dkt. No. 62 at 12, Dkt. No. 67 at 14.

The Washington State Court of Appeals has defined when a shareholder has standing to bring suit "for wrongs done to a corporation":

> The standing doctrine requires that a plaintiff must have a personal stake in the outcome of the case in order to bring suit. Ordinarily, a shareholder cannot sue for wrongs done to a corporation, because the corporation is a separate entity: the shareholder's interest is viewed as too removed to meet the standing requirements. Even a shareholder who owns all or most of the stock, but who suffers damages only indirectly as a shareholder, cannot sue as an individual. …
>
> There are two often overlapping exceptions to the general rule: (1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder; and (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders.

*Sabey v. Howard Johnson & Co.*, 5 P.3d 730, 735 (Wash. Ct. App. 2000). The special duty must have "its origin in circumstances independent of the stockholder's status as a stockholder." *Hunter v. Knight, Vale & Gregory,* 571 P.2d 212, 216 (Wash. Ct. App. 1977).

Defendants acknowledge that Plaintiff's complaint raises claims brought individually and directly for violation of Section 14(a) of the Securities Exchange Act of 1934, but argue that in reality Plaintiff's claims are derivative. Specifically, Defendants argue that Plaintiff's claims are not direct because "shareholder claims for an alleged reduction in stock value" are considered a "wrong done to a corporation" under Washington law. Dkt. No. 72 at 6 (citing *Sabey*, 5 P.3d at 735[5]).

---

[5] Defendants cite *Sabey* for this proposition, but *Sabey* does not state this conclusion.

ORDER - 9

Plaintiff, however, disagrees both as to the nature of his claims and the teaching of *Sabey*. He contends he is suing "for a wrong done to himself and certain other—but not all—shareholders: soliciting them to approve the unfair Buyout via a materially misleading Proxy." Dkt. No. 67 at 11. Because RealNetworks did not own the shares, but the shareholders did, Plaintiff contends that he is bringing the action to vindicate himself, rather than RealNetworks. *Id*. It is Plaintiff's position that *Sabey*'s general rule does not apply to his claims because he is not seeking to right a wrong done to the corporation. *See, e.g.*, *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 ("[S]hareholders were deprived of the right to a fully informed vote. This claimed injury is independent of any injury to the corporation[.]").

The Court agrees with Plaintiff that *Sabey* does not control. In that case, an individual plaintiff's holding company purchased a corporation that was in the process of phasing out its pension plan and replacing it with a 401(k) and profit-sharing plan. 5 P.3d at 732–33. In pursuing the purchase, the plaintiff relied on representations made by an actuarial firm advising the corporation in its transition away from the pension plan. *Id*. After the purchase was concluded, the pension plan was found to be underfunded in violation of ERISA, and the plaintiff *and* his holding company were notified that they were liable for a shortfall of $3.75 million. *Id*. at 733. The plaintiff settled that claim and then sued the actuarial firm for reimbursement, and the Washington State Court of Appeals found that the plaintiff, as an individual, had standing to bring a direct suit because (1) he had received and relied upon direct representations from the actuarial firm, which owed him a duty; and (2) he incurred personal liability under ERISA and was therefore injured as an individual. *Id*. at 735–36. The court distinguished these circumstances as exceptions to the general rule that a shareholder (the plaintiff) cannot sue for wrongs done to a corporation (the plaintiff's holding company). *Id*.

ORDER - 10

*Sabey* is factually distinguishable from Plaintiff's claims because that case does not involve securities law, or a claim related to a misleading proxy statement.  Moreover, the rule it announces is limited to claims for "wrongs done to a corporation" rather than (as here) injuries suffered directly by shareholders.  More recent authority cited by Defendants can also be distinguished factually and/or legally.  *See, e.g.*, *Woods View II, LLC v. Kitsap County*, 352 P.3d 807, 818 (Wash. Ct. App. 2015) ("Shareholders are usually not allowed to bring an individual direct cause of action for an injury *inflicted upon the corporation or its property by a third party*." (emphasis added)); *Sound Infiniti, Inc. v. Snyder*, 186 P.3d 1107, 1116 (Wash. Ct. App. 2008) (holding that a minority shareholder "may maintain personal damage claims against third parties—such as [majority shareholders] in their individual capacities—for the deprivation of perquisites only if his alleged entitlement to them arises from *something other than his shareholder status*").

Defendants have cited no authority holding that the type of injury Plaintiff asserts in this lawsuit is derivative rather than direct, and the Court is aware of other authority contradicting that proposition.  *See, e.g.*, *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1014 (9th Cir. 2010) (explaining that, with respect to a Washington corporation, "to the extent that [a shareholder] is personally aggrieved [by corporate fraud], his recourse would be to bring a *direct* action against [the corporation]"); *Pipe Fitters Local Union 120 Pension Plan v. McFarlane*, 560 P.3d 863, 871 (Wash. Ct. App. 2024) (holding that where a shareholder pleads fraudulent shareholder/corporate conduct, Washington law permits shareholders to bring "individual claims" for damages); *Schwartzman v. McGavick*, No. C06-1080P, 2007 WL 1174697, at *11 (W.D. Wash. Apr. 19, 2007) (describing a shareholder's Section 14(a) claim for a misleading proxy statement against a Washington corporation as "direct"); *In re Price/Costco S'holder Litig.*, No. C94-1874C, 1995 WL 786631, at *8 (W.D. Wash. Oct. 30, 1995) (finding that a shareholder's Section 14(e) claim based on misleading statements in a cash tender offer is direct because "aggrieved shareholders

ORDER - 11

sue for individual injury allegedly caused by director misrepresentation and fraud, not for injuries to the corporation itself"); SHAREHOLDER LITIGATION IN WASHINGTON STATE § 5.03 ("Merger challenges are typically asserted as direct actions, often by a representative plaintiff seeking to certify a class of shareholders, rather than as derivative actions.").

Because Plaintiff's claims describe an alleged injury suffered by him, not the corporation, the Court finds that he has standing to pursue them via a direct action.

**B.      The Court Denies Defendants' Motion to Dismiss for Failure to State a Claim.**

*1.      Legal Standards*

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court examines the complaint to determine whether, if the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The parties agree[6] that the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies, such that the complaint must allege "enough factual material to create a 'reasonable inference'" of the subjective falsity of the allegedly fraudulent opinion statements. *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1055–57 (9th Cir. 2023).

Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 "disallow the solicitation of a proxy by a statement that contains either (1) false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000). "To state a claim

---

[6] Dkt. No. 62 at 8–9, Dkt. No. 67 at 14.

ORDER - 12

under § 14(a) and Rule 14a–9, a plaintiff must establish that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *N.Y.C. Emps.*, 593 F.3d at 1022 (9th Cir. 2010).

The Private Securities Litigation Reform Act ("PSLRA") sets forth specific elements a plaintiff must plead into order to state a claim under Section 14(a):

> To state a claim under Section 14(a), the PSLRA requires that a plaintiff: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement ... is made on information and belief, ... all facts on which that belief is formed," 15 U.S.C. § 78u–4(b)(1)(B); (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2)(A); and (3) show that "the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages," 15 U.S.C. § 78u–4(b)(4).

*Bailey v. Zendesk, Inc.*, 731 F. Supp. 3d 1109, 1115 (N.D. Cal. 2024).

To meet his burden under the first Section 14(a) element, Plaintiff must allege particularized facts showing why the challenged statements in the proxy "were false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). If a plaintiff alleges that opinion statements in a proxy are material misrepresentations, the plaintiff must identify both the objective and subjective falsity of the misrepresentations. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017). But there are "three different standards for pleading falsity of opinion statements." *Id.* "First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue." *Id.* at 615–16 (*quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015)). "Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff

must allege that 'the supporting fact [the speaker] supplied [is] untrue.'" *Id.* at 616 (quoting *Omnicare*, 575 U.S. at 186). "Third, when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the [defendant's] opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Id.* (quoting *Omnicare*, 575 U.S. at 194).

> 2.    *Plaintiff's Complaint States a Valid Section 14(a) Claim.*

Defendants contend that the "gravamen of Plaintiff's Complaint is that the Proxy misled investors by only disclosing the financial projections prepared in July 2022[,]" without disclosing the earlier January or May forecasts, and that if ███████████████████████ ████████████████████████████████████████ Dkt. No. 62 at 16. Defendants group the challenges to proxy statements into three categories—(1) alleging false statements regarding the validity of the July projections, (2) alleging a misleading reference to "updated" projections, and (3) an omission as to the ███████ of the January and May projections—and argue that none of the challenged statements presents an actionable claim under Section 14(a). *Id.* Defendants also raise an overarching challenge to all of Plaintiff's claims/theories, arguing that the challenged statements in the proxy are forward-looking and therefore all fall under the PSLRA's "safe harbor" provision. *Id.* at 17–19. The Court will address the safe harbor argument first, and then consider whether the allegations as to the specific challenged statements are sufficient to state a valid Section 14(a) claim.

> a.    <u>Plaintiff's Claims Are Not Based on Forward-Looking Statements Covered by the PSLRA Safe Harbor.</u>

"The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *In re Quality Sys., Inc. Sec. Litig.* 865 F.3d 1130, 1142 (9th Cir. 2017). Forward-looking statements

ORDER - 14

covered by the safe harbor include "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (quoting 15 U.S.C. § 78u-5(i)). Defendants argue that each of the nine challenged statements in the proxy are "forward-looking" because when examined as a whole, they relate to future expectations of economic performance and therefore their accuracy cannot be determined until after the projection period. Dkt. No. 62 at 17 (citing *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1048 (N.D. Cal. 2019)).

The Court agrees with Defendants that parts of Plaintiff's challenged statements reference forward-looking projections, but it is not those portions that Plaintiff challenges as false or misleading. Instead, Plaintiff challenges Defendants' representations that the projections were, for example, prepared in "good faith" or represented "updated" or the "best" available estimates. *See, e.g.*, Dkt. No. 56 ¶¶ 128, 132–34, 137. Although there may be some forward-looking components of the challenged statements, courts in the Ninth Circuit focus on whether the plaintiff challenges the forward-looking part of a mixed statement.

> [T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts. Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement. As the First Circuit observed:
>
> > The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement. The safe harbor, we believe, is intended to apply only to allegations of falsehood as to the forward-looking aspects of the statement.

ORDER - 15

*Quality Sys.*, 865 F.3d at 1142 (quoting *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 177, 211–13 (1st Cir. 2005)).  Thus, while Defendants are correct that each of the challenged statements may contain a forward-looking statement, they have not shown that Plaintiff's claims are based on any forward-looking statements covered by the safe harbor.  Accordingly, the safe harbor is not available to protect Defendants from liability for Plaintiff's claims.

b.    <u>Plaintiff Adequately Challenges the Proxy's Statement that the July Projections Were Prepared in Good Faith and Reflected Management's Reasonable Best Estimates.</u>

Defendants argue that Plaintiff has not pleaded facts sufficient to support his claim with respect to Statement I (Dkt. No. 56 ¶¶ 128–30): that it was false or misleading to state that the July projections were "prepared in good faith" and "based on the best currently available estimates." Dkt. No. 62 at 21.  Defendants accuse Plaintiff of "jump[ing] to the conclusion that the statements in the Proxy regarding the validity of the July Projections are false." *Id*.  According to Defendants, because Plaintiff has failed to allege facts showing that the reasons provided in the proxy to justify the July projections are false, he has not pleaded objective falsity.  *Id*. at 22–23.  Defendants contend that when read as a whole, the proxy statement adequately discloses the process by which the July projections were created and the reasons why the January and May forecasts were revised. *See* Dkt. No. 64-1 at 27, 30–31.[7]  It is therefore Defendants' position that because Plaintiff has not shown that the reasons for the revisions were false—even if Plaintiff's allegations *could* show that Glaser had a motive to revise the prior projections downward—Plaintiff's allegations are insufficient.

---

[7] Defendants submitted the entire proxy statement along with their motion to dismiss, and Plaintiff agreed at oral argument that it is appropriate for the Court to take judicial notice of it as a public document filed with the SEC. *See Lawson v. Klondex Mines Ltd.*, 450 F. Supp. 3d 1057, 1070 (D. Nev. 2020) ("The court may properly 'take judicial notice of all public disclosure documents which are either required to be filed with the SEC or are actually filed with the SEC.'" (quoting *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 293 (3d Cir. 1999) (Nygaard, J., concurring))).

ORDER - 16

The Court disagrees.  "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (citation modified).  Here, Plaintiff's complaint alleges that, contrary to the proxy's reference to the preparation of the July 2022 projections in good faith, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ tailored the projections to the price he would be paying for RealNetworks.  *See* Dkt. No. 56 ¶¶ 129–30.  The complaint also contrasts the ███████████████ leading to the" July projections with Glaser's "numerous optimistic statements about [RealNetworks'] prospects[.]"  *Id*.

These allegations support an inference that the proxy's description of the July 2022 projections as "prepared in good faith" and the "best currently available estimates and judgments of Company management" were subjectively and objectively false, because Plaintiff alleges that the individual Defendants did not prepare the projections in good faith and the projections were objectively inconsistent with other reports of RealNetworks' position.  These allegations are therefore sufficient to withstand a motion to dismiss.  *See, e.g.*, *Brown v. Papa Murphy's Holdings, Inc.*, C19-5514-BHS-JRC, 2021 WL 1574446, at *2 (W.D. Wash. Apr. 22, 2021); *Karri v. Oclaro, Inc.*, No. 18-cv-03435-JD, 2020 WL 5982097, at *6 (N.D. Cal. Oct. 8, 2020).  Although Defendants may show at trial that the reductions leading to the July projections were in fact justified, a motion to dismiss is not the proper point in the litigation to resolve this argument.  *See, e.g.*, *Papa Murphy's*, 2021 WL 1574446, at *2 ("Defendants will have the opportunity to contest the validity of Brown's claims at a later stage in the litigation.").

ORDER - 17

   c.   Plaintiff Adequately Alleges the "Updated Financial Forecast" Referenced in the Proxy is Misleading and the Omission of the January Forecast and the May Forecast Further Rendered the Proxy Misleading.

Defendants contend that Plaintiff cannot complain that the proxy referenced an "updated financial forecast" without acknowledging that it was a ██████████████████████████ ███████████████████████ because "update" is a neutral term and the proxy as a whole provides the context from which it is obvious that the "update" was a reduction. Dkt. No. 62 at 26–28.

That "update" is a neutral term is Plaintiff's point: without providing any means of comparing the January projection to the later May and July projections, Plaintiff contends that the proxy omitted information critical to the shareholders' ability to appreciate the reason for or the extent of the "update." Dkt. No. 67 at 24. Plaintiff contends that he has adequately pleaded that the proxy's reference to a generic "update" is misleading, ██████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████ *See* Dkt. No. 56 ¶ 134.

This argument is persuasive. *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead[.]"). Plaintiff has adequately alleged that the proxy's reference to the July projections as "updated" concealed the ██████████ ████████████████████████████ prevented the shareholders from assessing whether the ████████████████████████████. Whether, as Defendants argue (*e.g.*, Dkt. No. 72 at 14), the shareholders could have read the proxy as a whole to discern that the July projections represented reductions is not appropriate to resolve as a matter of law on a motion to dismiss. *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("Only if the adequacy of the

ORDER - 18

disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." (citation modified)).

### d.     Plaintiff Adequately Alleges That Defendants Acted Negligently.

The requisite level of culpability for a Section 14(a) claim is negligence. *Assad v. Mines Mgmt., Inc.*, No. 2:16-cv-00256, 2016 WL 4611573, at *3 (E.D. Wash. Sep. 2, 2016) (citing *SEC v. Das*, 723 F.3d 943, 954 (8th Cir. 2013)); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682–83 (9th Cir. 2005). A plaintiff must plead facts supporting a strong inference[8] of negligence as to each defendant, rather than pleading as to unspecified defendants collectively. *See Azar v. Blount Int'l*, No. 3:16-cv-483-SI, 2017 WL 1055966, at *9 (D. Or. Mar. 20, 2017) (citing *Knollenberg*, 152 F. App'x at 683)). Defendants contend that Plaintiff failed to plead with specificity the negligence of each Defendant. Dkt. No. 62 at 29–30.

The complaint alleges that Glaser took actions to coerce the Special Committee into recommending approval of the merger, and that RealNetworks' board and the Special Committee were aware of Glaser's purposes and conflicts of interest. *See, e.g.*, Dkt. No. 56 ¶¶ 122–26, 160–63. The complaint also alleges that each individual Defendant authorized the filing of the proxy with the SEC, and that they were each obligated to carefully review the proxy prior to its filing and dissemination to the Company's shareholders. *Id.* ¶ 127. Because (as explained earlier), the complaint adequately alleges that the proxy contains false/misleading statements that were discussed openly at board meetings, these allegations as to each board member's obligation to review the proxy prior to authorizing its filing are sufficient to support a strong inference of negligence as to each individual board member. *See Azar*, 2017 WL 1055966, at *10 ("[T]he

---

[8] At oral argument, Plaintiff's counsel explained why he reads *Finjan* to eliminate the "strong inference" standard for Section 14(a) claims, but cited no authority indicating that any court shared his view. The Court need not resolve this issue because, as explained herein, Plaintiff's allegations satisfy the "strong inference" standard.

ORDER - 19

Amended Complaint here sufficiently alleges that the Proxy was materially misleading because it omitted the September Projections and also alleges that Defendants prepared, reviewed, or disseminated the Proxy. It sufficiently alleges, with particularly, a strong inference of negligence."). And Plaintiff also alleges that RealNetworks is liable for violations of the Securities Exchange Act "as the issuing entity of the Proxy[.]" Dkt. No. 56 ¶164.

Defendants questioned at oral argument whether any board member other than Glaser and perhaps Jaffe would have an incentive to undervalue RealNetworks' projections, but again, this issue cannot be resolved on a motion to dismiss. Because Plaintiff's complaint adequately alleges that all board members were on notice of the false or misleading statements in the proxy, and yet approved its dissemination via RealNetworks, the Court finds that the complaint plausibly alleges the negligence of all Defendants.

e.      Plaintiff Adequately Alleges Loss Causation.

To plead loss causation, a plaintiff must allege facts showing a connection between the proxy misstatements and an actual economic harm. *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Defendants contend that Plaintiff has failed to adequately plead loss causation because he offers only speculative allegations that the merger consideration was inadequate without alleging specifically that the value of his shares exceeded the value attributed to them in the merger. Dkt. No. 72 at 17.

Plaintiff has alleged that the shareholders were misled into approving a merger agreement with consideration that is discounted as compared to other valuations (Dkt. No. 56 ¶¶ 139–48), and these allegations are sufficient to plead loss causation. Whether Plaintiff will ultimately be able to prove his damages is a question for another day. *See Gilead*, 536 F.3d at 1057 (finding that loss causation is generally a matter of proof at trial, and "so long as the plaintiff alleges facts to

ORDER - 20

support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds").

Because—for all of these reasons—the Court finds that Plaintiff has adequately pleaded his Section 14(a) claim, the Court will not dismiss his Section 20(a) for lack of a predicate claim. *See* Dkt. No. 67 at 31. A Section 20(a) claim requires that a plaintiff must allege both "a primary violation of the federal securities law" (*i.e.*, a Section 14(a) claim) and "that the defendant exercised actual power or control over the primary violator." *Dearborn Heights*, 856 F.3d at 623 (citation modified). The parties agree that these claims rise and fall together. *See* Dkt. No. 62 at 33. Based on the Court's assessment of the Section 14(a) claim, it finds that Plaintiff's claims rise together.

## IV.   CONCLUSION

For these reasons, the Court DENIES Defendants' motion to dismiss. Dkt. No. 62.

This order is provisionally filed under seal because the parties' briefing and the operative complaint are sealed. The parties are directed to meet and confer as to whether this order should remain under seal and, if so, what redactions are appropriate for a public version. The parties shall file a joint status report on this issue, attaching a proposed redacted version if necessary, no later than January 20, 2026.

Dated this 13th day of January, 2026.

Kymberly K. Evanson
United States District Judge

ORDER - 21